# EXHIBIT B

**State Court Record**

**Attachments:**

1. **Supplemental Cover Sheet**
2. **Recent State Court Docket**
3. **Third Amended Complaint**
4. **Service Documents**
5. **Remainder of the State Court Record**
6. **Verification of Sherle R. Flaggman**

# Attachment 1

**Supplemental Civil Cover Sheet**

# SUPPLEMENTAL CIVIL COVER SHEET
# FOR CASES REMOVED FROM ANOTHER JURISDICTION

This form must be attached to the Civil Cover Sheet at the time
the case is filed in the United States District Clerk's Office

Additional sheets may be used as necessary.

1. **Style of the Case:**

Please include all Plaintiff(s), Defendant(s), Intervenor(s), Counterclaimant(s), Crossclaimant(s) and Third Party Claimant(s) still remaining in the case and indicate their party type. Also, please list the attorney(s) of record for each party named and include their bar number, firm name, correct mailing address, and phone number (including area code).

| Party | Party Type | Attorney(s) |
|---|---|---|
| Kayla Melton, surviving wife of Pedro Colazo-Villa, and on behalf of Pedro Agustin Colazon, Isaac Colazo, Alisco Ofelia Jalisciense Colazo-Villa and Vincent Aylan Colazo, surviving children of Pedro Colazo-Villa | Plaintiffs | David Degnan (027422)<br>Mark W. Horne (029449)<br>DEGNAN LAW GROUP<br>4105 N. 20th St., Ste. 220<br>Phoenix, AZ 85016<br>602-266-0531 |
| Maricopa County, Maricopa County Sheriff's Office | Defendants | Sherle R. Flaggman (019079)<br>Maxine S. Mak (031158)<br>Maricopa County Attorney's Office<br>Civil Services Division<br>225 W. Madison<br>Phoenix, AZ 85003<br>602-506-8541 |
| | | |

2. **Jury Demand:**

Was a Jury Demand made in another jurisdiction?   Yes ⬤   No ◯

If "Yes," by which party and on what date?

Plaintiff _____    05/05/2020

3. **Answer:**

Was an Answer made in another jurisdiction?   Yes ◯   No ⬤

If "Yes," by which party and on what date?

_____    _____

**4.** **Served Parties:**

The following parties have been served at the time this case was removed:

| Party | Date Served | Method of Service |
|---|---|---|
| Maricopa County | 07/10/2020 | Personal Service |
| | | |
| | | |

**5.** **Unserved Parties:**

The following parties have not been served at the time this case was removed:

| Party | Reason Not Served |
|---|---|
| Maricopa County Sheriff's Office | Unknown |
| | |
| | |

**6.** **Nonsuited, Dismissed or Terminated Parties:**

Please indicate changes from the style of the papers from another jurisdiction and the reason for the change:

| Party | Reason for Change |
|---|---|
| N/A | N/A |
| | |
| | |

**7.** **Claims of the Parties:**

The filing party submits the following summary of the remaining claims of each party in this litigation:

| Party | Claims |
|---|---|
| Maricopa County and Maricopa County Sheriff's Office | 42 U.S.C.1983; violation of 4th &14th amendments; violation of due process |
| | |
| | |

**Pursuant to 28 USC § 1446(a) a copy of all process, pleadings, and orders served in another jurisdiction (State Court) shall be filed with this removal.**

# Attachment 2

**Recent State Court Docket**

 ❯ Docket

# Civil Court Case Information – Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2020-005416 | Judge: | Coury, Christopher |
| File Date: | 5/5/2020 | Location: | Downtown |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Kayla Melton | Plaintiff | Female | Mark Horne |
| Pedro Agustin Colazo | In The Matter Of (IMO) | Male | Pro Per |
| Isaac Colazo | In The Matter Of (IMO) | Male | Pro Per |
| Alisco Ofelia Jalisciense Colazo-Villa | In The Matter Of (IMO) | Male | Pro Per |
| Vincent Aylan Colazo | In The Matter Of (IMO) | Male | Pro Per |
| Maricopa County | Defendant | | Sherle Flaggman |
| Maricopa County Sheriffs Office | Defendant | | Sherle Flaggman |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 1/8/2021 | AMC - Amended Complaint | 1/11/2021 | |
| **NOTE:** Third Amended Complaint | | | |
| 12/10/2020 | 019 - ME: Ruling | 12/10/2020 | |
| 12/4/2020 | 019 - ME: Ruling | 12/4/2020 | |
| 11/30/2020 | REL - Reply | 12/2/2020 | |
| **NOTE:** PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT | | | |
| 11/23/2020 | 025 - ME: Case Status Minute Entry | 11/23/2020 | |
| 11/13/2020 | REL - Reply | 11/17/2020 | |
| **NOTE:** DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT | | | |
| 11/13/2020 | RES - Response | 11/17/2020 | |
| **NOTE:** DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT | | | |
| 10/30/2020 | MTA - Motion To Amend | 11/3/2020 | |
| **NOTE:** Motion for Leave to File Second Amended Complaint | | | |
| 10/30/2020 | RES - Response | 11/3/2020 | |
| **NOTE:** Response to Defendants' Motion to Dismiss PLAINTIFF'S First Amended Complaint | | | |
| 10/19/2020 | NOT - Notice | 10/21/2020 | |
| **NOTE:** Notice of Stipulation for First Extension on Plaintiffs' Deadline to Respond to Motion to Dismiss | | | |
| 9/28/2020 | MTD - Motion To Dismiss | 9/29/2020 | |
| **NOTE:** Defendants' Motion To Dismiss Plaintiff's First Amended Complaint | | | |
| 8/28/2020 | AMC - Amended Complaint | 8/31/2020 | |
| **NOTE:** Amended Complaint | | | |
| 7/30/2020 | ORD - Order | 7/30/2020 | |
| **NOTE:** RE: STIPULATION FOR PLAINTIFF TO FILE A FIRST AMENDED COMPLAINT AND EXTENDING DEADLINE FOR DEFENDANTS RESPONSIVE PLEADING | | | |
| 7/28/2020 | STP - Stipulation | 7/28/2020 | |
| **NOTE:** STIPULATION FOR PLAINTIFF TO FILE A FIRST AMENDED COMPLAINT AND EXTENDING DEADLINE FOR DEFENDANT'S RESPONSIVE PLEADING | | | |
| 7/17/2020 | AFS - Affidavit Of Service | 7/21/2020 | |
| **NOTE:** MARICOPA COUNTY | | | |
| 7/17/2020 | SUM - Summons | 7/20/2020 | |
| 5/5/2020 | COM - Complaint | 5/7/2020 | |
| 5/5/2020 | CCN - Cert Arbitration - Not Subject | 5/7/2020 | |
| 5/5/2020 | CSH - Coversheet | 5/7/2020 | |

**Case Calendar**

There are no calendar events on file

**Judgments**

There are no judgments on file

# Attachment 3

**Third Amended Complaint**

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA, <br><br> Plaintiffs, <br> vs. <br><br> MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X; <br><br> Defendants. | No. CV2020-005416 <br><br> **THIRD AMENDED COMPLAINT** <br><br> (Tort: Non-Motor Vehicle; Wrongful Death) <br><br> (Tier 3) |

COMES NOW, Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), for their Complaint against Defendants MAROCPA COUNTY and MARICOPA COUNTY SHERIFF'S OFFICE,

hereby allege as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiffs Kayla Melton, Pedro Agustin Colazo, Isaac Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa, are residents of Maricopa County, Arizona, and they are the surviving wife and children of the deceased Pedro Colazo-Villa ("Decedent" or "Colazo-Villa"). Plaintiff KAYLA MELTON brings this action on behalf of herself, as the surviving wife of Decedent, and the other foregoing statutory beneficiaries, who are the surviving children of Decedent, pursuant to A.R.S. § 12-612.

2.     Pursuant to A.R.S. § 12-611 et seq., Plaintiffs also bring this action for emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages caused by the suffering and death of Decedent.

3.     Defendant Maricopa County is a political subdivision of the State of Arizona.

4.     Defendant The Maricopa County Sheriff's Office ("MCSO") is a law enforcement agency for Maricopa County.

5.     Maricopa County and the Maricopa County Sheriff's Office are collectively referred to herein as "Defendants" or "MCSO".

6.     The actions of MCSO and its officers, sergeants and agents constitute the actions of Maricopa County and Maricopa County is liable for the actions of such officers, sergeants and agents via *respondeat superior* and other law.

7.     At all relevant times, Sergeants Jeffrey D. Cadle, Robert Lawrence Normile and Manuel A. Madrigal ("MCSO Deputies") were agents and employees of MCSO and Maricopa County and were at all times acting within the course and scope of their employment. Defendants Maricopa County and MCSO and are vicariously liable for MCSO Deputies' actions under the theory of *respondeat superior*.

8.     John and Jane Does 1 through 10 and Black and White Companies I through X (collectively "Doe Defendants") are fictitious names used to identify Defendants whose identities are currently unknown to Plaintiffs, who together with named Defendants contributed to causing the harms, losses and damages described in this Complaint. Plaintiffs

will amend their Complaint when the true names of those Defendants become known.

9.      Defendant Maricopa County, Defendant MCSO, the MSCO Deputies and John and Jane Does are collectively referred to herein as "Defendants."

10.      Jurisdiction and venue are proper as the events giving rise to Plaintiffs' Complaint occurred in Maricopa County, Arizona and the amount in controversy exceeds the minimal jurisdictional requirements of this Court.

11.      The amount of Plaintiffs' damages qualifies this matter as a Tier 3 case.

## GENERAL ALLEGATIONS

12.      Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

13.      On or about May 6, 2019, Pedro Colazo-Villa was shot and killed outside his home by MCSO's Responding Deputies.

14.      Shortly prior to the shooting death of Mr. Colazo-Villa, the Responding Deputies arrived at 10038 E. Akron Street, Mesa, Arizona 85207 ("Incident Location") in response to a 911 call in which the caller claimed that Mr. Colazo-Villa stated that he would burn down the Incident Location.

15.      On information and belief, the Responding Deputies had information that Mr. Colazo-Villa had a previous incident with MCSO in which he signaled his intent to commit "suicide by cop."

16.      On information and belief, the Responding Deputies had information that this previous incident occurred on or around November 19, 2018, during which time Mr. Colazo-Villa stated that the officers will be back to "put him down."

17.      Additionally, on information and belief, the Responding Deputies had information that Mr. Colazo-Villa "tried…to kill himself before by slitting his wrist."

18.      Through media reports, it appears that MSCO claims that Responding Deputies arrived at the Incident Location just as Mr. Colazo-Villa was exiting his vehicle.   The Responding Deputies allege that Mr. Colazo-Villa was armed with a rifle and so Responding Deputies immediately took to defensive positions.

19.      Although he posed no immediate threat of harm, Responding Deputies fired

3

their weapons at Mr. Colazo-Villa, immediately injuring him.

20. Upon being shot by the Responding Deputies, Mr. Colazo-Villa was incapacitated and, therefore, posed no threat to MCSO Deputies or any third parties. Instead of attempting to provide assistance and care to Mr. Colazo-Villa, the Responding Deputies continued to wait in their defensive positions.

21. Mr. Colazo-Villa was completely incapacitated and was attempting to raise his hand and arm while he was laying down on the street in front of the Incident Location. In response to Mr. Colazo-Villa raising his arm and hand, the Responding Deputies fired their weapons toward Mr. Colazo-Villa and those shots ultimately proved fatal. It took several more minutes before any of the Responding Deputies approached Mr. Colazo-Villa after he was shot for the second time and this additional time prevented Mr. Colazo-Villa from receiving any medical attention that could have potentially saved his life. Mr. Colazo-Villa was pronounced dead upon his arrival at the hospital.

<u>COUNT IV</u>
*(Wrongful Death)*

22. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

23. Defendants' enactment and use of a municipal/county policy, custom, decision, ordinance, regulation, or practice caused the death of Mr. Colazo-Villa.

24. Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

25. At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

26. At the time of the shooting, Decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

27. At the time of the shooting, Plaintiffs had a clearly established right under the

DEGNAN LAW GROUP

4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

Constitution against the loss of their familial relationship with Decedent through the objectively unreasonable use of force.

28. As a direct and proximate result of Defendants' use of force and failure to provide adequate healthcare to Decedent after the shooting, Plaintiffs suffered the loss of their familial relationship with Decedent in violation of the Fourth Amendment.

29. Defendants enacted a municipal/county custom, policy, decision, ordinance, regulation, or practice to respond to individuals such as Decedent with deadly force instead of preserving the individual's life through alternative means of de-escalation.

30. This custom, policy, decision, ordinance, regulation, or practice is deficient because it leads to the unnecessary deaths of individuals attempting "suicide by cop" or who do not pose a threat necessitating lethal force.

31. This custom, policy, decision, ordinance, regulation, or practice caused the deprivation of Plaintiffs' federally protected Constitutional rights because it caused Decedent's death.

32. At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

33. Defendants' actions in following this municipal/county custom, policy, decision, ordinance, regulation, or practice were done with willful indifference, intentionally, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected Constitutional rights.

34. As a consequence of Decedent's death, Plaintiffs suffered pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced for the rest of their lives.

35. Because the municipal/county custom, policy, decision, ordinance, regulation, or practice was likely to cause the death of individuals, Plaintiffs' harms were obviously likely to occur from Defendants' following the policy.

36. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Kayla Melton suffered the death of her beloved husband

and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

37.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

38.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

39.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT V

### (42 U.S.C. § 1983 Violation of Due Process Rights and Fourth Amendment Rights)

40.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

41.     Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

42.     At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

43.     At the time of the shooting, Decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

DEGNANLAW G|DG|

4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

44.     The officers' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Decedent's Fourth Amendment rights.

45.     The officers unlawfully seized Decedent by means of objectively unreasonable, excessive and shocking physical force, thereby unreasonably restraining Decedent of his freedom.

46.     The force used constituted deadly force in that it caused Decedent's death.

47.     None of the officers took reasonable steps to protect Decedent from the unreasonable excessive force of other responding officers. They are each therefore liable for the injuries and damages resulting from the unreasonable force of each other officer.

48.     Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Decedent's federally protected constitutional rights.

49.     They did so with shocking and willful indifference to Decedent's rights and their conscious awareness that they would cause Decedent's death.

50.     Defendants' acts and omissions intentionally deprived Decedent of his constitutional rights and caused him damages.

51.     Defendants enacted a municipal/county custom, policy, decision, ordinance, regulation, or practice to respond to individuals such as Decedent with deadly force instead of preserving the individual's life through alternative means of de-escalation.

52.     This custom, policy, decision, ordinance, regulation, or practice is deficient because it leads to the unnecessary deaths of individuals attempting "suicide by cop" or who do not pose a threat necessitating lethal force.

53.     This custom, policy decision, ordinance, regulation, or practice caused the deprivation of Plaintiffs' federally protected Constitutional rights because it caused Decedent's death.

54.     At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

55.     Defendants' actions in following this municipal/county custom, policy,

7

decision, ordinance, regulation, or practice were done with willful indifference, intentionally, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected Constitutional rights.

56.    As a direct and proximate result of Defendants' unlawful conduct, Decedent has suffered the loss of his life, and Plaintiffs have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

57.    Because the municipal/county custom, policy, decision, ordinance, regulation, or practice was likely to cause the death of individuals, Plaintiffs' harms were obviously likely to occur from Defendants' following the policy.

58.    Also as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of Decedent's future earnings, in an amount to be determined at trial.

59.    Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VI

### *(42 U.S.C. § 1983 Violation of Fourteenth Amendment Rights)*

60.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

61.    Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

62.    At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

63.    At the time of the shooting, Decedent had a clearly established right under the Fourteenth Amendment to receive adequate healthcare while in custody.

64.    The officers' actions and omissions, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Decedent's Fourteenth Amendment rights.

8

65. After Defendants shot Decedent, Decedent had a serious medical need that, if not treated with immediate medical attention, would result in death.

66. The officers unlawfully failed to provide necessary medical attention to Decedent after shooting him, thereby subjecting him to cruel and unusual punishment while in police custody.

67. None of the officers took reasonable steps to correct the actions and omissions of other responding officers. They are each therefore liable for the injuries and damages resulting from the actions and omissions of each other officer.

68. Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Decedent's federally protected constitutional rights.

69. They did so with shocking and willful indifference to Decedent's rights and their conscious awareness that they would cause Decedent's death.

70. Defendants' acts and omissions intentionally deprived Decedent of his constitutional rights and caused him damages.

71. At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

72. As a direct and proximate result of Defendants' unlawful conduct, Decedent has suffered the loss of his life, and Plaintiffs have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

73. Also as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of Decedent's future earnings, in an amount to be determined at trial.

74. Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VII

### *(42 U.S.C. § 1983 Violation of Substantive Due Process Rights)*

75. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

9

76. Plaintiffs in this action are citizens of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

77. At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

78. At the time of the shooting, Plaintiffs had a clearly established right under the Constitution to substantive due process against the loss of their familial relationship with Decedent.

79. The officers' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Plaintiffs' substantive due process rights.

80. The officers unlawfully killed Decedent by means of objectively unreasonable, excessive and shocking physical force, thereby unreasonably depriving Plaintiffs of their familial relationship with Decedent.

81. Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected Constitutional rights.

82. They did so with shocking and willful indifference to Plaintiffs' rights and their conscious awareness that they would cause Decedent's death.

83. Defendants' acts and omissions intentionally deprived Plaintiffs of their Constitutional rights and caused them damages.

84. Defendants enacted a municipal/county custom, policy, decision, ordinance, regulation, or practice to respond to individuals such as Decedent with deadly force instead of preserving the individual's life through alternative means of de-escalation.

85. This custom, policy, decision, ordinance, regulation, or practice is deficient because it leads to the unnecessary deaths of individuals attempting "suicide by cop" or who do not pose a threat necessitating lethal force.

86. This custom, policy, decision, ordinance, regulation, or practice caused the deprivation of Plaintiffs' federally protected Constitutional rights because it caused

Decedent's death.

87.	At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

88.	Defendants' actions in following this municipal/county custom, policy, decision, ordinance, regulation, or practice were done with willful indifference, intentionally, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected Constitutional rights.

89.	As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of their familial relationship with Decedent, and have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

90.	Because the municipal/county custom, policy, decision, ordinance, regulation, or practice was likely to cause the death of individuals, Plaintiffs' harms were obviously likely to occur from Defendants' following the policy.

91.	Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## **DEMAND FOR JURY TRIAL**

92.	Plaintiffs demand a trial by jury on all issues triable of right by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants as follows:

A.	For Plaintiffs' general and special damages including but not limited to emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages;

B.	For Plaintiffs' costs incurred in pursuing these claims;

C.	For pre- and post-judgment interest to the extent provided by law;

D.	For such other further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 8th day of January, 2021.

**DEGNAN LAW GROUP**

/s/ Mark Horne
David Degnan, Esq.
Mark Horne, Esq.
*Attorneys for Plaintiffs*

ORIGINAL of the foregoing e-filed
this 30th day of October 2020, with copy
emailed to:

Sherle R. Flaggman, DCA
Maxine S. Mak, DCA
**Maricopa County Attorney's Office**
*Civil Services Division*
225 W. Madison Street
Phoenix, AZ 85003
flaggmas@mcao.maricopa.gov
makm@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
*Attorneys for Defendants*

/s/ Heather Stamps

# Attachment 4

**Service Documents**



CLERK OF THE
SUPERIOR COURT
FILED
A. SUTTON, DEP

2020 JUL 17 AM 11: 28

1  **DEGNAN LAW GROUP**
2  David Degnan (AZ SBN 027422)
   Mark W. Horne (AZ SBN 029449)
3  4105 N. 20th Street, Suite 220
   Phoenix, Arizona 85016
4  (602) 266-0531
5  d.degnan@degnanlawaz.com
   m.horne@degnanlawaz.com
6  *Attorneys for Plaintiffs*

7           **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

8              **IN AND FOR THE COUNTY OF MARICOPA**

9  KAYLA MELTON, surviving wife of      No.   CV2020-005416
10 PEDRO COLAZO-VILLA, and on behalf
   of PEDRO AGUSTIN COLAZO, ISAAC       **SUMMONS**
11 COLAZO,       ALISCO      OFELIA
   JALISCIENSE   COLAZO-VILLA   and
12 VINCENT AYLAN COLAZO, surviving
13 children of PEDRO COLAZO-VILLA,

14              Plaintiffs,
15 vs.

16 MARICOPA   COUNTY,   a   political
17 subdivision of the State of Arizona; JOHN
   and JANE DOES 1 through 10; BLACK
18 and WHITE COMPANIES I through X;

19              Defendants.
20

*If you would like legal advice from a lawyer, contact the Lawyer Referral Service at 602-257-4434 or www.maricopalawyers.org Sponsored by the Maricopa County Bar Association*

21 ┌─────────────────────────────────────────────────────────────┐
22 │ **WARNING: This is an official document from the Court that affects your rights. Read** │
   │ **carefully. If you do not understand it, contact a lawyer for help.** │
23 └─────────────────────────────────────────────────────────────┘

24 **FROM THE STATE OF ARIZONA TO:**

25              **MARICOPA COUNTY**

26 1.   A lawsuit has been filed against you. A copy of this lawsuit and other court papers
        are being served on you with this summons.
27

28

1

DEGNAN LAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

2.  If you do not want a judgment or order taken against you without your input, you must file an "Answer" or a "Response" in writing with the court, and pay the filing fee. If you do not file an "Answer" or "Response" the other party may be given the relief requested in his/her Petition or Complaint. To file your "Answer" or "Response" take, or send, the "Answer" or "Response" to the:

- Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 OR
- Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 OR
- Office of the Clerk of Superior Court, 222 East Javelina Avenue, Mesa, Arizona 85210-6201 OR
- Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.

Mail a copy of your "Response" or "Answer" to the other party at the address listed on the top of this Summons.

3.  If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served. If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address listed at the top of the preceding page, from the Clerk of the Superior Court's Customer Service Center at:

- 601 West Jackson, Phoenix, Arizona 85003
- 18380 North 40th Street, Phoenix, Arizona 85032
- 222 East Javelina Avenue, Mesa, Arizona 85210
- 14264 West Tierra Buena Lane, Surprise, Arizona 85374

5.  Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least three (3) judicial days before your scheduled court date.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED THIS DATE:     MAY 0 5 2020     JEFF FINE, CLERK

Clerk of the Superior Court

By Deputy Clerk: _____

S. Olmos



# Attachment 5

**Remainder of the State Court Record**

JEFF FINE
Clerk of the Superior Court
By Sonja Olmos, Deputy
Date 05/05/2020 Time 16:35:38
Description                          Amount
————— CASE# CV2020-005416 —————
CIVIL NEW COMPLAINT              333.00
———————————————————————
TOTAL AMOUNT                       333.00
Receipt# 27772497

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA, <br><br> Plaintiffs, <br><br> vs. <br><br> MARICOPA COUNTY, a political subdivision of the State of Arizona; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X; <br><br> Defendants. | No.  CV2020-005416 <br><br> **COMPLAINT** <br><br> (Tort: Non-Motor Vehicle; Wrongful Death) <br><br> (Tier 3) |

*(sidebar)* DG DEGNAN LAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

COMES NOW, Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), for their Complaint against Defendant MAROCPA COUNTY, hereby allege as follows:

**PARTIES, JURISDICTION AND VENUE**

///

1

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

1.    Plaintiffs Kayla Melton, Pedro Agustin Colazo, Isaac Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa, are residents of Maricopa County, Arizona, and they are the surviving wife and children of the deceased Pedro Colazo-Villa ("Decedent" or "Colazo-Villa"). Plaintiff KAYLA MELTON brings this action on behalf of herself, as the surviving wife of Decedent, and the other foregoing statutory beneficiaries, who are the surviving children of Decedent, pursuant to A.R.S. § 12-612.

2.    Pursuant to A.R.S. § 12-611 et seq., Plaintiffs also bring this action for emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages caused by the suffering and death of Decedent.

3.    Defendant Maricopa County is a political subdivision of the State of Arizona.

4.    The Maricopa County Sheriff's Office ("MCSO") is a law enforcement agency for Maricopa County and is non-jural entity that is not subject to suit in its own name.

5.    The actions of MCSO and its officers, sergeants and agents constitute the actions of Maricopa County and Maricopa County is liable for the actions of such officers, sergeants and agents via *respondeat superior* and other law.

6.    At all relevant times, Sergeants Jeffrey D. Cadle, Robert Lawrence Normile and Manuel A. Madrigal ("MCSO Deputies") were agents and employees of MCSO and Maricopa County and were at all times acting within the course and scope of their employment. Defendants Maricopa County and MCSO and are vicariously liable for MCSO Deputies' actions under the theory of *respondeat superior*.

7.    John and Jane Does 1 through 10 and Black and White Companies I through X (collectively "Doe Defendants") are fictitious names used to identify Defendants whose identities are currently unknown to Plaintiffs, who together with named Defendants contributed to causing the harms, losses and damages described in this Complaint. Plaintiffs will amend their Complaint when the true names of those Defendants become known.

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

8.     Defendant Maricopa County, MCSO, the MSCO Deputies and John and Jane Does are collectively referred to herein as "Defendants."

9.     Jurisdiction and venue are proper as the events giving rise to Plaintiffs' Complaint occurred in Maricopa County, Arizona and the amount in controversy exceeds the minimal jurisdictional requirements of this Court.

10.    The amount of Plaintiffs' damages qualifies this matter as a Tier 3 case.

## GENERAL ALLEGATIONS

11.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

12.    On or about May 6, 2019, Pedro Colazo-Villa was shot and killed outside his home by MCSO's Responding Deputies.

13.    Shortly prior to the shooting death of Mr. Colazo-Villa, the Responding Deputies arrived at 10038 E. Akron Street, Mesa, Arizona 85207 ("Incident Location") in response to a 911 call in which the caller claimed that Mr. Colazo-Villa stated that he would burn down the Incident Location.

14.    Through media reports, it appears that MSCO claims that Responding Deputies arrived at the Incident Location just as Mr. Colazo-Villa was exiting his vehicle. The Responding Deputies allege that Mr. Colazo-Villa was armed with a rifle and so Responding Deputies immediately took to defensive positions.

15.    Although he posed no immediate threat of harm, Responding Deputies fired their weapons at Mr. Colazo-Villa, immediately injuring him.

16.    Upon being shot by the Responding Deputies, Mr. Colazo-Villa was incapacitated and, therefore, posed no threat to MCSO Deputies or any third parties. Instead of attempting to provide assistance and care to Mr. Colazo-Villa, the Responding Deputies continued to wait in their defensive positions.

17.    Mr. Colazo-Villa was completely incapacitated and was attempting to raise his hand and arm while he was laying down on the street in front of the Incident Location. In response to Mr. Colazo-Villa raising his arm and hand, the Responding Deputies fired their weapons toward Mr. Colazo-Villa and those shots ultimately proved fatal. It took

several more minutes before any of the Responding Deputies approached Mr. Colazo-Villa after he was shot for the second time and this additional time prevented Mr. Colazo-Villa from receiving any medical attention that could have potentially saved his life. Mr. Colazo-Villa was pronounced dead upon his arrival at the hospital.

<u>COUNT I</u>
*(Violations of A.R.S. § 13-410)*

18. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

19. Defendants violated A.R.S. § 13-410 when the Responding Deputies used unreasonable deadly force against Mr. Colazo-Villa.

20. In pertinent part, A.R.S. § 13-409 holds that "[a] person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention on in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force....'

21. While A.R.S. § 13-410 does grant law enforcement the use of deadly force, it does so under the restraints of A.R.S. § 13-409. A.R.S. § 13-410, in pertinent part, holds that the "threatened use of deadly physical force by a person against another is justified pursuant to section 13-409 only if a reasonable person effecting the arrest or preventing the escape would believe the suspect or escapee is actually resisting the discharge of a legal duty with deadly physical force or with the apparent capacity to use deadly physical force."

22. In addition, ARS 13-410(C) holds that the "use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that it is necessary to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force. *Id.* (C)(1).

23. The deadly force was unreasonable because Mr. Colazo-Villa did not pose a risk of deadly force against any of the Responding Deputies or other third parties at the time that he was shot.

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

4

DEGNAN LAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

24. Mr. Colazo-Villa was incapacitated by the use of physical force against him. He was subdued and incapable of threatening the Deputies or third persons. The Deputies again fired their weapons toward Mr. Colazo-Villa, and their use of deadly force was unreasonable.

25. As a direct and proximate result of Defendants' unreasonable use of deadly force, Decedent sustained serious injuries that resulted in death.

26. As a direct and proximate result of Defendants' unreasonable use of deadly force, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

27. As a direct and proximate result of Defendants' unreasonable use of deadly force, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

28. As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

29. As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT II
### (Negligence)

30. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

31. At all relevant times, Defendants had a duty to conform to the legal standard of reasonable conduct in the light of the apparent risk.

5

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

32.     Defendants breached their duty and were negligent when they failed to act with reasonable care and fired their weapons toward Mr. Colazo-Villa; their use of force was unreasonable and negligent.

33.     Defendants further breached their duty when they failed to timely address Decedent's life threating injuries and in treating the Decedent as a threat as he laid dying from his injuries.

34.     As a direct and proximate result of Defendants' negligence Mr. Colazo-Villa sustained serious injuries that resulted in death.

35.     As a direct and proximate result of negligence, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

36.     As a direct and proximate result of Defendants' negligence, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

37.     As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

38.     As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT III
### *(Negligence Per Se)*

39.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

40.     At all relevant times, Defendants owed a duty to comply with applicable

6

statutes, regulations, and rules regarding the use of deadly force.

41. Defendants breached this duty when they unreasonably used deadly force when it was not warranted, *see* A.R.S. § 13-410.

42. Defendants' failure to comply with the above-referenced statute was the direct and proximate cause of Decedent's injuries and damages, and thus constitutes negligence *per se*.

43. As a direct and proximate result of negligence *per se*, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

44. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

45. As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

46. As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

<u>**COUNT IV**</u>
*(Wrongful Death)*

47. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

48. Defendants' negligence and breach of duties caused the death of Mr. Colazo-Villa.

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

**DEGNAN LAW GROUP**
4105 N. 20ᵀᴴ STREET, SUITE 220
PHOENIX, ARIZONA 85016

49.     As a consequence of Decedent's death, Plaintiffs suffered pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced for the rest of their lives.

50.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

51.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

52.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

53.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## DEMAND FOR JURY TRIAL

54.     Plaintiffs demand a trial by jury on all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants as follows:

A.     For Plaintiffs' general and special damages including but not limited to emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages;

8

B. For Plaintiffs' costs incurred in pursuing these claims;

C. For pre- and post-judgment interest to the extent provided by law;

D. For such other further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this _____ day of May, 2020.

**DEGNAN LAW GROUP**

David Degnan, Esq.
Mark Horne, Esq.
*Attorneys for Plaintiffs*

1  **DEGNAN LAW GROUP**
2  David Degnan (AZ SBN 027422)
   Mark W. Horne (AZ SBN 029449)
3  4105 N. 20th Street, Suite 220
   Phoenix, Arizona 85016
4  (602) 266-0531
5  d.degnan@degnanlawaz.com
   m.horne@degnanlawaz.com
6  *Attorneys for Plaintiffs*

7           **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

8             **IN AND FOR THE COUNTY OF MARICOPA**

9  KAYLA MELTON, surviving wife of          No.   CV2020-005416
10 PEDRO COLAZO-VILLA, and on behalf
   of PEDRO AGUSTIN COLAZO, ISAAC           **CERTIFICATE OF COMPULSORY**
11 COLAZO,       ALISCO     OFELIA          **ARBITRATION**
   JALISCIENSE   COLAZO-VILLA   and
12 VINCENT AYLAN COLAZO, surviving
13 children of PEDRO COLAZO-VILLA,

14                          Plaintiffs,

15 vs.

16 MARICOPA      COUNTY,    a    political
17 subdivision of the State of Arizona; JOHN
   and JANE DOES 1 through 10; BLACK
18 and WHITE COMPANIES I through X;

19                          Defendants.

20

21

22      Undersigned counsel knows the dollar limits and any other limitations set forth by
23 the Local Rules of this Superior Court, and further certifies that this case **IS NOT** subject
   to compulsory arbitration, as provided by Rules 72 and 76 of the Arizona Rules of Civil
24 Procedure.
25
26      **RESPECTFULLY SUBMITTED** this _____ day of May, 2020.
27 ///
28

DEGNAN LAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

1

DEGNAN LAW GROUP

David Degnan, Esq.
Mark Horne, Esq.
*Attorneys for Plaintiffs*

DG DEGNAN LAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# In the Superior Court of the State of Arizona
## In and For the County of Maricopa

CV2020-005416

Case Number _____

## CIVIL COVER SHEET- NEW FILING ONLY
### (Please Type or Print)

Plaintiff's Attorney  Mark W. Horne

Attorney Bar Number  029449

Is Interpreter Needed? ☐ Yes ☒ No

If yes, what language(s):

_____

_____

CLERK IN THE
SUPERIOR COURT
S. OLIVOS, DEP
FILED
2020 MAY 5 PM 4: 36

---

Plaintiff's Name(s): (List all)      Plaintiff's Address:                Phone #:          Email Address:

Kayla Melton, surviving wife of Pedro Colazo-Villa, and on behalf of Pedro Agustin Colazo, Isaac Colazo, Vincent Aylan Colazo and

Alisco Ofelia Jalisciense Colazo-Villa, surviving children of Pedro Colazo-Villa

c/o Degnan Law Group, 4105 N. 20th St., Ste. 220, Phoenix, AZ 85016, 602-266-0531, m.horne@degnanlawaz.com

(List additional Plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)

Maricopa County

_____

_____

(List additional Defendants on page two and/or attach a separate sheet)

## RULE 26.2 DISCOVERY TIER OR MONETARY RELIEF CLAIMED:

**IMPORTANT: Any case category that has an asterisk (\*) MUST have a dollar amount claimed or Tier selected.** State the monetary amount in controversy or place an "X" next to the discovery tier to which the pleadings allege the case would belong under Rule 26.2.

☐ Amount Claimed $_____      ☐ Tier 1    ☐ Tier 2    ☒ Tier 3

## NATURE OF ACTION

Place an "X" next to the **one** case category that most accurately describes your primary case. Any case category that has an asterisk (\*) **MUST** have a dollar amount claimed or Tier selected as indicated above.

### 100 TORT MOTOR VEHICLE:

☐ 101 Non-Death/Personal Injury\*

☐ 102 Property Damage\*

☐ 103 Wrongful Death\*

## 110 TORT NON-MOTOR VEHICLE:

- [ ] 111 Negligence*
- [ ] 112 Product Liability – Asbestos*
- [ ] 112 Product Liability – Tobacco*
- [ ] 112 Product Liability – Toxic/Other*
- [ ] 113 Intentional Tort*
- [ ] 114 Property Damage*
- [ ] 115 Legal Malpractice*
- [ ] 115 Malpractice – Other professional*
- [ ] 117 Premises Liability*
- [ ] 118 Slander/Libel/Defamation*
- [x] 116 Other (Specify) wrongful death *

## 120 MEDICAL MALPRACTICE:

- [ ] 121 Physician M.D.*
- [ ] 122 Physician D.O*
- [ ] 123 Hospital*
- [ ] 124 Other*

## 130 & 197 CONTRACTS:

- [ ] 131 Account (Open or Stated)*
- [ ] 132 Promissory Note*
- [ ] 133 Foreclosure*
- [ ] 138 Buyer-Plaintiff*
- [ ] 139 Fraud*
- [ ] 134 Other Contract (i.e. Breach of Contract)*
- [ ] 135 Excess Proceeds-Sale*
- [ ] Construction Defects (Residential/Commercial)*
  - [ ] 136 Six to Nineteen Structures*
  - [ ] 137 Twenty or More Structures*
- [ ] 197 Credit Card Debt (Maricopa County Only)*

## 150-199 OTHER CIVIL CASE TYPES:

- [ ] 156 Eminent Domain/Condemnation*
- [ ] 151 Eviction Actions (Forcible and Special Detainers)*
- [ ] 152 Change of Name
- [ ] 153 Transcript of Judgment
- [ ] 154 Foreign Judgment

- [ ] 158 Quiet Title*
- [ ] 160 Forfeiture*
- [ ] 175 Election Challenge
- [ ] 179 NCC-Employer Sanction Action (A.R.S. §23-212)
- [ ] 180 Injunction against Workplace Harassment
- [ ] 181 Injunction against Harassment
- [ ] 182 Civil Penalty
- [ ] 186 Water Rights (Not General Stream Adjudication)*
- [ ] 187 Real Property *
- [ ] Special Action against Lower Courts
      (See Lower Court Appeal cover sheet in Maricopa)
- [ ] 194 Immigration Enforcement Challenge
      (A.R.S. §§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL:

- [ ] Administrative Review
      (See Lower Court Appeal cover sheet in Maricopa)
- [ ] 150 Tax Appeal
      (All other tax matters must be filed in the AZ Tax
      Court)
- [ ] 155 Declaratory Judgment
- [ ] 157 Habeas Corpus
- [ ] 184 Landlord Tenant Dispute – Other*
- [ ] 190 Declaration of Factual Innocence (A.R.S. §12-771)
- [ ] 191 Declaration of Factual Improper Party Status
- [ ] 193 Vulnerable Adult (A.R.S. §46-451)*
- [ ] 165 Tribal Judgment
- [ ] 167 Structured Settlement (A.R.S. §12-2901)
- [ ] 169 Attorney Conservatorships (State Bar)
- [ ] 170 Unauthorized Practice of Law (State Bar)
- [ ] 171 Out-of-State Deposition for Foreign Jurisdiction
- [ ] 172 Secure Attendance of Prisoner
- [ ] 173 Assurance of Discontinuance
- [ ] 174 In-State Deposition for Foreign Jurisdiction
- [ ] 176 Eminent Domain– Light Rail Only*
- [ ] 177 Interpleader– Automobile Only*
- [ ] 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- [ ] 183 Employment Dispute- Discrimination*

☐ 185 Employment Dispute-Other*

☐ 196 Verified Rule 45.2 Petition

☐ 195(a) Amendment of Marriage License

☐ 195(b) Amendment of Birth Certificate

☐ 163 Other*

_____

(Specify)

## EMERGENCY ORDER SOUGHT

☐ Temporary Restraining Order     ☐ Provisional Remedy     ☐ OSC     ☐ Election Challenge

☐ Employer Sanction     ☐ Other (Specify) _____

## COMMERCIAL COURT (Maricopa County Only)

☐ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the Commercial Court. More information on the Commercial Court, including the most recent forms, are available on the Court's website at:

https://www.superiorcourt.maricopa.gov/commercial-court/.

**Additional Plaintiff(s):**

_____

_____

**Additional Defendant(s):**

_____

_____

William Heck
Maricopa County
Certified Process Server #MC-7779
8808 North Central Avenue, Suite 278
Phoenix, AZ 85020

CLERK OF THE
SUPERIOR COURT
FILED
A. SUTTON. DEP

2020 JUL 17 AM II: 27

## IN THE SUPERIOR COURT OF THE STATE OF
## ARIZONA IN AND FOR THE COUNTY OF MARICOPA

**KAYLA MELTON, surviving wife of
PEDRO COLAZO-VILLA, et al.,**

      Plaintiffs,

  vs.

**MARICOPA COUNTY, a political
subdivision of the Sate of
Arizona, et al.,**

      Defendants.

Case No.: **CV2020-005416**

**AFFIDAVIT OF
SERVICE OF PROCESS**

---

WILLIAM HECK, Certified Process Server #MC-7779, Being duly sworn, states: That I am qualified to serve process in this cause, having been so appointed by the Court of Maricopa County. I received the following documents in this action:

**SUMMONS; COMPLAINT; CERTIFICATE OF COMPULSORY ARBITRATION**

from Mark Horne SBN 029449, on 7/10/2020, and in each instance I, personally, served a true copy of each document listed above on those named below in the manner and at the time and place shown.

Upon: **Dorene Stretar**, Maricopa County Clerk of the Board Specialist, accepting on behalf of Maricopa County, on 7/10/2020 at 2:30 P.M., at 301 West Jefferson Street, 10th Floor, Phoenix, AZ, by leaving one (1) set of the above listed documents with **HER PERSONALLY.**

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed on the 14th day of July, 2020.

                                            William Heck
                                            Maricopa County Certified
                                            Process Server #MC-7779

1  ADEL ALLISTER
2  MARICOPACOUNTY ATTORNEY

3  By:    SHERLE R. FLAGGMAN (019079)
           MAXINE S. MAK (031158)
4          Deputy County Attorneys
5          flaggmas@mcao.maricopa.gov
           makm@mcao.maricopa.gov
6
7  CIVIL SERVICES DIVISION
   225 West Madison Street
8  Phoenix, Arizona 85003
   Telephone (602) 506-8541
9  Facsimile (602) 506-4317
10 ca-civilmailbox@mcao.maricopa.gov
   MCAO Firm No. 00032000
11
12 Attorneys for Defendant Maricopa County

13          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

14             IN AND FOR THE COUNTY OF MARICOPA

15 Kayla Melton, surviving wife of Pedro Colazo-          No. CV2020-005416
16 Villa, and on behalf of Pedro Agustin Colazon,
   Isaac Colazo, Alisco Ofelia Jalisciense Colazo-       **STIPULATION FOR PLAINTIFF**
17 Villa and Vincent Aylan Colazo, surviving             **TO FILE A FIRST AMENDED**
   children of Pedro Colazo-Villa,                       **COMPLAINT AND EXTENDING**
18                                                       **DEADLINE FOR DEFENDANT'S**
19                 Plaintiffs,                           **RESPONSIVE PLEADING**
20 v.
                                                         (Honorable Christopher Coury)
21 Maricopa County, a political subdivision of the
   State of Arizona; John and Jane Does 1
22 through 10; Black and White Companies I
   through X;
23
24                 Defendants.

25

26          Having met and conferred, the parties hereby stipulate that Plaintiff will file a First

27 Amended Complaint within thirty (30) days and that Defendant's Answer or responsive

28

                                        1

pleading will be filed within 30 days thereafter.

**RESPECTFULLY SUBMITTED** this 28th day of July 2020.

ALLISTER ADEL
MARICOPACOUNTY ATTORNEY

BY: /s/ Sherle R. Flaggman
SHERLE R. FLAGGMAN
MAXINE S. MAK
Deputy County Attorneys
*Attorneys for Defendant Maricopa*
*County*

DEGNAN LAW GROUP

BY: /s/ David Degnan (with consent)
DAVID DEGNAN
MARK W. HORNE
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the TurboCourt System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Honorable Christopher Coury
Maricopa County Superior Court
East Court Building-914
101 W. Jefferson Street
Phoenix, AZ 85003

David Degnan, Esq.
Mark W. Horne, Esq.
DEGNAN LAW GROUP
4105 N. 20th St., Ste. 220
Phoenix, AZ 85016
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

/s/ *R. Scott*

S:\CIVIL\CIV\Matters\CJ\2019\Melton v. Penzone CJ2019 0134\Pleadings\Stip for FAC and Extending Answer Deadline.docx

2

Clerk of the Superior Court
*** Electronically Filed ***
L. Stogsdill, Deputy
7/30/2020 8:00:00 AM
Filing ID 11859057

1
2
3
4
5

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Kayla Melton, surviving wife of Pedro Colazo-Villa, and on behalf of Pedro Agustin Colazon, Isaac Colazo, Alisco Ofelia Jalisciense Colazo-Villa and Vincent Aylan Colazo, surviving children of Pedro Colazo-Villa,<br><br>    Plaintiffs,<br><br>v.<br><br>Maricopa County, a political subdivision of the State of Arizona; John and Jane Does 1 through 10; Black and White Companies I through X;<br><br>    Defendants. | No. CV2020-005416<br><br>**[PROPOSED] ORDER RE: STIPULATION FOR PLAINTIFF TO FILE A FIRST AMENDED COMPLAINT AND EXTENDING DEADLINE FOR DEFENDANT'S RESPONSIVE PLEADING**<br><br>(Honorable Christopher Coury) |

   Pursuant to the parties' Stipulation, and with good cause appearing;

   **IT IS HEREBY ORDERED** that Plaintiffs shall file a First Amended Complaint within thirty (30) days of the entry of this Order;

   **IT IS FURTHER ORDERED** that Defendant's Answer or responsive pleading will be filed within thirty (30) days after Plaintiffs file their First Amended Complaint.

   DATED this _____ day of _____ 2020.


         _____

         Honorable Christopher Coury
         Judge of the Maricopa County Superior Court

1

# eSignature Page 1 of 1

**Granted as Submitted**

Judicial Officer Comments

/s/ Christopher A. Coury

July 29, 2020



/S/ Christopher Coury Date: 7/29/2020

Judicial Officer of Superior Court

**ENDORSEMENT PAGE**

CASE NUMBER: CV2020-005416                    SIGNATURE DATE: 7/29/2020

E-FILING ID #: 11859057                              FILED DATE: 7/30/2020 8:00:00 AM


DAVID W DEGNAN



MARK W HORNE

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA, <br><br> Plaintiffs, <br><br> vs. <br><br> MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X; <br><br> Defendants. | No. CV2020-005416 <br><br> **AMENDED COMPLAINT** <br><br> (Tort: Non-Motor Vehicle; Wrongful Death) <br><br> (Tier 3) |

COMES NOW, Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), for their Complaint against Defendants MAROCPA COUNTY and MARICOPA COUNTY SHERIFF'S OFFICE,

hereby allege as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiffs Kayla Melton, Pedro Agustin Colazo, Isaac Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa, are residents of Maricopa County, Arizona, and they are the surviving wife and children of the deceased Pedro Colazo-Villa ("Decedent" or "Colazo-Villa"). Plaintiff KAYLA MELTON brings this action on behalf of herself, as the surviving wife of Decedent, and the other foregoing statutory beneficiaries, who are the surviving children of Decedent, pursuant to A.R.S. § 12-612.

2. Pursuant to A.R.S. § 12-611 et seq., Plaintiffs also bring this action for emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages caused by the suffering and death of Decedent.

3. Defendant Maricopa County is a political subdivision of the State of Arizona.

4. Defendant The Maricopa County Sheriff's Office is a law enforcement agency for Maricopa County.

5. Maricopa County and the Maricopa County Sheriff's Office are collectively referred to herein as "Defendants" or "MCSO".

6. The actions of MCSO and its officers, sergeants and agents constitute the actions of Maricopa County and Maricopa County is liable for the actions of such officers, sergeants and agents via *respondeat superior* and other law.

7. At all relevant times, Sergeants Jeffrey D. Cadle, Robert Lawrence Normile and Manuel A. Madrigal ("MCSO Deputies") were agents and employees of MCSO and Maricopa County and were at all times acting within the course and scope of their employment. Defendants Maricopa County and MCSO and are vicariously liable for MCSO Deputies' actions under the theory of *respondeat superior*.

8. John and Jane Does 1 through 10 and Black and White Companies I through X (collectively "Doe Defendants") are fictitious names used to identify Defendants whose identities are currently unknown to Plaintiffs, who together with named Defendants contributed to causing the harms, losses and damages described in this Complaint.

Plaintiffs will amend their Complaint when the true names of those Defendants become known.

9.     Defendant Maricopa County, Defendant MCSO, the MSCO Deputies and John and Jane Does are collectively referred to herein as "Defendants."

10.     Jurisdiction and venue are proper as the events giving rise to Plaintiffs' Complaint occurred in Maricopa County, Arizona and the amount in controversy exceeds the minimal jurisdictional requirements of this Court.

11.     The amount of Plaintiffs' damages qualifies this matter as a Tier 3 case.

## GENERAL ALLEGATIONS

12.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

13.     On or about May 6, 2019, Pedro Colazo-Villa was shot and killed outside his home by MCSO's Responding Deputies.

14.     Shortly prior to the shooting death of Mr. Colazo-Villa, the Responding Deputies arrived at 10038 E. Akron Street, Mesa, Arizona 85207 ("Incident Location") in response to a 911 call in which the caller claimed that Mr. Colazo-Villa stated that he would burn down the Incident Location.

15.     Through media reports, it appears that MSCO claims that Responding Deputies arrived at the Incident Location just as Mr. Colazo-Villa was exiting his vehicle. The Responding Deputies allege that Mr. Colazo-Villa was armed with a rifle and so Responding Deputies immediately took to defensive positions.

16.     Although he posed no immediate threat of harm, Responding Deputies fired their weapons at Mr. Colazo-Villa, immediately injuring him.

17.     Upon being shot by the Responding Deputies, Mr. Colazo-Villa was incapacitated and, therefore, posed no threat to MCSO Deputies or any third parties. Instead of attempting to provide assistance and care to Mr. Colazo-Villa, the Responding Deputies continued to wait in their defensive positions.

18.     Mr. Colazo-Villa was completely incapacitated and was attempting to raise his hand and arm while he was laying down on the street in front of the Incident Location.

In response to Mr. Colazo-Villa raising his arm and hand, the Responding Deputies fired their weapons toward Mr. Colazo-Villa and those shots ultimately proved fatal. It took several more minutes before any of the Responding Deputies approached Mr. Colazo-Villa after he was shot for the second time and this additional time prevented Mr. Colazo-Villa from receiving any medical attention that could have potentially saved his life. Mr. Colazo-Villa was pronounced dead upon his arrival at the hospital.

## COUNT I
### *(Violations of A.R.S. § 13-410)*

19.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

20.     Defendants violated A.R.S. § 13-410 when the Responding Deputies used unreasonable deadly force against Mr. Colazo-Villa.

21.     In pertinent part, A.R.S. § 13-409 holds that "[a] person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention on in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force….'

22.     While A.R.S. § 13-410 does grant law enforcement the use of deadly force, it does so under the restraints of A.R.S. § 13-409.  A.R.S. § 13-410, in pertinent part, holds that the "threatened use of deadly physical force by a person against another is justified pursuant to section 13-409 only if a reasonable person effecting the arrest or preventing the escape would believe the suspect or escapee is actually resisting the discharge of a legal duty with deadly physical force or with the apparent capacity to use deadly physical force."

23.     In addition, ARS 13-410(C) holds that the "use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that it is necessary to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force. *Id.* (C)(1).

24.     The deadly force was unreasonable because Mr. Colazo-Villa did not pose a risk of deadly force against any of the Responding Deputies or other third parties at the

time that he was shot.

25. Mr. Colazo-Villa was incapacitated by the use of physical force against him. He was subdued and incapable of threatening the Deputies or third persons. The Deputies again fired their weapons toward Mr. Colazo-Villa, and their use of deadly force was unreasonable.

26. As a direct and proximate result of Defendants' unreasonable use of deadly force, Decedent sustained serious injuries that resulted in death.

27. As a direct and proximate result of Defendants' unreasonable use of deadly force, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

28. As a direct and proximate result of Defendants' unreasonable use of deadly force, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

29. As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

30. As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT II
### *(Negligence)*

31. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

32. At all relevant times, Defendants had a duty to conform to the legal standard

5

of reasonable conduct in the light of the apparent risk.

33.    Defendants breached their duty and were negligent when they failed to act with reasonable care and fired their weapons toward Mr. Colazo-Villa; their use of force was unreasonable and negligent.

34.    Defendants further breached their duty when they failed to timely address Decedent's life threating injuries and in treating the Decedent as a threat as he laid dying from his injuries.

35.    As a direct and proximate result of Defendants' negligence Mr. Colazo-Villa sustained serious injuries that resulted in death.

36.    As a direct and proximate result of negligence, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

37.    As a direct and proximate result of Defendants' negligence, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

38.    As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

39.    As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

### COUNT III
### *(Negligence Per Se)*

40.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

DEGNANLAW GROUP
4105 N. 20ᵗʰ Sᴛʀᴇᴇᴛ, Sᴜɪᴛᴇ 220
Pʜᴏᴇɴɪx, Aʀɪᴢᴏɴᴀ 85016

41.     At all relevant times, Defendants owed a duty to comply with applicable statutes, regulations, and rules regarding the use of deadly force.

42.     Defendants breached this duty when they unreasonably used deadly force when it was not warranted, *see* A.R.S. § 13-410.

43.     Defendants' failure to comply with the above-referenced statute was the direct and proximate cause of Decedent's injuries and damages, and thus constitutes negligence *per se*.

44.     As a direct and proximate result of negligence *per se*, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

45.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

46.     As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

47.     As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

**COUNT IV**
*(Wrongful Death)*

48.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

49.     Defendants' negligence and breach of duties caused the death of Mr. Colazo-

7

Villa.

50.     As a consequence of Decedent's death, Plaintiffs suffered pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced for the rest of their lives.

51.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

52.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

53.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

54.     As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## DEMAND FOR JURY TRIAL

55.     Plaintiffs demand a trial by jury on all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants as follows:

A.     For Plaintiffs' general and special damages including but not limited to emotional distress, loss of consortium, loss of love and affection, loss of support, medical

and funeral expenses and other economic and non-economic damages;

        B.     For Plaintiffs' costs incurred in pursuing these claims;

        C.     For pre- and post-judgment interest to the extent provided by law;

        D.     For such other further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 28th day of August, 2020.

**DEGNAN LAW GROUP**

/s/ Mark W. Horne
David Degnan, Esq.
Mark W. Horne, Esq.
*Attorneys for Plaintiffs*

Clerk of the Superior Court
*** Electronically Filed ***
T. Hays, Deputy
9/28/2020 9:18:55 AM
Filing ID 12046497

1 ADEL ALLISTER
2 MARICOPACOUNTY ATTORNEY

3 By:    SHERLE R. FLAGGMAN (019079)
          MAXINE S. MAK (031158)
4        Deputy County Attorneys
         flaggmas@mcao.maricopa.gov
5        makm@mcao.maricopa.gov

6
   CIVIL SERVICES DIVISION
7  225 West Madison Street
   Phoenix, Arizona 85003
8  Telephone (602) 506-8541
   Facsimile (602) 506-4317
9  ca-civilmailbox@mcao.maricopa.gov
10 MCAO Firm No. 00032000

11
   *Attorneys for Defendants Maricopa County*
12 *& Maricopa County Sheriff's Office*

13
              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
14
                  **IN AND FOR THE COUNTY OF MARICOPA**
15

16 | Kayla Melton, surviving wife of Pedro Colazo-Villa, and on behalf of Pedro Agustin Colazon, Isaac Colazo, Alisco Ofelia Jalisciense Colazo-Villa and Vincent Aylan Colazo, surviving children of Pedro Colazo-Villa, | No. CV2020-005416 |

   **DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

                    Plaintiffs,
20 v.

   (Honorable Christopher Coury)

21
   Maricopa County, a political subdivision of the State of Arizona; John and Jane Does 1 through 10; Black and White Companies I through X;

                    Defendants.
25

26

27

28

                              1

Pursuant to Rule 12(b)(6) of the Arizona Rules of Civil Procedure, Defendants Maricopa County and Maricopa County Sheriff's Office ("MCSO") move to dismiss Plaintiff's First Amended Complaint ("FAC") for failure to state a claim because: (1) MCSO is a non-jural entity and cannot be sued; (2) Maricopa County cannot be vicariously liable for the actions of MCSO deputies; (3) no cause of action arises from the Arizona justification/defense statutes; (4) Arizona does not recognize a tort of negligent use of excessive or unreasonable force; (5) Plaintiff has failed to state a claim for negligence *per se;* (4) a wrongful death allegation fails to state a claim for relief in the context of alleged excessive or unreasonable force.  Accordingly, Plaintiff's FAC must be dismissed.

**I.    Facts.** This claim arises from the death of Pedro Colazo-Villa who was shot by MCSO deputies on May 6, 2019. *See* ¶ 13 of Plaintiff's First Amended Complaint ("FAC"). Plaintiff's FAC names MCSO and Maricopa County as Defendants.

**II.    Standard of Review for Motion to Dismiss.**

In considering a Rule 12(b)(6) motion to dismiss, the court assumes "the truth of the well-pled factual allegations and indulge in all reasonable inferences therefrom." *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 (2008).  The motion is granted if the plaintiff "would not be entitled to relief under any facts susceptible of proof in the statement of the claim."  *Mohave Disposal, Inc. v. City of Kingman*, 186 Ariz. 343, 346 (1996).

**III.    Plaintiff has failed to state a claim against the Maricopa County Sheriff's Office because it is a non-jural entity which cannot be sued.**  MCSO may not be sued because it is a non-jural entity. *Braillard v. Maricopa County*, 224 Ariz. 481, 232 P.3d

1263 (Ariz. Ct. App. 2010). "Governmental entities have no inherent power and possess only those powers and duties delegated to them by their enabling statutes. Thus, a governmental entity may be sued only if the legislature has so provided." *Id*. at 481, ¶ 12. Arizona's legislature does not designate MSCO as a political subdivision and thus does permit MCSO to sue or be sued. *See* A.R.S. § 11–201. "[N]o Arizona statute confers [the power to sue or be sued] on MCSO as a separate legal entity." *Id*. The MCSO is an administrative creation of the county sheriff to allow him to carry out his statutory duties and not a "person" amenable to suit pursuant to § 1983. Because there is no enabling statute granting status MCSO as a legal entity, it cannot be sued.

Because MCSO is non-jural, Plaintiff's FAC fails to state a claim against MCSO and MCSO must be dismissed from this action.

## IV. Plaintiff has failed to state a claim against Maricopa County for the actions of the Sheriff's deputies.

Plaintiff's FAC alleges that Maricopa County is vicariously liable for the actions of the MCSO deputies who shot Mr. Colazo-Villa. *See* FAC, ¶¶ 6, 7. Plaintiff's allegations fail to state a claim because, as a matter of law, Maricopa County bears no vicarious liability for the law enforcement actions of the Maricopa County Sheriff or his deputies in the performance of their statutory duties. The Sheriff is an elected County official under A.R.S. §11-401. The Arizona Constitution provides that the Sheriff is a county officer whose duties are statutorily prescribed. *See* Ariz. Const. Art. 12, §§ 3, 4. Arizona's statutes delegate traditional law enforcement powers and duties, and their operations, to the Sheriff. Specifically, A.R.S. § 11-441 empowers the Sheriff to preserve the peace (A.R.S. § 11-441(A)(1)); to perform arrests of persons committing

3

crimes (A.R.S. § 11-441(A)(2)); to prevent and suppress all affrays, breaches of the peace, riots, and insurrections which may come to the knowledge of the sheriff (A.R.S. § 11-441(A)(3)); to take charge of and keep the county jail (A.R.S. § 11-441(A)(5)); and to conduct or coordinate within the county search or rescue operations involving the life or health of any person. (A.R.S. § 11-441(C)). Maricopa County's oversight of the Sheriff is restricted to fiscal and budgetary matters. *See,* A.R.S. §§ 11-251 and 11-444.

Maricopa County has neither the legal power to hire or terminate the Sheriff's employees nor a right of control over the Sheriff or his deputies in the performance of their statutorily prescribed duties. *See Hounshell v. White*, 220 Ariz. 1, 202 P.3d 466 (App. 2008). *See also Fridena v. Maricopa County*, 18 Ariz. App. 527, 531, 504 P.2d 58, 61 (1972) (holding that Maricopa County was not liable under the doctrine of *respondeat superior* for the alleged tortious conduct of county sheriff's deputies in serving a writ of restitution) and *Hernandez v. Maricopa County*, 138 Ariz. 143, 146, 673 P.2d 341, 344 (App. 1983) (holding that Maricopa County was not liable under *respondeat superior* when Plaintiff was arrested and held in jail overnight for failing to pay a speeding ticket due to an error by a county Justice of the Peace staff member failing to credit Plaintiff with payment of the ticket).

The deputies involved in the event with Mr. Colazo-Villa were employees of the duly elected Sheriff at the time of the incident. The deputies were hired and trained by the Sheriff. A.R.S. §11-409. As a matter of law, Maricopa County cannot be vicariously liable for the law enforcement conduct of the Sheriff, his deputies, or other employees. Plaintiff's allegations that the County is vicariously liable for the actions of the Sheriff's

deputies fails to state a cognizable claim for relief. Therefore, Maricopa County must be dismissed from this action.

**V.      Count I Plaintiff's FAC fails to state a claim for relief under A.R.S. §§ 13-409 and 13-410.** Count I of Plaintiff's FAC is premised upon A.R.S. §§ 13-409 and 13-410 which are known as "justification statutes" because they shield law enforcement officers from intentional tort claims based on justified intentional uses of force. "Section 13-409 provides a justification defense for law enforcement officers who use physical force." *Ryan v. Napier*, 245 Ariz. 54, 62, ¶ 34 (2018) "If the officer's use of force is justified under § 13-409, the officer is immune from civil liability." *Id*. at 63, ¶ 34. The statutes are not available to a plaintiff as an affirmative theory of recovery. Plaintiff's FAC thus fails to state a claim for relief based upon A.R.S. §§ 13-409 and 13-410.

Moreover, to the extent Plaintiff's FAC alleges negligent conduct by the Sheriff's deputies, the justification statutes may not be asserted by the Defendants and they thus have no place in the instant action because it is premised upon a negligence theory. *See Napier*, 245 Ariz. at 63, ¶ 36 ("Nonetheless, as a practical matter, the §13-409 justification defense is either redundant or immaterial, and therefore inapplicable, in negligence actions.") And, "a trial court should not instruct a jury on the justification defense under § 13-409 if the only claim against the law enforcement officer is negligence." *Id.* at 64, ¶ 38.

Count I of Plaintiff's FAC fails to state a claim for relief and it must be dismissed.

**VI.     Count II of Plaintiff's FAC fails to state a claim for the negligent use of force.** In Arizona, a plaintiff cannot bring a negligence claim based upon a law enforcement officer's intentional acts of applying force. *See. Napier*, 245 Ariz. at 60 - 61. Any

negligence claim must be based upon conduct independent of the officer's intentional acts. *Id*. at 57, ¶1, and 62, ¶31. No negligence cause of action exists for the deputies' intentional decision to shoot. *Id*. at 61. *See also Liberti v. City of Scottsdale*, 2020 WL 3034623 at * 2 (9th Cir. June 5, 2020); *Leibel v. City of Buckeye*, 364 F.Supp.3d 1027, 1044 (D. Ariz. 2019).

*Napier* and its progeny establish that negligent use of intentionally inflicted force is not a cognizable claim; therefore, Plaintiff's negligence allegations fail to state a claim and must be dismissed.

**VII.  Count III of Plaintiff's FAC fails to state a claim for negligence *per se*.**  Count III of Plaintiff's FAC alleges negligence *per se* based upon the deputies' alleged violation of §13-410. *See* FAC ¶ 42. "A person who violates a statute enacted for the protection and safety of the public is guilty of negligence *per se*." *Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 596 (App. 1994). Count III of Plaintiff's FAC fails to state a claim for relief because, as a justification/defense statute, A.R.S. §13-410 was not enacted for the protection and safety of the public.  Moreover, as discussed in Section V, *supra*, A.R.S. §13-410 is a justification/defense statute and does not give rise to a cause of action. And finally, as discussed in Section VI, *supra,* there can be no claim for negligence in a case based upon an intentional act.

Plaintiff has failed to state a claim for negligence *per se* and Count III of her FAC must be dismissed.

**VIII.  Count IV of Plaintiff's FAC fails to state a claim for wrongful death.**  In Count IV of their FAC, and specifically at ¶ 49, Plaintiff alleges that Defendants' negligence

resulted in the wrongful death of Mr. Colzo-Villa. Such a claim is no longer viable under Arizona law. Based upon *Napier*, Plaintiff's allegation of wrongful death fails to state a claim for relief and must be dismissed.

**IX.  Conclusion.**  Plaintiff's FAC fails to state a claim for relief because: (1) MCSO is a non-jural entity and cannot be sued; (2) Maricopa County cannot be vicariously liable for the actions of MCSO deputies; (3) no cause of action arises from the Arizona justification/defense statutes; (4) Arizona does not recognize a tort of negligent use of excessive or unreasonable force; (5) Plaintiff has failed to state a claim for negligence *per se;* (6) a wrongful death allegation fails to state a claim for relief in the context of alleged excessive or unreasonable force.  Accordingly, Plaintiff's FAC must be dismissed.

**RESPECTFULLY SUBMITTED** this 28th day of September 2020.

ALLISTER ADEL
MARICOPACOUNTY ATTORNEY

BY: /s/ *Sherle R. Flaggman*
　　　SHERLE R. FLAGGMAN
　　　MAXINE S. MAK
　　　Deputy County Attorneys
　　　*Attorneys for Defendants Maricopa*
　　　*County & Maricopa County Sheriff's*
　　　*Office*

CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the TurboCourt System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Honorable Christopher Coury
Maricopa County Superior Court
East Court Building-914
101 W. Jefferson Street
Phoenix, AZ 85003

David Degnan, Esq.
Mark W. Horne, Esq.
DEGNAN LAW GROUP
4105 N. 20th St., Ste. 220
Phoenix, AZ 85016
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiff*

/s/ *R. Scott*

S:\CIVIL\CIV\Matters\CJ\2019\Melton v. Penzone CJ2019 0134\Pleadings\MTD FAC.docx

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA,<br><br>     Plaintiffs,<br><br>vs.<br><br>MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X;<br><br>     Defendants. | No. CV2020-005416<br><br>**NOTICE OF STIPULATION FOR FIRST EXTENSION ON PLAINTIFFS' DEADLINE TO RESPOND TO MOTION TO DISMISS**<br><br>*(Assigned to the Hon. Christopher Coury)* |

The parties hereby stipulate to extend Plaintiffs' deadline to respond to Defendants' Motion to Dismiss to Friday, <u>October 30</u>, 2020, on or before which day Plaintiffs must file Response to the Defendants' Motion to Dismiss. Defendants' Reply will be due on Friday, November 13, 2020. Pursuant to Rule 7.1(g)(4), no order from the Court is necessary and the extension is effective automatically with this filing.

**RESPECTFULLY SUBMITTED** this 19th day of October, 2020.

**DEGNAN LAW GROUP**

/s/ Mark W. Horne
David Degnan, Esq.
Mark W. Horne, Esq.
*Attorneys for Plaintiffs*

**MARICOPA COUNTY ATTORNEY'S OFFICE**

/s/ Sherle R. Flaggman (with permission)
Sherle R. Flaggman, DCA
Maxine S. Mak, DCA
*Attorneys for Defendants*

ORIGINAL of the foregoing e-filed
this 19th day of October 2020, with copy
emailed to:

Sherle R. Flaggman, DCA
Maxine S. Mak, DCA
**Maricopa County Attorney's Office**
*Civil Services Division*
225 W. Madison Street
Phoenix, AZ 85003
flaggmas@mcao.maricopa.gov
makm@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
*Attorneys for Defendants*

/s/ Kellen Quinn

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorney for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA, | NO. CV2020-005416 |
| Plaintiffs, | **MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |
| vs. | (Tort: Non-Motor Vehicle; Wrongful Death) |
| MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X; | (Tier 3) |
| Defendants. | |

Plaintiffs KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of

DEGNAN LAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

PEDRO COLAZO-VILLA, by and through undersigned counsel, and pursuant to Ariz. R. Civ. P. 15(a), hereby move for leave to amend their Amended Complaint to include their claims under 42 U.S.C. § 1983 and amend their claim for wrongful death. A clean version of the proposed Second Amended Complaint is attached as Exhibit "A" hereto and a redlined copy is attached hereto as Exhibit "B." The proposed amendments are necessary to add Plaintiffs' claims against Defendants under 42 U.S.C. § 1983 and amend their claim for wrongful death now that Plaintiffs have had an opportunity to investigate the same. Plaintiffs are not acting in bad faith, and this matter is still in the pleading stage and Defendants will suffer no prejudice by the proposed amendments. This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to A.R.C.P. 15(a)(2), a copy of the proposed Second Amended Complaint is attached hereto as Exhibit A. Leave should be granted for Plaintiffs to file the attached Second Amended Complaint.

Pursuant to Rule 15, "leave to amend must be freely given when justice requires." Ariz. R. Civ. Pro. 15(a)(2). *See also Cagle v. Carr*, 101 Ariz. 225, 227, 418 P.2d 381, 383 (1966). "[A]mendments to pleadings should be granted with great liberty, so that cases may be decided on the merits rather than on mere technicalities of pleadings, and so long as the granting of the amendment does not prejudice the other party." *Id*.

Although the decision whether to grant leave to amend is discretionary, it is generally an abuse of discretion to deny a request to amend absent undue[1] delay, dilatory action or undue prejudice. *Owen v. Superior Court of State of Ariz.*, 133 Ariz. 75, 79, 649 P.2d 278, 282 (1982); *Uvleman v. D.S. Rentco*, 194 Ariz. 300, 302-03, 981 P.2d 1097, 1103 (App. 1996); *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 597, 826 P.2d 1217, 1233 (App.

---

[1] To be "undue" courts have required that the delay be negligent or dilatory in nature. *State Compensation Fund v. Yellow Cab Co. of Phoenix*, 197 Ariz. 120, 125, 3 P.3d 1040, 1045 (Ariz. App. Div. 1, 1999); *Owen v. Superior Court of State of Ariz.*, 133 Ariz. 75, 79, 649 P.2d 278, 282 (1982).

1991). In fact, even an undue delay, without more is insufficient to refuse a request to amend. *See Owen* at 79, 649 P.2d at 282 (denial of request to amend after approximately twenty-seven (27) month delay reversed); *Uvleman*, at 303, 981 P.2d at 1084 (denial of request to amend is inappropriate where there is no showing of prejudice resulting from delay).

In this case, there has been no "undue delay" or "dilatory action." This case is still in the pleading stage and Defendants have filed a motion to dismiss which Plaintiffs are about to respond to. Indeed, the Arizona Supreme Court permitted defendants to amend their answer in a case where there were only 73 days left until trial. *See Cagle v. Carr*, 101 Ariz. 225, 418 P.2d 381 (1966). If the defendants in that case did not violate the "undue delay" and "dilatory action" provisions set forth in *Foman v. Davis*, certainly Plaintiffs' motion to amend, where a trial date has not even been set does not violate these provisions.

For the same reasons, there is no "undue prejudice." Our Supreme Court held that the plaintiffs should have been allowed to amend their complaint where the case was still in the discovery phase and the amendments were based on facts already known to the defendant. *See Spitz v. Bache & Co.*, 122 Ariz. 530, 596 P.2d 365 (1979). In *Spitz*, the Court observed that the plaintiffs' "proposed amended is directed to the same party and predicated on the same transactions which [defendant] had notice of from the start of litigation…[and the] case was still in discovery state." *Id.*, 122 Ariz. at 531, 596 P.2d at 366.

As explained above, this case is still in the pleading stage and a trial date has not been set by this Court. The requested amendment is necessary for Plaintiffs to add their claims against Defendants under 42 U.S.C. § 1983 and amend their claim for wrongful death now that they have had an opportunity to investigate the same. As such, Plaintiffs Move to Amend their Amended Complaint. Accordingly, leave to amend should be granted.

WHEREFORE, based upon all of the foregoing, Plaintiffs respectfully request that this Court grant leave to amend their Amended Complaint, and allow the Plaintiffs ten (10) days from entry of the order granting this Motion to file and serve the Second Amended Complaint. A proposed order is included herewith for the Court's convenience.

**RESPECTFULLY SUBMITTED** this 30th day of October, 2020.

**DEGNAN LAW GROUP**

/s/ Mark W. Horne
David Degnan, Esq.
Mark W. Horne, Esq.
*Attorneys for Plaintiffs*

ORIGINAL of the foregoing e-filed
this 30th day of October 2020, with copy
emailed to:

Sherle R. Flaggman, DCA
Maxine S. Mak, DCA
**Maricopa County Attorney's Office**
*Civil Services Division*
225 W. Madison Street
Phoenix, AZ 85003
flaggmas@mcao.maricopa.gov
makm@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
*Attorneys for Defendants*

/s/ Kellen Quinn

# EXHIBIT A

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA, <br><br> Plaintiffs, <br> vs. <br><br> MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X; <br><br> Defendants. | No. CV2020-005416 <br><br> **SECOND AMENDED COMPLAINT** <br><br> (Tort: Non-Motor Vehicle; Wrongful Death) <br><br> (Tier 3) |

COMES NOW, Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), for their Complaint against Defendants MAROCPA COUNTY and MARICOPA COUNTY SHERIFF'S OFFICE,

1

hereby allege as follows:

**PARTIES, JURISDICTION AND VENUE**

///

1.      Plaintiffs Kayla Melton, Pedro Agustin Colazo, Isaac Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa, are residents of Maricopa County, Arizona, and they are the surviving wife and children of the deceased Pedro Colazo-Villa ("Decedent" or "Colazo-Villa"). Plaintiff KAYLA MELTON brings this action on behalf of herself, as the surviving wife of Decedent, and the other foregoing statutory beneficiaries, who are the surviving children of Decedent, pursuant to A.R.S. § 12-612.

2.      Pursuant to A.R.S. § 12-611 et seq., Plaintiffs also bring this action for emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages caused by the suffering and death of Decedent.

3.      Defendant Maricopa County is a political subdivision of the State of Arizona.

4.      Defendant The Maricopa County Sheriff's Office ("MCSO") is a law enforcement agency for Maricopa County.

5.      Maricopa County and the Maricopa County Sheriff's Office are collectively referred to herein as "Defendants" or "MCSO".

6.      The actions of MCSO and its officers, sergeants and agents constitute the actions of Maricopa County and Maricopa County is liable for the actions of such officers, sergeants and agents via *respondeat superior* and other law.

7.      At all relevant times, Sergeants Jeffrey D. Cadle, Robert Lawrence Normile and Manuel A. Madrigal ("MCSO Deputies") were agents and employees of MCSO and Maricopa County and were at all times acting within the course and scope of their employment. Defendants Maricopa County and MCSO and are vicariously liable for MCSO Deputies' actions under the theory of *respondeat superior*.

8.      John and Jane Does 1 through 10 and Black and White Companies I through X (collectively "Doe Defendants") are fictitious names used to identify Defendants whose identities are currently unknown to Plaintiffs, who together with named Defendants

DEGNANLAW G. DG P.
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

DEGNANLAW GDGP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

contributed to causing the harms, losses and damages described in this Complaint. Plaintiffs will amend their Complaint when the true names of those Defendants become known.

9.     Defendant Maricopa County, Defendant MCSO, the MSCO Deputies and John and Jane Does are collectively referred to herein as "Defendants."

10.     Jurisdiction and venue are proper as the events giving rise to Plaintiffs' Complaint occurred in Maricopa County, Arizona and the amount in controversy exceeds the minimal jurisdictional requirements of this Court.

11.     The amount of Plaintiffs' damages qualifies this matter as a Tier 3 case.

## **GENERAL ALLEGATIONS**

12.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

13.     On or about May 6, 2019, Pedro Colazo-Villa was shot and killed outside his home by MCSO's Responding Deputies.

14.     Shortly prior to the shooting death of Mr. Colazo-Villa, the Responding Deputies arrived at 10038 E. Akron Street, Mesa, Arizona 85207 ("Incident Location") in response to a 911 call in which the caller claimed that Mr. Colazo-Villa stated that he would burn down the Incident Location.

15.     Through media reports, it appears that MSCO claims that Responding Deputies arrived at the Incident Location just as Mr. Colazo-Villa was exiting his vehicle. The Responding Deputies allege that Mr. Colazo-Villa was armed with a rifle and so Responding Deputies immediately took to defensive positions.

16.     Although he posed no immediate threat of harm, Responding Deputies fired their weapons at Mr. Colazo-Villa, immediately injuring him.

17.     Upon being shot by the Responding Deputies, Mr. Colazo-Villa was incapacitated and, therefore, posed no threat to MCSO Deputies or any third parties. Instead of attempting to provide assistance and care to Mr. Colazo-Villa, the Responding Deputies continued to wait in their defensive positions.

18.     Mr. Colazo-Villa was completely incapacitated and was attempting to raise his hand and arm while he was laying down on the street in front of the Incident Location. In

response to Mr. Colazo-Villa raising his arm and hand, the Responding Deputies fired their weapons toward Mr. Colazo-Villa and those shots ultimately proved fatal. It took several more minutes before any of the Responding Deputies approached Mr. Colazo-Villa after he was shot for the second time and this additional time prevented Mr. Colazo-Villa from receiving any medical attention that could have potentially saved his life. Mr. Colazo-Villa was pronounced dead upon his arrival at the hospital.

## COUNT I
### (Violations of A.R.S. § 13-410)

19.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

20.     Defendants violated A.R.S. § 13-410 when the Responding Deputies used unreasonable deadly force against Mr. Colazo-Villa.

21.     In pertinent part, A.R.S. § 13-409 holds that "[a] person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention on in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force….'

22.     While A.R.S. § 13-410 does grant law enforcement the use of deadly force, it does so under the restraints of A.R.S. § 13-409.  A.R.S. § 13-410, in pertinent part, holds that the "threatened use of deadly physical force by a person against another is justified pursuant to section 13-409 only if a reasonable person effecting the arrest or preventing the escape would believe the suspect or escapee is actually resisting the discharge of a legal duty with deadly physical force or with the apparent capacity to use deadly physical force."

23.     In addition, ARS 13-410(C) holds that the "use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that it is necessary to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force. *Id*. (C)(1).

24.     The deadly force was unreasonable because Mr. Colazo-Villa did not pose a risk of deadly force against any of the Responding Deputies or other third parties at the time

4

that he was shot.

25.    Mr. Colazo-Villa was incapacitated by the use of physical force against him. He was subdued and incapable of threatening the Deputies or third persons. The Deputies again fired their weapons toward Mr. Colazo-Villa, and their use of deadly force was unreasonable.

26.    As a direct and proximate result of Defendants' unreasonable use of deadly force, Decedent sustained serious injuries that resulted in death.

27.    As a direct and proximate result of Defendants' unreasonable use of deadly force, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

28.    As a direct and proximate result of Defendants' unreasonable use of deadly force, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

29.    As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

30.    As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT II
### (Negligence)

31.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

32.    At all relevant times, Defendants had a duty to conform to the legal standard

of reasonable conduct in the light of the apparent risk.

33. Defendants breached their duty and were negligent when they failed to act with reasonable care and fired their weapons toward Mr. Colazo-Villa; their use of force was unreasonable and negligent.

34. Defendants further breached their duty when they failed to timely address Decedent's life threating injuries and in treating the Decedent as a threat as he laid dying from his injuries.

35. As a direct and proximate result of Defendants' negligence Mr. Colazo-Villa sustained serious injuries that resulted in death.

36. As a direct and proximate result of negligence, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

37. As a direct and proximate result of Defendants' negligence, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

38. As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

39. As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT III
### *(Negligence Per Se)*

40. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

6

DEGNANLAW G. DG P
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

41.     At all relevant times, Defendants owed a duty to comply with applicable statutes, regulations, and rules regarding the use of deadly force.

42.     Defendants breached this duty when they unreasonably used deadly force when it was not warranted, *see* A.R.S. § 13-410.

43.     Defendants' failure to comply with the above-referenced statute was the direct and proximate cause of Decedent's injuries and damages, and thus constitutes negligence *per se*.

44.     As a direct and proximate result of negligence *per se*, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

45.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

46.     As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

47.     As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT IV
### *(Wrongful Death)*

48.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

49.     Defendants' negligence and breach of duties caused the death of Mr. Colazo-Villa.

50.     Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

51.     At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

52.     At the time of the shooting, Decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

53.     At the time of the shooting Decedent also had a clearly established right under the Fourteenth Amendment to not be deprived of his life without due process of law.

54.     At the time of the shooting, Decedent also had a clearly established right under the Eighth Amendment to be free from cruel and unusual punishment by receiving adequate healthcare while in custody.

55.     At the time of the shooting, Plaintiffs had a clearly established right under the Constitution to substantive due process against the loss of their familial relationship with Decedent.

56.     As a direct and proximate result of Defendants' failure to provide adequate healthcare to Decedent after the shooting, Decedent suffered the loss of his life in violation of the Eighth Amendment.

57.     As a direct and proximate result of Defendants' use of force and failure to provide adequate healthcare to Decedent after the shooting, Plaintiffs suffered the loss of their familial relationship with Decedent in violation of the Fourth and Fourteenth Amendments.

58.     None of the officers took reasonable steps to correct the actions and omissions of other responding officers. They are each therefore liable for the injuries and damages resulting from the actions and omissions of each other officer.

59.     At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with

8

Decedent.

60. As a consequence of Decedent's death, Plaintiffs suffered pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced for the rest of their lives.

61. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

62. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

63. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

64. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT V

### *(42 U.S.C. § 1983 Violation of Due Process Rights and Fourth and Fourteenth Amendment Rights)*

65. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

66. Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

DEGNANLAW G DG P
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

67.     At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

68.     At the time of the shooting, Decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

69.     At the time of the shooting, Decedent also had a clearly established right under the Fourteenth Amendment to not be deprived of his life without due process of law.

70.     The officers' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Decedent's Fourth Amendment rights.

71.     The officers' actions and use of force, as described herein, were also malicious and involved reckless, callous, and deliberate indifference to Decedent's federally protected rights. The use of force by the officers shocks the conscience and was a violation of Decedent's Fourteenth Amendment rights.

72.     The officers unlawfully seized Decedent by means of objectively unreasonable, excessive and shocking physical force, thereby unreasonably restraining Decedent of his freedom.

73.     The force used constituted deadly force in that it caused Decedent's death.

74.     None of the officers took reasonable steps to protect Decedent from the unreasonable excessive force of other responding officers. They are each therefore liable for the injuries and damages resulting from the unreasonable force of each other officer.

75.     Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Decedent's federally protected constitutional rights.

76.     They did so with shocking and willful indifference to Decedent's rights and their conscious awareness that they would cause Decedent's death.

77.     Defendants' acts and omissions intentionally deprived Decedent of his constitutional rights and caused him damages.

78.     At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

79.     As a direct and proximate result of Defendants' unlawful conduct, Decedent has suffered the loss of his life, and Plaintiffs have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

80.     Also as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of Decedent's future earnings, in an amount to be determined at trial.

81.     Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VI

### *(42 U.S.C. § 1983 Violation of Eighth Amendment Rights)*

82.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

83.     Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

84.     At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

85.     At the time of the shooting, Decedent had a clearly established right under the Eighth Amendment to be free from cruel and unusual punishment by receiving adequate healthcare while in custody.

86.     The officers' actions and omissions, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Decedent's Eighth Amendment rights.

87.     The officers unlawfully failed to provide necessary medical attention to Decedent after shooting him, thereby subjecting him to cruel and unusual punishment while

in police custody.

88.    None of the officers took reasonable steps to correct the actions and omissions of other responding officers. They are each therefore liable for the injuries and damages resulting from the actions and omissions of each other officer.

89.    Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Decedent's federally protected constitutional rights.

90.    They did so with shocking and willful indifference to Decedent's rights and their conscious awareness that they would cause Decedent's death.

91.    Defendants' acts and omissions intentionally deprived Decedent of his constitutional rights and caused him damages.

92.    At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

93.    As a direct and proximate result of Defendants' unlawful conduct, Decedent has suffered the loss of his life, and Plaintiffs have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

94.    Also as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of Decedent's future earnings, in an amount to be determined at trial.

95.    Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VII

### *(42 U.S.C. § 1983 Violation of Substantive Due Process Rights)*

96.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

97.    Plaintiffs in this action are citizens of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

98.    At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's

Office, and their acts and omissions were conducted within the scope of their official duties or employment.

99.    At the time of the shooting, Plaintiffs had a clearly established right under the Constitution to substantive due process against the loss of their familial relationship with Decedent.

100.    The officers' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Plaintiffs' substantive due process rights.

101.    The officers unlawfully killed Decedent by means of objectively unreasonable, excessive and shocking physical force, thereby unreasonably depriving Plaintiffs of their familial relationship with Decedent.

102.    None of the officers took reasonable steps to protect Decedent from being killed and thus to protect Plaintiffs from the loss of their familial relationship by other responding officers. They are each therefore liable for the injuries and damages resulting from the unreasonable force of each other officer.

103.    Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected Constitutional rights.

104.    They did so with shocking and willful indifference to Plaintiffs' rights and their conscious awareness that they would cause Decedent's death.

105.    Defendants' acts and omissions intentionally deprived Plaintiffs of their Constitutional rights and caused them damages.

106.    At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

107.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of their familial relationship with Decedent, and have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

108.    Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42

U.S.C. § 1988.

<strong><u>DEMAND FOR JURY TRIAL</u></strong>

109.    Plaintiffs demand a trial by jury on all issues triable of right by jury.

<strong><u>PRAYER FOR RELIEF</u></strong>

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants as follows:

A.    For Plaintiffs' general and special damages including but not limited to emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages;

B.    For Plaintiffs' costs incurred in pursuing these claims;

C.    For pre- and post-judgment interest to the extent provided by law;

D.    For such other further relief as the Court deems just and proper.


**RESPECTFULLY SUBMITTED** this 30th day of October, 2020.

DEGNAN LAW GROUP


_____

David Degnan, Esq.
Mark Horne, Esq.
*Attorneys for Plaintiffs*

# EXHIBIT B

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA,<br><br>        Plaintiffs,<br><br>vs.<br><br>MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X;<br><br>        Defendants. | No. CV2020-005416<br><br>**SECOND AMENDED COMPLAINT**<br><br>(Tort: Non-Motor Vehicle; Wrongful Death)<br><br>(Tier 3) |

COMES NOW, Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), for their Complaint against Defendants MAROCPA COUNTY and MARICOPA COUNTY SHERIFF'S OFFICE,

1

hereby allege as follows:

## PARTIES, JURISDICTION AND VENUE

/ / /

1.      Plaintiffs Kayla Melton, Pedro Agustin Colazo, Isaac Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa, are residents of Maricopa County, Arizona, and they are the surviving wife and children of the deceased Pedro Colazo-Villa ("Decedent" or "Colazo-Villa"). Plaintiff KAYLA MELTON brings this action on behalf of herself, as the surviving wife of Decedent, and the other foregoing statutory beneficiaries, who are the surviving children of Decedent, pursuant to A.R.S. § 12-612.

2.      Pursuant to A.R.S. § 12-611 et seq., Plaintiffs also bring this action for emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages caused by the suffering and death of Decedent.

3.      Defendant Maricopa County is a political subdivision of the State of Arizona.

4.      Defendant The Maricopa County Sheriff's Office ("MCSO") is a law enforcement agency for Maricopa County.

5.      Maricopa County and the Maricopa County Sheriff's Office are collectively referred to herein as "Defendants" or "MCSO".

6.      The actions of MCSO and its officers, sergeants and agents constitute the actions of Maricopa County and Maricopa County is liable for the actions of such officers, sergeants and agents via *respondeat superior* and other law.

7.      At all relevant times, Sergeants Jeffrey D. Cadle, Robert Lawrence Normile and Manuel A. Madrigal ("MCSO Deputies") were agents and employees of MCSO and Maricopa County and were at all times acting within the course and scope of their employment. Defendants Maricopa County and MCSO and are vicariously liable for MCSO Deputies' actions under the theory of *respondeat superior*.

8.      John and Jane Does 1 through 10 and Black and White Companies I through X (collectively "Doe Defendants") are fictitious names used to identify Defendants whose identities are currently unknown to Plaintiffs, who together with named Defendants

2

contributed to causing the harms, losses and damages described in this Complaint. Plaintiffs will amend their Complaint when the true names of those Defendants become known.

9. Defendant Maricopa County, Defendant MCSO, the MSCO Deputies and John and Jane Does are collectively referred to herein as "Defendants."

10. Jurisdiction and venue are proper as the events giving rise to Plaintiffs' Complaint occurred in Maricopa County, Arizona and the amount in controversy exceeds the minimal jurisdictional requirements of this Court.

11. The amount of Plaintiffs' damages qualifies this matter as a Tier 3 case.

## GENERAL ALLEGATIONS

12. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

13. On or about May 6, 2019, Pedro Colazo-Villa was shot and killed outside his home by MCSO's Responding Deputies.

14. Shortly prior to the shooting death of Mr. Colazo-Villa, the Responding Deputies arrived at 10038 E. Akron Street, Mesa, Arizona 85207 ("Incident Location") in response to a 911 call in which the caller claimed that Mr. Colazo-Villa stated that he would burn down the Incident Location.

15. Through media reports, it appears that MSCO claims that Responding Deputies arrived at the Incident Location just as Mr. Colazo-Villa was exiting his vehicle. The Responding Deputies allege that Mr. Colazo-Villa was armed with a rifle and so Responding Deputies immediately took to defensive positions.

16. Although he posed no immediate threat of harm, Responding Deputies fired their weapons at Mr. Colazo-Villa, immediately injuring him.

17. Upon being shot by the Responding Deputies, Mr. Colazo-Villa was incapacitated and, therefore, posed no threat to MCSO Deputies or any third parties. Instead of attempting to provide assistance and care to Mr. Colazo-Villa, the Responding Deputies continued to wait in their defensive positions.

18. Mr. Colazo-Villa was completely incapacitated and was attempting to raise his hand and arm while he was laying down on the street in front of the Incident Location. In

response to Mr. Colazo-Villa raising his arm and hand, the Responding Deputies fired their weapons toward Mr. Colazo-Villa and those shots ultimately proved fatal. It took several more minutes before any of the Responding Deputies approached Mr. Colazo-Villa after he was shot for the second time and this additional time prevented Mr. Colazo-Villa from receiving any medical attention that could have potentially saved his life. Mr. Colazo-Villa was pronounced dead upon his arrival at the hospital.

<u>COUNT I</u>
*(Violations of A.R.S. § 13-410)*

19.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

20.     Defendants violated A.R.S. § 13-410 when the Responding Deputies used unreasonable deadly force against Mr. Colazo-Villa.

21.     In pertinent part, A.R.S. § 13-409 holds that "[a] person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention on in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force…."

22.     While A.R.S. § 13-410 does grant law enforcement the use of deadly force, it does so under the restraints of A.R.S. § 13-409. A.R.S. § 13-410, in pertinent part, holds that the "threatened use of deadly physical force by a person against another is justified pursuant to section 13-409 only if a reasonable person effecting the arrest or preventing the escape would believe the suspect or escapee is actually resisting the discharge of a legal duty with deadly physical force or with the apparent capacity to use deadly physical force."

23.     In addition, ARS 13-410(C) holds that the "use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that it is necessary to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force. *Id*. (C)(1).

24.     The deadly force was unreasonable because Mr. Colazo-Villa did not pose a risk of deadly force against any of the Responding Deputies or other third parties at the time

4

DEGNANLAW G DG
4105 N. 20ᵀᴴ Sᴛʀᴇᴇᴛ, sᴜɪᴛᴇ 220
Pʜᴏᴇɴɪx, Aʀɪᴢᴏɴᴀ 85016

that he was shot.

25.     Mr. Colazo-Villa was incapacitated by the use of physical force against him. He was subdued and incapable of threatening the Deputies or third persons.  The Deputies again fired their weapons toward Mr. Colazo-Villa, and their use of deadly force was unreasonable.

26.     As a direct and proximate result of Defendants' unreasonable use of deadly force, Decedent sustained serious injuries that resulted in death.

27.     As a direct and proximate result of Defendants' unreasonable use of deadly force, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

28.     As a direct and proximate result of Defendants' unreasonable use of deadly force, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

29.     As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

30.     As a direct and proximate result of Defendants' unreasonable use of deadly force that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

### COUNT II
*(Negligence)*

31.     Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

32.     At all relevant times, Defendants had a duty to conform to the legal standard

5

of reasonable conduct in the light of the apparent risk.

33. Defendants breached their duty and were negligent when they failed to act with reasonable care and fired their weapons toward Mr. Colazo-Villa; their use of force was unreasonable and negligent.

34. Defendants further breached their duty when they failed to timely address Decedent's life threating injuries and in treating the Decedent as a threat as he laid dying from his injuries.

35. As a direct and proximate result of Defendants' negligence Mr. Colazo-Villa sustained serious injuries that resulted in death.

36. As a direct and proximate result of negligence, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

37. As a direct and proximate result of Defendants' negligence, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

38. As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

39. As a direct and proximate result of Defendants' negligence that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

<u>COUNT III</u>
*(Negligence Per Se)*

40. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

41.    At all relevant times, Defendants owed a duty to comply with applicable statutes, regulations, and rules regarding the use of deadly force.

42.    Defendants breached this duty when they unreasonably used deadly force when it was not warranted, *see* A.R.S. § 13-410.

43.    Defendants' failure to comply with the above-referenced statute was the direct and proximate cause of Decedent's injuries and damages, and thus constitutes negligence *per se*.

44.    As a direct and proximate result of negligence *per se*, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

45.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

46.    As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

47.    As a direct and proximate result of Defendants' negligence *per se* that resulted in Decedent's death, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

<u>**COUNT IV**</u>
*(Wrongful Death)*

48.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

49.    Defendants' negligence and breach of duties caused the death of Mr. Colazo-Villa.

7

DEGNANLAW GROUP
4105 N. 20ᵀᴴ Street, suite 220
Phoenix, Arizona 85016

Formatted: Font color: Auto

DEGNANLAW ᴳ ᴰⁱᴳ

4105 N. 20ᵀᴴ STREET, SUITE 220
PHOENIX, ARIZONA 85016

50.    Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

51.    At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

52.    At the time of the shooting, Decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

53.    At the time of the shooting Decedent also had a clearly established right under the Fourteenth Amendment to not be deprived of his life without due process of law.

54.    At the time of the shooting, Decedent also had a clearly established right under the Eighth Amendment to be free from cruel and unusual punishment by receiving adequate healthcare while in custody.

55.    At the time of the shooting, Plaintiffs had a clearly established right under the Constitution to substantive due process against the loss of their familial relationship with Decedent.

56.    As a direct and proximate result of Defendants' failure to provide adequate healthcare to Decedent after the shooting, Decedent suffered the loss of his life in violation of the Eighth Amendment.

57.    As a direct and proximate result of Defendants' use of force and failure to provide adequate healthcare to Decedent after the shooting, Plaintiffs suffered the loss of their familial relationship with Decedent in violation of the Fourth and Fourteenth Amendments.

58.    None of the officers took reasonable steps to correct the actions and omissions of other responding officers. They are each therefore liable for the injuries and damages resulting from the actions and omissions of each other officer.

59.    At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with

8

Decedent.

49.

50.60. As a consequence of Decedent's death, Plaintiffs suffered pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced for the rest of their lives.

51.61. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Kayla Melton suffered the death of her beloved husband and experienced severe emotional distress, loss of consortium, loss of support, medical and funeral expenses and other economic and non-economic damages due to the death of her beloved husband.

52.62. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs Pedro Agustin Colazo, Isaac Omar Colazo, Vincent Aylan Colazo and Alisco Ofelia Jalisciense Colazo-Villa suffered the death of their father and experienced severe emotional distress, loss of consortium, loss of support and other economic and non-economic damages due to the death of their beloved father.

53.63. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have been deprived of love, care, affection, companionship, support, financial support and other benefits and pleasures of the family relationship.

64. As a direct and proximate result and consequence of Decedent's death, wrongfully caused by Defendants, Plaintiffs have incurred funeral expenses, medical and other healthcare-related expenses and will incur additional medical and other healthcare-related expenses in the future.

## COUNT V

### *(42 U.S.C. § 1983 Violation of Due Process Rights and Fourth and Fourteenth Amendment Rights),*

65. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

66. Decedent in this action was a citizen of the United States and all of the police

9

officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

67.     At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

68.     At the time of the shooting, Decedent had a clearly established right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

69.     At the time of the shooting, Decedent also had a clearly established right under the Fourteenth Amendment to not be deprived of his life without due process of law.

70.     The officers' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Decedent's Fourth Amendment rights.

71.     The officers' actions and use of force, as described herein, were also malicious and involved reckless, callous, and deliberate indifference to Decedent's federally protected rights. The use of force by the officers shocks the conscience and was a violation of Decedent's Fourteenth Amendment rights.

72.     The officers unlawfully seized Decedent by means of objectively unreasonable, excessive and shocking physical force, thereby unreasonably restraining Decedent of his freedom.

73.     The force used constituted deadly force in that it caused Decedent's death.

74.     None of the officers took reasonable steps to protect Decedent from the unreasonable excessive force of other responding officers. They are each therefore liable for the injuries and damages resulting from the unreasonable force of each other officer.

75.     Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Decedent's federally protected constitutional rights.

76.     They did so with shocking and willful indifference to Decedent's rights and their conscious awareness that they would cause Decedent's death.

77.     Defendants' acts and omissions intentionally deprived Decedent of his

10

DEGNANLAW G **DG**
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

constitutional rights and caused him damages.

78. At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

79. As a direct and proximate result of Defendants' unlawful conduct, Decedent has suffered the loss of his life, and Plaintiffs have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

80. Also as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of Decedent's future earnings, in an amount to be determined at trial.

81. Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT VI**

***(42 U.S.C. § 1983 Violation of Eighth Amendment Rights)***

82. Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

83. Decedent in this action was a citizen of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

84. At all relevant times hereto, all individual Defendants to this claim were acting under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

85. At the time of the shooting, Decedent had a clearly established right under the Eighth Amendment to be free from cruel and unusual punishment by receiving adequate healthcare while in custody.

86. The officers' actions and omissions, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Decedent's Eighth Amendment rights.

87. The officers unlawfully failed to provide necessary medical attention to

11

Decedent after shooting him, thereby subjecting him to cruel and unusual punishment while in police custody.

88.    None of the officers took reasonable steps to correct the actions and omissions of other responding officers. They are each therefore liable for the injuries and damages resulting from the actions and omissions of each other officer.

89.    Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Decedent's federally protected constitutional rights.

90.    They did so with shocking and willful indifference to Decedent's rights and their conscious awareness that they would cause Decedent's death.

91.    Defendants' acts and omissions intentionally deprived Decedent of his constitutional rights and caused him damages.

92.    At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

93.    As a direct and proximate result of Defendants' unlawful conduct, Decedent has suffered the loss of his life, and Plaintiffs have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

94.    Also as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of Decedent's future earnings, in an amount to be determined at trial.

95.    Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VII

*(42 U.S.C. § 1983 Violation of Substantive Due Process Rights)*

96.    Plaintiffs hereby incorporate all preceding paragraphs as though fully set forth herein.

97.    Plaintiffs in this action are citizens of the United States and all of the police officer Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

98.    At all relevant times hereto, all individual Defendants to this claim were acting

12

under the color of state law in their capacity as officers of the Maricopa County Sheriff's Office, and their acts and omissions were conducted within the scope of their official duties or employment.

99. At the time of the shooting, Plaintiffs had a clearly established right under the Constitution to substantive due process against the loss of their familial relationship with Decedent.

100. The officers' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances and were a violation of Plaintiffs' substantive due process rights.

101. The officers unlawfully killed Decedent by means of objectively unreasonable, excessive and shocking physical force, thereby unreasonably depriving Plaintiffs of their familial relationship with Decedent.

102. None of the officers took reasonable steps to protect Decedent from being killed and thus to protect Plaintiffs from the loss of their familial relationship by other responding officers. They are each therefore liable for the injuries and damages resulting from the unreasonable force of each other officer.

103. Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected Constitutional rights.

104. They did so with shocking and willful indifference to Plaintiffs' rights and their conscious awareness that they would cause Decedent's death.

105. Defendants' acts and omissions intentionally deprived Plaintiffs of their Constitutional rights and caused them damages.

106. At all relevant times, Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their interactions with Decedent.

107. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered the loss of their familial relationship with Decedent, and have suffered damages and losses as described herein entitling them to damages in an amount to be determined at trial.

54.108. Plaintiffs are also entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### DEMAND FOR JURY TRIAL

55.109. Plaintiffs demand a trial by jury on all issues triable of right by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants as follows:

A. For Plaintiffs' general and special damages including but not limited to emotional distress, loss of consortium, loss of love and affection, loss of support, medical and funeral expenses and other economic and non-economic damages;

B. For Plaintiffs' costs incurred in pursuing these claims;

C. For pre- and post-judgment interest to the extent provided by law;

D. For such other further relief as the Court deems just and proper.


**RESPECTFULLY SUBMITTED** this 30th day of OctoberAugust, 2020.

**DEGNAN LAW GROUP**

_____
David Degnan, Esq.
Mark Horne, Esq.
*Attorneys for Plaintiffs*

14

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA,<br><br>                            Plaintiffs,<br><br>vs.<br><br>MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X;<br><br>                            Defendants. | No. CV2020-005416<br><br>**RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>(*Assigned to the Honorable Christopher Coury*) |

Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), by and through undersigned counsel, submit the

1

following as their Response to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (the "FAC").

As a preliminary matter, Plaintiffs have filed a motion to amend the FAC to include claims arising under 42 U.S.C. § 1983 and further claims under their wrongful death claim. Plaintiffs aver that their Second Amended Complaint makes moot many of Defendants' arguments in their Motion to Dismiss (the "Motion").

## I.     STANDARD ON MOTION TO DISMISS

In evaluating motions to dismiss for failure to state a claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). In order to state a claim, the complaint "need not contain detailed factual allegations; rather, it must plead enough facts to state a claim to relief that is plausible on its face." *Id*. at 1067-68 (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). Further, motions to dismiss are disfavored and "doubts should be resolved in favor of the pleader." *Williams v. Gorton*, 529 F.2d 668, 672 (9th Cir. 1976).

A motion to dismiss pursuant to Rule 12(b)(6) ARCP that is filed at the initial pleading stage, however, is not favored and *sua sponte* dismissals for failure to state a claim are strongly disfavored. *Acker v. CSO Chevira*, 188 Ariz. 252, 934 P.2d 816 (Ct. App. Div. 1 1997). If the deficiency in the complaint is one that can be cured by further pleading, the motion should be denied, or if granted, the plaintiff should be given leave to amend. *Republic Nat. Bank of New York v. Pima County*, 200 Ariz. 199, 25 P.3d 1 (Ct. App. Div. 2 2001).

## II.     Plaintiff has stated a claim against the Maricopa County Sheriff's Office.

### a. **MCSO HAS DIRECT AUTHORITY AND CONTROL OVER ITS DEPUTIES.**

The Maricopa County Sheriff's Office ("MCSO") has direct authority and control over the deputies involved in Decedent's shooting. MCSO has several policies and procedures that directly relate to the conduct involved in this case[1]. These policies include:

1. MCSO has general disciplinary control over officers. "It is the policy of the Office to ensure that employees are conducting themselves according to the law, Office Policy, Maricopa County Merit Rules, and applicable County Policy. In the event that an employee is not in compliance, the Office shall address the issue and impose fair and equitable discipline as necessary." [MCSO Policy and Procedures: GC-17, Employee Disciplinary Procedures, attached hereto as Exhibit A, at 1.]

2. MCSO has control and oversight over Supervisors, who have control and oversight of subordinates. "It is the policy of the Office to ensure supervisors, at all levels, provide proper direction, coordination, and control of subordinates. Supervisors shall direct their efforts toward the intelligent and efficient performance of the functions of the Office and shall require their subordinates to do the same." [MCSO Policy and Procedures: GB-2, Command Responsibility, attached hereto as Exhibit B, at 1.]

3. MCSO has oversight of policing activities. "Respond to the scene of certain arrests; including but not limited to:…d. Any arrest that involves use of force requiring documentation in a *Use of Force Report*;" [Exhibit B, at 14.]

4. MCSO ensures accountability of all officers in the chain of command. "Sworn commanders shall hold all supervisors directly accountable for the quality and effectiveness of the supervision they provide, including the performance evaluations prepared as specified in Office Policy GC-4, *Employee Performance Appraisals*, and whether they identified and

---

[1] The Court may take judicial notice of the MCSO policies attached hereto, as those policies are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Ariz. R. Evid. 201(b)(2).

responded to employee misconduct, as specified in Office Policies GC-17, *Employee Disciplinary Procedures*, GH-5, *Early Identification System*, and GH-2, *Internal Investigations*." [Exhibit B, at 21.]

5.      Inappropriate use of force is considered an aggravating factor when considering discipline of an officer. "Conduct involving inappropriate use of force (violation of Office Policy CP-1, *Use of Force*, which shall be considered a separate Office Policy violation) in the investigative process." [Exhibit A, at 7-8.]

6.      MCSO is responsible for training its deputies. "It is the policy of the Office to ensure that deputy recruits, deputies-in-training, deputy sheriffs, reserve deputies, posse members, and deputy supervisors are trained to perform the job duties of their respective classifications." [MCSO Policy and Procedures: GG-1, Peace Officer Training and Administration, attached hereto as Exhibit C, at 1.]

7.      MCSO is responsible for ensuring that deputies use force appropriately. "It is the policy of the Office to ensure that trained employees are authorized to use reasonable force or control in the performance of their duties." [MCSO Policy and Procedures: CP-1, Use of Force, attached hereto as Exhibit D, at 1.]

8.      MCSO is responsible for hiring and promoting deputies. "It is the policy of the Office to administer an efficient, effective, and fair process resulting in the appointment and promotion of those individuals who best demonstrate the skills, knowledge, and abilities necessary for a successful career with the Office." [MCSO Policy and Procedures: GC-12, Hiring and Promotional Procedures, attached hereto as Exhibit E, at 1.]

These policies demonstrate that MCSO has complete control over the hiring, training, management, and conduct of its deputies. The actions of the deputies in the shooting of Decedent is exactly within the scope of their employment, as MCSO's policies specifically address use of force. The Amended Complaint properly alleges that the officers involved in the shooting were acting within the course and scope of their employment, were agents and

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

employees of MCSO, and that Maricopa County and MCSO are vicariously liable for their actions. *See State, Dept. of Admin. v. Schallock*, 189 Ariz. 250, 941 P.2d 1275, 1281 (Ariz. 1997) (citing Restatement (Second) of Agency, § 219 *et seq.*). Plaintiffs have properly stated a claim for the vicarious liability of MCSO, which, as explained below, adequately states a claim against Maricopa County as the proper defendant.

Plaintiffs named MCSO in their Amended Complaint because on July 21, 2020, counsel for Maricopa County sent an email to Plaintiffs' counsel raising several issues related to Plaintiffs' Complaint, for the purpose of conferring on those issues prior to filing a motion to dismiss. Defendant's counsel argued that Sheriff Paul Penzone is the proper Defendant and that Maricopa County should be dismissed. Though Plaintiffs still believe that Maricopa County is the proper defendant, Plaintiffs amended their Complaint to add the Maricopa County Sheriff's Office ("MCSO") as a defendant in response to counsel's communications.

**III.** **Plaintiff has stated a claim against Maricopa County, who is the proper party in this litigation.**

Plaintiffs' naming MCSO should not result in dismissal, as naming MCSO adequately refers to the proper defendant. *See Simon v. Maricopa Medical Center*, 225 Ariz. 55, ¶ 13 (Ct. App. 2010) ("Assuming the Police Department is a non-jural entity, Simon's naming the Police Department rather than the City of Phoenix as a defendant in his complaint is a purely technical error that does not warrant dismissal.").

As explained above, MCSO has vicarious liability for the actions of its deputies. But, as Defendants also point out, MCSO is a non-jural entity. *Braillard v. Maricopa County*, 224 Ariz. 481, 232 P.3d 1263 (Ariz. Ct. App. 2010). Because MCSO is a non-jural entity, Maricopa County is the proper defendant in this action. Defendants provide no authority establishing that a county is not the proper defendant for actions taken by its sheriff's office. If Defendants' assertions were correct, it would mean that liability would only attach to the

5

DEGNAN LAW GROUP
410 S. N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

Sheriff himself for excessive use of force by MCSO officers. To support this conclusion, Defendants cite the Arizona Constitution and statutes that state the Sheriff is a county officer and list the Sheriff's duties. However, Defendants provide no authority that only the Sheriff is liable for the actions of his deputies. The Arizona Court of Appeals has held that in a lawsuit arising out of an altercation with officers of a police department, the proper party was the associated jural entity. *Simon*, 225 Ariz. at ¶ 13.

Further, Defendants incorrectly state that Maricopa County's oversight of the Sheriff is limited to "fiscal and budgetary matters," and thus Maricopa County can have no vicarious liability for the actions of the Sheriff or his deputies [Motion at 4.] But, Maricopa County's oversight of the Sheriff is not so limited, and the County has authority to "[m]ake and enforce all local, police, sanitary and other regulations not in conflict with general law." A.R.S. § 11-251(31). The County's ability to enforce police regulations necessarily gives it broad oversight over the Sheriff.

Defendants argue that because the Sheriff hires and trains his deputies, Maricopa County cannot be held vicariously liable as a matter of law. Defendant provides no authority for this proposition, or why the County would not have ultimate oversight over the Sheriff or his deputies. Instead Defendant cites to cases holding that Maricopa County does not have disciplinary control over the Sheriff or his deputies. But, the Arizona Court of Appeals has recognized that a county may incur liability for a county officer's failure to discipline an employee. *See Hounshell v. White*, 220 Ariz. 1, 202 P.3d 466 (Ct. App. 2008) (citing *Estate of Abdollahi v. County of Sacramento*, 405 F.Supp.2d 1194, 1200-01, 1206-07 (E.D. Cal. 2005); *Ware v. Jackson County, Mo.*, 150 F.3d 873, 883 (8th Cir. 1998)). To the extent such an allegation is required to support the County's liability, Plaintiffs request leave to amend the FAC to add such allegation.

**IV.    Count I states a claim for relief under A.R.S. §§ 13-409 and 13-410.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants provide no authority for their assertion that A.R.S. §§ 13-409 and 13-410 do not provide Plaintiffs an affirmative theory of recovery. Instead, the only authority they provide explains how the statutes are used as a justification defense. Plaintiffs have properly pled claims under these statutes and Defendants cannot use a justification defense against Plaintiffs' claims.

## V.  Count II properly states a claim for negligence.

As an initial matter, Defendants' Motion fails to address Plaintiffs' allegations in the FAC that Defendants were negligent for failing to "timely address Decedent's life threatening injuries and in treating the Decedent as a threat as he laid dying from his injuries." FAC at ¶ 34. This allegation claims a distinct act of negligence that Defendants are liable for. Defendants provide no authority establishing they cannot be held liable for their negligence in failing to treat Decedent's injuries. In fact, Defendants do not even address these allegations in their Motion. Dismissal should be precluded based on the allegations regarding Defendants' failure to treat Decedent's injuries.

Further, the FAC should not be dismissed for the allegation of intentional acts in Plaintiffs' negligence claim. Defendants cite to the *Napier* case to argue that intentional acts of an officer cannot support a negligence claim. But the *Napier* case states that a plaintiff may "plead negligence and battery as alternative theories if the evidence supports each theory." *Napier*, 245 Ariz. at ¶ 31. Here, the FAC includes allegations supporting both a negligence theory (failure to address Decedent's injuries) and a battery theory (intentional shooting of Decedent). FAC at ¶¶ 20, 25, 34. To the extent the Court holds that Plaintiffs' allegations regarding Defendants' intentional acts are more appropriately pled through a battery claim, Plaintiffs request leave to amend to clarify their claim.

## VI.  Count III properly states a claim for negligence *per se*.

As discussed above, Plaintiffs have properly pled a claim for negligence. The applicable authority does not hold that a statutory violation must comprise a separate cause of action to support a claim of negligence *per se*, only that there must be a violation of "a statute enacted for the protection and safety of the public…" *Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 596 (App. 1994). Here, Plaintiffs' FAC alleges that Defendants violated A.R.S. § 13-410 by unreasonably using deadly force when it was not warranted. In their Motion, Defendants provide no authority or support for their assertion that A.R.S. § 13-410 was not enacted for the protection and safety of the public. The Arizona Court of Appeals has held that the appropriate standard for negligence *per se* is: "The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment…whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results." *Good v. City of Glendale*, 150 Ariz. 218, 221, 722 P.2d 386, 389 (App. 1986). Here, the type of harm suffered by Decedent is exactly the type of harm that A.R.S. § 13-410 is meant to protect against. The justification statute is designed to specifically set the parameters for when deadly force may be used. Thus, its purpose is to protect the public by forbidding use of deadly force except in very specific situations. Defendants' violation of A.R.S. § 13-410 makes them liable for negligence *per se*.

**VII.**    **Count IV states a claim for wrongful death.**

Defendant argues that Plaintiffs' claim for wrongful death fails because the FAC does not properly state a claim for negligence. For the reasons stated above, Plaintiffs have properly stated claims for negligence and negligence *per se*. Additionally, Plaintiffs' Second Amended Complaint includes further allegations under their wrongful death claim that makes

Defendants' arguments moot. Thus, Plaintiffs have properly stated a claim for wrongful death.

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss the First Amended Complaint in its entirety.

**RESPECTFULLY SUBMITTED** this 30th day of October, 2020.

**DEGNAN LAW GROUP**

/s/ Mark W. Horne
David Degnan, Esq.
Mark W. Horne, Esq.
*Attorneys for Plaintiffs*

ORIGINAL of the foregoing e-filed
this 30th day of October 2020, with copy
emailed to:

Sherle R. Flaggman, DCA
Maxine S. Mak, DCA
**Maricopa County Attorney's Office**
*Civil Services Division*
225 W. Madison Street
Phoenix, AZ 85003
flaggmas@mcao.maricopa.gov
makm@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
*Attorneys for Defendants*

/s/ *Kellen Quinn*

# EXHIBIT A

|  | **MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES** | |
|---|---|---|
| | **Subject** <br> **EMPLOYEE DISCIPLINARY PROCEDURES** | **Policy Number** <br> **GC-17** <br> **Effective Date** <br> **06-25-20** |

| **Related Information** | **Supersedes** |
|---|---|
| Maricopa County Employee Merit Rules <br> Maricopa County Law Enforcement Officer Merit Rules <br> ARS Title 38 Chapter 8 Article 1 <br> ARS § 39-128 <br> ARS Title 39 <br> CP-1, *Use of Force* <br> CP-2, *Code of Conduct* <br> CP-5, *Truthfulness* <br> GC-16, *Employee Grievance Procedures* <br> GE-4, *Use, Assignment, and Operation of Vehicles* <br> GH-2, *Internal Investigations* <br> GH-5, *Early Identification System* | GC-17 (06-27-19) |

## PURPOSE

The purpose of this Office Policy is to establish guidelines and procedures for administrating discipline, maintaining disciplinary records, and processing disciplinary appeals for employees.

Although this Policy refers to "employees" throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

## POLICY

It is the policy of the Office to ensure that employees are conducting themselves according to the law, Office Policy, Maricopa County Merit Rules, and applicable County Policy. In the event that an employee is not in compliance, the Office shall address the issue and impose fair and equitable discipline as necessary.

Office employees are required to report violations of policy; supervisors are accountable for identifying and responding to policy or procedure violations by personnel under their command; and employees are accountable for policy and procedure violations. The Office shall apply policies uniformly.

## DEFINITIONS

*Aggravating Factor:* Any fact or circumstance that increases the severity or culpability of an act (i.e., recidivism, harm to the victim, or lack of remorse).

*Appointing Authority:* For the purpose of this Office Policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for the conducting of the Pre-Determination Hearing; and providing the employee with an opportunity to be heard.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IAPro Early Identification case management system.

***Classified:*** All positions in Maricopa County service that are covered by the Maricopa County Merit System. Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

***Class Remedial Matter:*** Misconduct by employees of the Office involving those matters covered by the Melendres case or the remedies to which those impacted by the Melendres case are entitled.

***Coaching:*** Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of the Attachment A, the first use of Coaching shall not constitute an offense. However, the use of Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation. Coaching shall be documented in Blue Team.

***Early Identification System* (EIS):** A system of electronic databases that capture and store threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, IAPro, and EIPro are applications of EIS.

***Employee:*** A person currently employed by the Office in a classified, unclassified, full-time, part-time, contract, temporary, or probationary status.

***Exempt Employee:*** An employee who meets the definition of an executive, administrative, or professional employee as defined in the Fair Labor Standards Act. Employees who are designated as exempt are not eligible for overtime pay.

***Initial Probation, Detention Only:*** A specified period following the most recent employment, to include hire, promotion, demotion, or transfer, into any classified position during which the work performance of the employee is evaluated. An initial probationary employee is at-will and may be released from initial probation for or without cause. The initial probation shall be a minimum of 12 months, and may be extended by the Sheriff, or designee, for up to six additional months. The exception to the initial probation only occurs based on market range title adjustments and reassignments.

***Probationary Appointment, Sworn Only:*** The appointment to a regular position through certification in accordance with the Law Enforcement Officers Merit System Rules. The probationary period for the probationary appointment of an entry level deputy shall be one year and may be extended by the Sheriff, or designee, for up to six additional months. An employee may be separated at any time during the initial probationary period without the right of appeal. In any case of suspension, dismissal, or demotion during an employee's initial probationary period the Sheriff, or designee, may investigate the circumstances and causes for the action taken. The employee must be given written notice of the action taken by the Sheriff, or designee prior to the expiration of the established probationary period or the employee will be considered to have successfully completed the probationary period.

***Internal Affairs Investigator:*** Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the Professional Standards Bureau (PSB) or supervisors in an Office division or bureau who are assigned to investigate misconduct.

***Intervention:*** An approved specified action taken by a supervisor to improve a situation or prevent a potential

negative work performance situation from developing into misconduct.

***Investigative File:*** The Office's complete investigative report and any attachments detailing the incidents being investigated. The file shall contain, but is not limited to, the *Administrative Investigations Process Checklist, Cover Sheet, Findings Page(s), Prior Work History Report*, Investigative Report, the *Presumptive Range of Discipline* form, the *Employee Disciplinary Considerations and Decision* form, transcripts, audio/video of interviews, body camera footage, the *Inmate Grievance Form* if applicable, etc. Depending on the outcome of the investigation, the file may also contain, but is not limited to, a *Final Disposition Letter*, *Closed Case Notification*, and documents that record discipline, to include the Pre-Determination Hearing (PDH) recording. The Professional Standards Bureau shall maintain the investigative file of all documents within the Office's custody and control relating to any investigation and related disciplinary proceedings, grievance proceedings, and appeals to the Maricopa County Merit System Council or state court.

***Law Enforcement Officer:*** An employee of the Office, other than an initial probation employee, who is a deputy sheriff or a detention officer.

***Minor Discipline:*** Discipline less severe than a suspension, such as a written reprimand.

***Misconduct:*** Any violation of Office Policy or procedure; federal, state, or local criminal or civil law; constitutional violations, whether criminal or civil; administrative rules, including, but not limited to, the Maricopa County Merit System Rules; or Office regulations.

> ***Criminal Misconduct:*** Conduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> ***Minor Misconduct:*** Conduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

> Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include; squad briefing, meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the Office as an External Complaint or has not already been assigned to the PSB.

> ***Serious Misconduct:*** Conduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

***Mitigating Factor:*** Any information or evidence presented regarding the employee or the circumstances of the incident that might result in reduced discipline.

***Non-Exempt Employee:*** An employee who is covered by the provisions of the Fair Labor Standards Act and must be compensated for overtime hours worked.

***Official Investigation:*** An official examination by a supervisor, an internal affairs investigator, a criminal investigator, or a polygraph examiner into alleged employee misconduct that relates to or may affect an employee's position with the Office. The Office has two types of investigations that are used to examine these allegations:

> 1.      Administrative Investigation: An investigation conducted into apparent violations of Office Policy.

Sustained allegations for an administrative investigation provide the basis for the imposition of discipline according to the Discipline Matrices provided in Attachment A and the Categories of Offenses provided in Attachment B.

2.    Criminal Investigation: An investigation by a criminal investigator into an allegation of employee criminal misconduct. These include the process of collecting information (or evidence) about a crime in order to: 1) determine if a crime has been committed; 2) identify the perpetrator; 3) apprehend the perpetrator; and 4) provide evidence to support a conviction in court.

The following does not constitute an official investigation or investigative interview: (a) in the normal course of duty, counseling or instruction, or an informal verbal admonishment by, or other routine or unplanned contact with a supervisor or other law enforcement officer; or (b) preliminary questioning to determine the scope of the allegations or if an investigation is necessary. However, such counseling, instructions, verbal admonishments, other contacts, and preliminary questioning are covered by and subject to the truthfulness standards found in Office Policy CP-5, *Truthfulness*.

***Off-Duty:*** A time considered when an employee is **not** being compensated by the County.

***On-Duty:*** A time considered when an employee is being compensated by the County.

***Pre-Determination Hearing*** **(PDH):** A forum that allows an employee, regardless of employment status, who is being considered for suspension, demotion, dismissal, or probationary release, to address the appointing authority, the Sheriff, or designee, regarding the intended discipline.

***Preponderance of the Evidence:*** Facts alleged are more likely true than not true. Preponderance of the evidence is only utilized when determining an investigatory finding of Sustained.

***Promotional Probation*** **(Sworn Only):** The promotional probationary period for a sworn employee shall be six months unless extended by the Sheriff for no more than six months. A promotional probationary employee, who fails to satisfactorily complete the promotional probationary period, may, without right of appeal, revert to a position of the class previously occupied or to another suitable position. A promotional probationary employee, who is suspended or dismissed, has the right of appeal.

***Regular Status:*** The status a deputy sheriff or detention officer achieves under the applicable Maricopa County Merit System Rules when retained a position of the classified service following the successful completion of the initial probation period or probationary appointment period.

***Serious Discipline:*** Discipline which results in an employee receiving a suspension, demotion, or dismissal from employment. All sustained violations of a Category 7 Offense, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, shall result in dismissal from employment.

***Unclassified Employee, Civilian Only:*** An at-will employee not covered by the Maricopa County Employee Merit System Rules.

***Volunteer:*** A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

**PROCEDURES**

1.    **Individual Responsibility:** Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary action, up to and including dismissal from employment. The presumptive discipline for a failure to report such allegations shall be commensurate with the presumptive discipline for the

underlying misconduct. All employees who commit misconduct shall be held accountable, as specified in this Office Policy.

2. **Conflicts of Interest:** Conflict of interest, nepotism, or bias of any kind in the administration of discipline is prohibited.

   A. No employee who has an external business relationship or close personal relationship with a principal may make any disciplinary decisions or recommendations with respect to the misconduct, including the determination of any appeal arising from any discipline.

   B. No employee shall be involved in making any disciplinary decisions or recommendations with respect to any persons who are superior in rank and in their chain of command.

   C. If the appointing authority who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting their involvement should immediately inform the PSB Commander, or if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority. The outside authority for disciplinary matters will be the Maricopa County Attorney's Office – Civil Division.

3. **Supervisor Initiated Intervention:** An approved action, as specified in Office Policy GH-5, *Early Identification System*, taken by a supervisor to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation. Supervisors may also initiate this action when an employee's conduct has minimal negative impact on the overall operations of the Office. Examples of employee work performance situations in which a supervisor may consider approved interventions include those categorized as a Category 1 or Category 2 of the Attachment B, of this Office Policy. Employee conduct outside of the limitations of this section shall be addressed, as specified in Office Policy GH-2, *Internal Investigations*. Supervisors are encouraged to contact the PSB if unsure whether the employee work performance situation may be addressed through a supervisor initiated intervention or reported to the PSB for investigation.

   A. Prior to determining intervention regarding work performance situations, the supervisor shall:

      1. Confirm the employee's conduct does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, as specified in this Office Policy, and which has not been received by the Office as an External Complaint, or has not already been assigned to the PSB;

      2. Review the employee's EIPro Dashboard to assist the supervisor in their intervention or corrective action decision; and

      3. Ensure that when considering a Coaching for the intervention, that the employee will not exceed the number of Coachings allowed, as specified in this Office Policy for three years prior to the current Offense.

   B. All supervisor initiated intervention action taken shall be documented in Blue Team, as specified in Office Policy GH-5, *Early Identification System*. The entry shall include justification for the intervention and the specific policy or policies involved in the performance issue linked to the employee.

4. **Progressive Discipline:** In order to protect the integrity and reputation of the Office, discipline shall be imposed pursuant to the appropriate disciplinary matrices in the Attachment A, as a corrective or punitive measure in response to an employee's misconduct in violation of Office Policy. The minimum level of

discipline imposed shall be a Written Reprimand. Acts of misconduct or repeated deficient job performance may warrant the use of progressive discipline. However, grave acts of misconduct may warrant serious discipline of an employee without minor discipline being used. Accordingly, minor discipline should generally be imposed first, unless the misconduct is of a more grievous nature. Conversely repeat violations, or multiple violations arising from one incident, should generally result in progressively more serious discipline. The PSB Commander and the appointing authority shall determine if minor or serious discipline are warranted upon review of the investigative report, the discipline matrices, and the Categories of Offenses. Progressive discipline does not apply to initial probationary or temporary employees.

A.     The Office will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline.

B.     The Office will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed.

5.     **Preliminary Determinations of Discipline:**

A.     Internal affairs investigators shall not recommend discipline. The administrative investigation sustaining a policy violation shall be forwarded to the PSB Commander to initiate the disciplinary process.

B.     The PSB Commander shall make preliminary determinations of the range the discipline to be imposed in all cases and shall document those determinations in writing on the *Presumptive Range of Discipline* form specific to the investigation under review, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.

C.     Once the PSB Commander determines the range of discipline to be imposed, the Administrative Services Division shall be responsible for coordinating the discipline process with the appointing authority. This includes preparing detailed correspondence, scheduling the PDH (if applicable), and ensuring all necessary notifications and actions are completed.

1.     If the PSB Commander makes a preliminary determination that minor discipline should be imposed, and the appointing authority has concurred, a Written Reprimand shall be prepared by the Administrative Services Division, as specified in this Office Policy.

2.     If the PSB Commander makes a preliminary determination that serious discipline should be imposed, the appointing authority will provide an opportunity for a PDH and will provide the employee with an opportunity to be heard, as specified in this Office Policy.

3.     When the determination indicates policy, training, tactical or equipment concerns, the PSB Commander shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate bureau chief and division commander for review and action.

6.     **Discipline Matrices:** One of the primary goals of this Office Policy is to make discipline uniform and equitable throughout the Office. It is essential to consider the offense, as well as mitigating and aggravating circumstances, when determining the level of discipline to be imposed. The Discipline Matrices (see Attachment A) represent penalties to be imposed for various Categories of Offenses. The Matrices establish a presumptive range of discipline dependent on the number of offenses and the duration of time between offenses. The Discipline Matrices also take into consideration the requirement that discipline for unclassified supervisory level or exempt, regular status employees must be issued pursuant to the Fair Labor Standards Act (FLSA) and that unclassified supervisory level or exempt, regular status employees typically hold a management

position and, therefore, are held to a higher standard. The employee's race and color, gender, gender identity, sexual orientation, national origin, age, religion, disability, pregnancy, veteran status, genetic information, or ethnicity is a prohibited consideration when determining discipline.

A.      The Office shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.

B.      The PSB Commander and the appointing authority reserve the right to deviate from the Discipline Matrices when the prescribed penalty fails to address the totality of the circumstances of the event. This deviation could result from a combination of mitigating or aggravating factors associated with a misconduct event, or possibly following the review of an outside agency's investigative report. Any departure from the presumptive range of discipline set out in the Discipline Matrices shall be justified in writing by PSB Commander or the appointing authority and placed in the employee's Personnel File and investigative file.

C.      The appointing authority shall administer discipline in matters involving serious discipline. The following shall be considered by the PSB Commander and the appointing authority when determining the appropriate penalty within the minimum and maximum recommended range of the Discipline Matrices:

     1.      The Office shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.

     2.      When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the Category of the Offense. Exoneration on the most serious offense does not preclude discipline or consideration of aggravating circumstances as to less serious offenses stemming from the same misconduct.

     3.      Mitigating and aggravating factors shall be considered when determining the appropriate discipline but shall not be utilized to absolve an employee of liability for the conduct.

         a.      Examples of mitigating factors that may be considered include, but are not limited to:

             (1)      Employee's work or service record;

             (2)      Employee's attitude towards the offense (accepts responsibility and does not shift to another);

             (3)      Employee notified the Office of the wrongdoing;

             (4)      Employee expressed remorse;

             (5)      Conduct occurred due to provocation by another employee;

             (6)      Conduct occurred due to an order by a supervisor; and/or

             (7)      Conduct was a mistake or misunderstanding of facts.

         b.      Examples of aggravating factors that may be considered include, but are not limited to:

(1)     Employee's work or service record;

(2)     Employee's attitude and actions during the investigation;

(3)     Employee's prior disciplinary record (as allowed for in this Office Policy);

(4)     Employee was previously warned or disciplined for engaging in similar misconduct;

(5)     Employee was dishonest (violation of Office Policy CP-5, *Truthfulness,* which shall be considered a separate Office Policy violation) during the investigation process;

(6)     Employee did not express remorse;

(7)     Employee failed to fully acknowledge the wrongful conduct, shifted blame;

(8)     Employee did not fully cooperate (violation of Office Policies CP-2, *Code of Conduct* and GH-2*, Internal Investigations*, which shall be considered separate Office Policy violations) in the investigative process;

(9)     Employee holds a rank or position of authority within the Office;

(10)    Employee was intoxicated;

(11)    Employee's contacts with the public, and prominence of the position;

(12)    Conduct was intentional, planned and premeditated;

(13)    Conduct occurred or was repeated over a significant length of time;

(14)    Conduct was deliberate, willful or reckless;

(15)    Conduct had a possibility to harm self, other employees, the Office, or the community;

(16)    Conduct harmed the profession of law enforcement;

(17)    Conduct caused a high level of torment or anguish to the victim;

(18)    Conduct involved the use of official authority to facilitate the misconduct;

(19)    Conduct resulted in financial benefit or self-gain to the employee;

(20)    Conduct involving inappropriate use of force (violation of Office Policy CP-1, *Use of Force*, which shall be considered a separate Office Policy violation) in the investigative process;

(21)    Conduct was based on a personal motive;

(22)    Conduct was criminal; and/or

(23)    Conduct was repetitive violations of the same nature.

4.      The number of times an employee has received prior discipline, shall be considered when determining where an employee shall be placed within the Categories and Offenses of the Matrices.

     a.      Discipline involving a sustained Office Policy violation of a Category 1-3 offense shall be considered for three years prior to the current offense.

     b.      Discipline involving a sustained Office Policy violation of a Category 4-7 offense shall be considered for five years prior to the current offense.

     c.      As an example: If a non-exempt employee has a sustained Category 2 and a separate sustained Category 5 (within three years prior to the current offense) and the current case involves a Category 2 offense, the conduct would be placed within the "Third Offense, Category 2" having a range of an 8-hour to 24-hour suspension.

     d.      All sustained violations of a Category 7 offense shall result in dismissal from employment.

5.      The Office is prohibited from considering the high (or low) profile nature of the incident, including media coverage or other public attention when determining appropriate discipline. The Office shall consider the nature of the allegations and any impact that tends to disrupt, diminish, or otherwise jeopardize public trust in the law enforcement profession.

➢   7.      **Office Vehicle Accidents:** The following shall apply for types of Office vehicle accidents specified in Office Policy GE-4, *Use, Assignment, and Operation of Vehicles*:

A.      Not at Fault Vehicle Accidents: Employees operating an Office vehicle involved in an accident in which it is determined during an accident investigation, review of the collision report, or during a command vehicle accident review, the employee is not at fault, shall not be reported to PSB for review. The accident shall be entered into Blue Team by the on-duty supervisor under the Incident Type: Vehicle Accident and requires no further action.

B.      Minor Vehicle Damage Accidents: Employees operating an Office vehicle involved in a minor vehicle damage accident, such as coming into contact with a concrete pillar or curb, a tree, a sign, another office vehicle, or other object, where damage occurs; the employee operating the vehicle causes damage to the undercarriage of the vehicle; or when the employee operating the vehicle causes damage to the vehicle due to driving on a non-paved road, shall not be reported to PSB for review. The accident shall be entered into Blue Team by the on-duty supervisor under the Incident Type: Vehicle Accident and requires no further action.

     1.      When an employee exceeds the EIS established threshold for Office vehicle accidents, the employee's supervisor shall complete the EIS Alert Response form, as specified in Office Policy GH-5, *Early Identification System*.

     2.      Coachings regarding Office vehicle accidents shall be considered separately when determining placement in the disciplines matrices for those matters covered in this Office Policy, and shall not be counted with any other Coachings unrelated to an Office vehicle accident.

C.      At Fault Vehicle Accidents or Vehicle Accidents Involving Injury: Employees operating an Office vehicle involved in an accident in which it is determined that the employee is at fault or there are injuries as a result of the vehicle accident, the incident shall be entered into Blue Team by the on-duty supervisor as an Internal Complaint and investigated.

D.     Emergency Response/Pursuit Driving Accidents: Accidents occurring during emergency response/pursuit driving, regardless of fault, shall be entered into Blue Team as an Internal Complaint and investigated.

E.     Blue Team entries shall include all related paperwork and reports, such as memorandums, the Damaged County Vehicle form, photographs, and Employers Report of Industrial Injury, and any County Risk Management documents, as attachments.

8.   **Minor Discipline:** Minor discipline may be imposed to correct an employee's performance or conduct. Discipline shall be based on the misconduct. The following form of disciplinary action is minor discipline:

A.     Written Reprimand: A Written Reprimand is a written directive to an employee advising the employee of performance deficiencies. The reprimand shall include corrective action to be taken by the employee.

Upon the PSB Commander's preliminary determination of discipline for an administrative investigation, and the appointing authority's concurrence, a Written Reprimand shall be prepared by the Administrative Services Division. The *Written Reprimand* shall include the following:

1.     An accurate and concise description of the conduct involved;

2.     A complete list of each sustained Office Policy, applicable County Policy, and/or County Merit Rules, stating the policies or rules that were violated, and quoting the relevant section/s verbatim;

3.     The Investigative Action (IA) case number;

4.     Corrective action to be taken by the employee;

5.     A directive forbidding recurrence of the unacceptable conduct and a notice that future similar conduct will result in further disciplinary action; and

6.     The appointing authority's signature.

B.     Once completed with all requisite signatures, the Written Reprimand will be forwarded to the supervisor who shall review and discuss the Written Reprimand with the employee and instruct the employee to acknowledge receipt by signing and dating the reprimand. If the employee refuses to sign the form, the supervisor shall document that on the form by writing refused to sign in the employee's signature block, with the supervisor's name and the date.

1.     A copy of the Written Reprimand shall be given to the employee and a second copy shall be placed in the employee's Division File. The original reprimand shall be sent to the Administrative Services Division who will be responsible for: placing a copy in the administrative investigation, scanning a copy into the EIS, and forwarding the original to the Human Resource Services Division for placement into the employee's Personnel File.

2.     Information regarding the Written Reprimand shall be included in the employee's next Employee Performance Appraisal (EPA).

C.     As specified in Office Policy GC-16, *Employee Grievance Procedures*, a Written Reprimand is not a grievable matter. If the employee disagrees with the content of the Written Reprimand, he may submit a written response to the Administrative Services Division within five business days. The Administrative Services Division shall ensure that the employee's written response is attached to the Written Reprimand and processed, as specified in this Office Policy. The employee's Written

Reprimand and associated attached written response shall become part of the file and be available for supervisory review in any future event. No further action will occur with the Written Reprimand or written response.

9. **Serious Discipline of a Regular Status Employee:**

A. Serious discipline, as defined as a suspension, demotion, or dismissal, may be imposed upon a sustained misconduct allegation, following a determination by the PSB Commander that serious discipline should be imposed, and the concurrence by the appointing authority.

B. A regular status law enforcement officer shall not be subject to serious discipline except for just cause. Each of the following prongs shall be met prior to issuing such discipline to a regular status law enforcement officer:

1. The employee was informed that disciplinary action could potentially result for such conduct, through the law, Merit Rules, applicable County Policy, Office Policy, command directives, *The Briefing Board*, other communications to the employee, or the employee should reasonably have known that disciplinary action could occur for such conduct;

2. The disciplinary action is reasonably related to the standards of conduct for a professional law enforcement officer, the mission of the Office, the orderly, efficient or safe operation of the Office, or the law enforcement officer's fitness for duty;

3. The discipline is supported by a preponderance of evidence that the conduct occurred; and

4. The discipline is not excessive and is reasonably related to the seriousness of the offense and the law enforcement officer's service record.

C. Employees who are being considered for serious discipline and will be conducting business with the Administrative Services Division will be required to secure all weapons in a locker, to include firearms and knives, prior to entering the Division. This includes the employee and the employee's assistant.

D. Pre-Determination Hearing (PDH): A regular status employee shall be offered a full opportunity to a PDH prior to imposing serious discipline.

1. PDH Notice: Employees who are being considered for serious discipline shall be notified in writing by the appointing authority. Once the notice is signed by the appointing authority a copy shall be placed in the investigative file. The notification shall include the following information:

   a. The proposed disciplinary action and, if suspension is being considered, the length of suspension being considered shall be included;

   b. The Maricopa County Merit Rules as applicable, and other policies that the employee is alleged to have violated;

   c. Sufficient details describing the specific reasons that are being considered for the disciplinary action and the application of the Discipline Matrices;

   d. The employee's relevant disciplinary history as specified in this Office Policy;

   e. The employee's opportunity to review the investigation file;

   f.  The employee's opportunity to present mitigating information; and

   g.  The date and time of the PDH. The date and time for the PDH shall allow a minimum of three business days for the employee to prepare for the hearing.

2. Summary of Discipline Issued: Upon request, employees shall be provided a basic summary, prior to the PDH, of discipline issued for similar-type misconduct, pursuant to the guidelines provided in ARS Title 38 Chapter 8 Article 1.

3. Employee Review of the Investigative File: The employee may review the investigative file prior to the PDH. The employee shall be granted, upon request, a reasonable amount of on-duty time to review the investigative file. The review shall not exceed eight hours and cannot require the use of overtime compensation. Supervisors are encouraged to make any necessary adjustment to the employee's schedule to avoid overtime compensation.

   a.  The employee may bring an assistant of their choosing to aid with the review of the investigative file and shall provide the assistant's name to the Administrative Services Division prior to the review. If the assistant is an Office employee, the assistant shall obtain permission from their immediate supervisor to be absent from their duties and shall do so at no cost to the Office by using their own off-duty time. Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operations of the area where the assistant is assigned.

     (1)  The assistant may not be an attorney or an Office supervisor, which includes anyone holding the rank of sergeant or above, or their civilian counterpart.

     (2)  The assistant shall not be in any way involved in the investigation or a related investigation.

     (3)  The use of an assistant does not grant the employee or the assistant permission to discuss the investigation with other members of the Office.

     (4)  The assistant shall be required to sign the Admonishment Regarding Review of Pending Investigation. Employees found to be in violation of the admonishment may be subject to disciplinary action, up to and including dismissal from employment.

   b.  Neither the employee nor their assistant may copy any portion of the investigative file during this review; however, both may take notes when reviewing the file.

4. PDH: The hearing shall be conducted with the appointing authority. The employee shall be compensated for the PDH and the supervisor shall adjust the employee's schedule to avoid overtime compensation.

   a.  The employee may bring an assistant of their choosing to aid with the PDH and shall notify the Administrative Services Division in advance who shall be attending. If the assistant is an Office employee, the assistant shall obtain permission from their immediate supervisor to be absent from their duties and shall do so at no cost to the Office by using their own off-duty time. Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operations of the area where the assistant is assigned.

       (1)     The assistant may not be an attorney or an Office supervisor, which includes anyone holding the rank of sergeant or above or their civilian counterpart.

       (2)     The assistant shall not be in any way involved in the investigation or a related investigation.

       (3)     The use of an assistant does not grant the employee or the assistant permission to discuss the PDH with other members of the Office.

b.     PDH's will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file. Upon request, the employee shall be provided a copy of the recording within 30 calendar days of the request.

c.     The employee's right to a PDH may be satisfied by the employee submitting a written response to the PDH Notice. If the employee does not appear at the PDH or submit a written response to the PDH Notice by the date of the PDH, the employee shall be deemed to have waived their right to a hearing.

d.     If an employee provides new or additional evidence at a PDH, the hearing will be suspended, and the matter will be returned to the PSB Commander for consideration or further investigation, as necessary.

       (1)     If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the PDH.

       (2)     The PSB shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.

e.     Upon consideration of all facts, the appointing authority, may:

       (1)     Impose a suspension, demotion, or dismissal and issue a Notice of Disciplinary Action to the employee;

       (2)     Further the investigation based on information provided during the PDH. If the employee disputes the fact found in the investigation, the internal affairs investigator shall be permitted to respond to the disputed facts or conduct additional investigation; and/or

       (3)     Take other appropriate action.

f.     The appointing authority shall document how the conclusion was reached for the issued discipline. This documentation shall be appended to the investigation file and placed in the employee's Personnel File.

       (1)     If the appointing authority conducting the PDH does not uphold the preliminary findings recommended by the PSB Commander in any respect or does not impose the PSB Commander's recommended discipline and/or non-disciplinary corrective action, the appointing authority shall also document in a written narrative their justification for doing so. This justification will be specific to the circumstances of the case and of sufficient detail to provide adequate understanding of the action taken or not taken, for an independent

reviewer, and be appended to the investigation file.

    (2)    The appointing authority shall document in a written narrative all deviation from the disciplinary matrices and shall only do so for reasons described in this Office Policy. This justification will be specific to the circumstances of the case and be appended to the investigation file. The appointing authority may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrices:

        (a)    Their personal opinion about the employee's reputation; and

        (b)    Whether others were jointly responsible for the misconduct, except that the appointing authority may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

E.    Notice of Disciplinary Action: When serious discipline is imposed, a regular status employee shall be notified in writing by the appointing authority.

    1.    A copy of the PDH Notice and Notice of Disciplinary Action, as well as documentation of the PDH hearing and subsequent actions taken by the appointing authority, shall be made part of the investigative file.

    2.    Copies of the PDH Notice and Notice of Disciplinary Action shall be placed in the employee's Personnel File. However, no information about the investigation of a law enforcement officer shall be placed in the Personnel File until the investigation and any subsequent disciplinary appeals to the Maricopa County Merit Commission are complete, as specified in ARS Title 38 Chapter 8 Article 1.

    3.    The Notice of Disciplinary Action shall include the following information:

        a.    The specific discipline imposed;

        b.    The Maricopa County Merit Rules as applicable, and other policies that the employee violated;

        c.    Sufficient details describing the specific reasons that were considered for the disciplinary action;

        d.    The employee's relevant disciplinary history as specified in this Office Policy;

        e.    The regular status employee's right to appeal such action to the Maricopa County Merit Commission; and

        f.    The Office Policies that were Not Sustained, Exonerated, or Unfounded.

    4.    Employees who are suspended remain governed by all the provisions of Office Policy CP- 2, *Code of Conduct*. While suspended, employees shall not wear any law enforcement uniform or take any law enforcement-type action, including working any off-duty employment.

F.    Administrative Leave with Pay: If it is determined that an employee must be removed from the workplace pending a PDH or a final discipline determination, the employee may be placed on

Administrative Leave with Pay, as specified in Office Policy GH-2, *Internal Investigations*. Employees on Administrative Leave with Pay remain governed by all the provisions of Office Policy CP-2, *Code of Conduct*. While on Administrative Leave with Pay, employees shall not wear any law enforcement uniform or take any law enforcement-type action, including working any off-duty employment.

10. **Serious Discipline of an Unclassified Employee**: An unclassified employee is not covered by the Maricopa County Merit System, however, shall be given the option of attending a PDH.

   A.   An unclassified employee is not obligated to attend the PDH as attendance is voluntary.

   B.   Any verbal or written statements made during the PDH may be used to incriminate the employee.

   C.   The PDH's will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file. Upon request, the employee shall be provided a copy of the recording within 30 calendar days of the request.

   D.   The employee may submit information in writing in addition to, or instead of attending the hearing.

   E.   The employee may be placed on Administrative Leave with Pay, as specified in this Office Policy.

   F.   Discipline imposed is not subject to appeal to the Maricopa County Merit Commission.

11   **EIS:** Once the discipline has been issued and the employee's right to appeal timeframe has expired, or following the completion of the appeal process, the Administrative Services Division is responsible for uploading the Findings of the investigation into IAPro. This information will then be accessible to supervisors in EIPro.

12. **Rescission of Discipline:** The Sheriff and the appointing authority have the authority to rescind, revoke, or alter any disciplinary decision made by either the PSB Commander or the appointing authority so long as:

   A.   That decision does not relate to the Sheriff or the appointing authority;

   B.   That decision is not related to an independent authority or to a Class Remedial Matter;

   C.   The Sheriff, or the appointing authority, provides a written narrative that documents the justification for the grounds of the decision as to each employee involved;

   D.   The written explanation is placed in the Personnel Files of all employees who were affected by the decision of the Sheriff, or the appointing authority; and

   E.   The written explanation is available to the public upon request.

13. **Appeal of Disciplinary Action:** A classified employee who receives discipline may request a review.

   A.   Any classified employee who receives minor discipline and disputes the content of the discipline may submit a written response, as specified in this Office Policy.

   B.   Serious discipline of classified regular status employees may be appealed to the Maricopa County Merit Commission. Procedures are specified in the Law Enforcement Officer Merit Rules for sworn personnel, the Employee Merit Rules for detention and classified civilian personnel, and ARS Title 38 Chapter 8 Article 1 for a regular status law enforcement officer. The Maricopa County Merit Rules are located on the Maricopa County Intranet.

C. On an appeal of discipline by a regular status law enforcement officer, the Maricopa County Merit Commission may dismiss the discipline if it determines that the Office did not make a good faith effort to complete the investigation within 180 calendar days, as specified in ARS Title 38 Chapter 8 Article 1.

1. The allegation regarding any employee act, omission, or misconduct may be sustained and the employee's personnel file shall reflect that the allegation was sustained, but no discipline was administered due to the Merit Commission's determination that the Office did not make a good faith effort to complete the investigation within 180 calendar days. Documentation of the Merit Commission outcome shall be placed in the investigative file.

2. The sustained discipline may be considered when determining discipline in any future sustained misconduct violation.

D. Any unclassified employee may not seek an appeal to discipline imposed.

➢ 14. **Volunteer**: A volunteer's continued service with the Office shall be at the discretion of the Sheriff. Volunteers are subject to, and shall comply with all Office Policies, rules, and regulations. Violations of Office Policies, rules, and regulation shall be addressed, as specified in Office Policies GH-2, *Internal Investigations,* and this Office Policy. Serious violations of Office Policy by a volunteer, shall result in a review by the PSB Commander to determine whether a Pre-Determination Hearing is held, or the services of the volunteer are to be immediately terminated

15. **Class Remedial Matters and Independent Disciplinary Authority:** Matters involving class remedial matters and the independent disciplinary authority shall be processed as required by law and Office Policy. Additional information regarding these processes may be obtained from the Administrative Services Division Operations Manual.

➢ 16. **Pay Increase Involving Employee Misconduct:**

A. An EPA shall not be held for an employee who is the principal of an open misconduct investigation, as specified in this Office Policy. Upon completion of the EPA, the employee may be eligible for a pay increase, provided the employee, "Meets Standards."

B. If an employee's investigation results in a sustained finding; and serious discipline is imposed, the employee shall not be eligible for their pay increase for 12 months following the date their suspension was imposed.

17**.** **Records Disclosure:** The Administrative Services Division may distribute copies of all or any portion of an investigative file for administrative or public record purposes or as necessary to comply with a judgment of a federal or state court.

A. In accordance with ARS Title 38 Chapter 8 Article 1, information about a regular status law enforcement officer's investigative file shall not be released for public inspection until the investigation is complete or the Office has discontinued the investigation. If the investigative file is the subject of an appeal to a disciplinary action by a classified law enforcement officer, the investigative file is not complete until the conclusion of the appeal process before the Maricopa County Merit Commission.

B. Investigative files for all other Office employees shall be released in accordance with state law pursuant to ARS, Title 39.

C. Polygraph data and reports regarding a classified law enforcement officer shall be disclosed pursuant

to ARS Title 38 Chapter 8 Article 1.

18.     **Records Retention:** In accordance with ARS § 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions. Administrative investigative files shall be maintained for five years after an employee's separation or retirement from Office employment, or as long as any document preservation requirement applies as a result of litigation.

# EXHIBIT B



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | | |
|---|---|---|
| **Subject**<br><br>**COMMAND RESPONSIBILITY** | **Policy Number**<br>**GB-2** | |
| | **Effective Date**<br>**06-28-19** | |

| Related Information | Supersedes |
|---|---|
| Arizona Constitution, Article 12, Section 3<br>ARS § 11-441 through 459<br>CP-2, *Code of Conduct*<br>CP-8, *Preventing Racial and Other Bias-Based Profiling*<br>CP-9, *Occupational Safety Program*<br>EA-2, *Patrol Vehicles*<br>EB-2, *Traffic Stop Data Collection*<br>GA-1, *Development of Written Orders*<br>GC-1, *Leaves and Absences*<br>GC-4, *Employee Performance Appraisals*<br>GC-17, *Employee Disciplinary Procedures*<br>GC-19, *Dress and Appearance*<br>GC-20, *Uniform Specifications*<br>GG-1, *Peace Officer Training Administration*<br>GG-2, *Detention/ Civilian Training Administration*<br>GH-2, *Internal Investigations*<br>GH-4, *Bureau of Internal Oversight Audits and Inspections*<br>GH-5, *Early Identification System*<br>GI-1, *Radio and Enforcement Communications Procedures*<br>GJ-2, *Critical Incident Investigations,*<br>GJ-35, *Body-Worn Cameras* | GB-2 (05-10-18) |

**PURPOSE**

The purpose of this Office Policy is to establish the order of command authority in the absence of the Sheriff, clear lines of authority through unity of command, guidelines for effective span of control, and other elements of command responsibility.

Although this Office Policy refers to "employees" throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

**POLICY**

It is the policy of the Office to ensure supervisors, at all levels, provide proper direction, coordination, and control of subordinates. Supervisors shall direct their efforts toward the intelligent and efficient performance of the functions of the Office and shall require their subordinates to do the same.

**DEFINITIONS**

➤ ***Bureau of Internal Oversight* (BIO) *Action Form:*** A form that captures command's response when the Audits and Inspections Unit (AIU) has identified perceived deficiencies during the performance of non-audit services, regardless of whether the deficiency is within the scope of the inspection, or outside the scope. The *BIO Action Form* (see attachment A) shall be sent out by the AIU as an attachment to a *BIO Action Form* entry initiated through Blue Team to a commander when their employee has been identified as having a perceived deficiency in a non-audit service report. The commander shall assign the form to be completed by the identified employee's immediate

supervisor. The completed *BIO Action Form* shall include the immediate supervisor and the employee's signature affirming the action taken to remedy the identified perceived deficiency. When deficiencies are identified, they shall be handled, as specified in Office Policy GH-5, *Early Identification System*, and this Office Policy. An Early Identification System (EIS) alert notification will be automatically initiated after the threshold of three deficiencies in a rolling 12-month period, identified from AIU inspections. The supervisor shall complete one of the following action options when completing a *BIO Action Form*:

A.   Training provided by MCSO, as specified in Office Policies GG-1, *Peace Officer Training Administration* and GG-2*, Detention/Civilian Training Administration*;

B.   Squad briefings,;

C.   Coaching;

D.   Referred to the Professional Standards Bureau (PSB) for investigation;

E.   Meeting with Supervisor;

F.   Meeting with the Commander;

G.   Supervisor Evaluation Period;

H.   Supervisor Ride Along/Work Along;

I.   Re-assignment;

J.   Employee Services;

K.   Action Plan; or

L.   No Further Action – To be used only in situations where the division identified and addressed the deficiency prior to being notified by the BIO. The Blue Team event number that was used to memorialize corrective actions previously taken by the division, shall be included to demonstrate that no additional action is warranted.

**Blue Team:** The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IAPro Early Identification case management system.

**Boilerplate:** Language that is stock, unoriginal, appears repeatedly in different reports, and fails to attest to the unique facts of an incident.

**Chain of Command:** Lines of communication going downward or upward through each successive level of command and supervision within the Office.

**Conclusory:** Language that is an inference, which has no proof.

**Court Order Required Training** (CORT)**:** The section of the Training Division that covers CORT Technical Support, CORT Curriculum Development, CORT Implementation, CORT Administration, and a supervisor to oversee all positions.

**Deputy:** Any sworn law enforcement officer employed by or working for the Office, to include a reserve deputy.

*Early Identification System* **(EIS)***:* A system of electronic databases that capture and store threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, the EIS Dashboard, IAPro, and EIPro are applications of EIS.

*Early Intervention Unit* **(EIU)***:* The EIU is part of the Bureau of Internal Oversight. The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users. The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures. The Office shall ensure there is sufficient staff to facilitate EIS input and training.

*Employee:* A person currently employed by the Office in a classified, unclassified, full-time, part-time, contract, temporary, or probationary status.

*Incident Report* **(IR)** *Memorialization:* An entry generated in Blue Team by a supervisor detailing  report writing deficiencies of a serious nature, or any investigatory stop, detention, or search unsupported by reasonable suspicion or are otherwise in violation of Office Policy. The *IR Memorialization* shall be generated if an employee's report, investigatory stop, detention, or search, contains any of the following: conclusory or boilerplate language; inconsistent information; lacks support for the action; has other indicia that the information in the report or form is not authentic or correct; lacks articulation of the legal basis for action; has other indicia that the information in the report or form is not authentic or correct; lacks probable cause for arrest; lacks reasonable suspicion; lacks elements of the crime; or appears to show evidence of bias-based profiling.

*Internal Affairs Investigator:* Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the PSB or supervisors in an Office division or bureau who are assigned to investigate misconduct.

➢ *Intervention:* An approved action taken by a supervisor to improve a situation or prevent a potential negative work performance deficiency situation from developing into misconduct.

*Line-Level Inspections:* Conducted by supervisors to ensure personnel are complying with Office policies, standard operating procedures, and requirements governing appearance, use and maintenance of uniforms, equipment, and facilities.

*Misconduct:* Includes any violation of Office Policy or procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> *Criminal Misconduct:* Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> *Minor Misconduct:* Conduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

➢ Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include;

squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the Office as an External Complaint or has not already been assigned to the PSB.

*Serious Misconduct:* Conduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

*Patrol Activity Log* **(PAL)***:* A report generated by Praxis indicating the activities of a patrol deputy or patrol supervisor which are captured through Office Code entries entered into the CAD System by Communications Division personnel, patrol deputies, and patrol supervisors. These activities include all dispatched calls and self-initiated activity conducted throughout their shift.

*Shift Briefings:* Informal sessions of short duration to keep employees' knowledge levels high, to keep employees up-to-date on new trends and developments, to keep employees notified of changes in schedule and assignments, and to provide training updates as determined by the Training Division.

*Supervisor:* An employee to whom subordinates report.

    A.   Commander: An employee with the rank of lieutenant or above, or its civilian equivalent and above.

    B.   First-Line Supervisor: An employee with the rank of sergeant, or its civilian equivalent.

*TheHUB:* The learning management system by which employees, reserve deputies, and posse members are provided access to all Office Policies; and where the acknowledgment of all Office Policy updates and revisions, indicating that they have been reviewed and understood by the viewer, are recorded. TheHUB shall also be used by employees, reserve deputies, and posse members to complete training requirements, and to register for in-person courses.

*Threshold:* The point at which a sufficient number of incidents have occurred to alert the EIU of conduct or performance that could become problematic for an employee or require a review of an Office operating procedure.

*Volunteer:* A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

## PROCEDURES

1.    **Command Authority of the Office:** The order of command authority for the Office shall be:

    A.   Sheriff: The elected position of Sheriff is derived from the Arizona Constitution, Article 12, Section 3, which permits the legislature to establish the range and scope of the Sheriff's authority, mandated duties, and responsibilities as set forth in Arizona Revised Statutes (ARS) § 11-441 through 459. The Maricopa County Sheriff's Office is the agency established to assist the Sheriff in executing their statutory duties and in providing public safety services to the members of the public of Maricopa County. The mandated responsibilities of the Office include, but are not limited to:

        1.    Providing law enforcement and preservation of the peace throughout all of Maricopa County, while recognizing that primary responsibility in incorporated cities is that of local police;

        2.    Providing for the care, custody, and control of individuals incarcerated in the Maricopa County jails;

3.       Supporting the Maricopa County Superior Court System by providing prisoner detention and transportation services, courtroom security, and the service of court process;

4.       Conducting or coordinating, within Maricopa County, search or rescue operations involving the life or health of any person; and

5.       Providing the training, logistical, and administrative support necessary to comply with mandated functions.

B.       In the absence of the Sheriff, the Chief Deputy shall assume the Sheriff's duties and responsibilities. The Chief Deputy is appointed by the Sheriff. The Chief Deputy performs duties that include, but are not limited to enforcing policies, rules, and regulations; preparing recommendations necessary to improve public relations; making public appearances as required; and applying management principles in administering to the needs of the Office.

C.       Prior to an absence of both the Sheriff and the Chief Deputy, either shall designate a sworn deputy chief to assume the duties and responsibilities of the Office. If no successor has been designated, the most senior, highest ranking sworn deputy chief shall assume responsibility.

2.       **Chain of Command:** Generally, the chain of command shall be followed at all times.

A.       There are occasions when the chain of command may be circumvented, but employees shall use discretion when operating outside the chain of command and may be held accountable for indiscretions. Generally, chain of command shall be informed following any deviation from the normal reporting structure.

B.       Nothing in this Office Policy shall preclude any supervisor from exercising direct contact or authority over any subordinate in their chain of command in the efficient and timely conduct of duty. When possible, intervening levels of supervision should be informed.

C.       Employees who observe or become aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor or directly to the PSB, or any outside entity authorized to take corrective action, without fear of retaliation. When the misconduct involves a supervisor, the employee shall contact the next level in the chain of command. Employees may also contact the PSB, at any time, regarding misconduct involving an Office employee or make a Blue Team entry.

3.       **Command Unity:** In order to achieve command unity, supervisors shall adhere to the following:

A.       Only one employee shall command or supervise a particular component, activity, incident, operation, or situation;

B.       No subordinate shall report to more than one single, consistent, and clearly identified direct supervisor at any given time;

C.       In emergencies, a supervisor is not relieved of the responsibility to act, even though a subordinate or incident is not under their direct command;

D.       First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command; and

E.       First-line patrol supervisors shall ensure that all deputies under their direct command comply with Office Policy, court orders, federal, state, and local law.

4.      **Direct Control:**

➤      A.      First-line patrol supervisors shall be assigned as the primary supervisor to no more persons than it is possible to effectively supervise. First-line patrol supervisors shall be assigned to supervise no more than a total of eight deputies, reserve deputies, and posse members , but in no event, should a patrol supervisor be responsible for more than a total of ten deputies, reserve deputies, and posse members.

1.      A Field Training Officer (FTO) and an Officer in Training (OIT) riding in the same patrol vehicle shall count as one deputy toward the ratio.

2.      An OIT driving solo in a patrol vehicle, on their limited solo phase, shall count as one deputy toward the ratio.

3.      Two patrol deputies riding in the same patrol vehicle shall count as two deputies toward the ratio.

4.      Civilian observers, academy recruit ride-alongs, and employee ride-alongs shall not count toward the ratio.

B.      If circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, the reason shall be documented in a memorandum. The memorandum documenting the request for an increase or decrease shall be forwarded through the chain of command. Upon review completion, a copy of the memorandum with command responses shall be forwarded to CID for distribution, and to the BIO for notification for any potential inspections that may be related. Supervisors establishing a span of control shall consider the following factors:

1.      The complexity and nature of the supervisor's duties, and the complexity of the subordinate's duties;

2.      The capabilities and experience of the supervisor and their subordinates;

3.      The geographic size of the district; and

4.      The volume of calls for service.

5.      **Delegated Authority:** No responsibility shall be assigned to an employee unless the supervisor has the authority necessary to fulfill that responsibility. Inherent with delegated authority is the latitude to make decisions and take the necessary actions to satisfy the requirements of each assigned task. Commensurate with authority, employees accept responsibility for the use, misuse, or failure to use that authority.

A.      A subordinate shall be held accountable for the exercise of delegated authority.

B.      Nothing in this Office Policy absolves a supervisor from responsibility and accountability for supervising subordinates and their use of delegated authority.

C.      A first-line supervisor shall appoint a designee to act in their place when they are absent from duty, unless such appointment is made by a higher authority. A designee acting as a first-line supervisor shall have the same authority and responsibility as the first-line supervisor they replace. Subordinates shall not be designated as acting first-line supervisors.

6.      **Orders:** Orders are commands or directives issued by a person with authority. When orders are given in the form of oral commands, they should be simple and direct and may be followed by a written order.

A.  Written orders should be used when: a situation is complex enough that misunderstanding is reasonably possible; when several persons or units are involved and all must have the same understanding; and when coordination, control, and follow-up are necessary.

    1.  Such orders permit the recipient to refer to them for details and serve as evidence of precise instructions.

    2.  Written orders are considered received when a subordinate receives a copy or becomes aware of the order after it is posted on an *MCSO Administrative Broadcast*, *The Briefing Board*, *MCSO Training Bulletin*, *MCSO Memorandum*, or in another accessible place.

B.  Oral orders shall be binding for compliance on an individual or groups of individuals when they receive or are made aware of them.

C.  Employees shall conscientiously obey all lawful orders given to them by persons having authority. Orders being relayed have the same authority as orders coming directly from the supervisor. Should a supervisor exercise authority over another supervisor's subordinates they shall inform that supervisor as soon as practical.

D.  When a conflict of orders occurs, employees shall respectfully call the conflicting order to the attention of the supervisor giving the new order. Should this information not change the supervisor's position, that supervisor's lawful order shall be followed. The employee shall not be held responsible for disobedience of the previous order.

7.  **Accountability:** To hold responsible, or to make one answer for something within one's own power or control.

A.  To ensure accountability, a supervisor shall:

    1.  Actively direct and supervise employees of lesser rank to ensure they perform assigned duties efficiently;

    2.  Monitor situations in which subordinates are involved and ensure that proper actions are taken;

    3.  Assume command of any situation coming to their attention that requires their involvement;

    4.  Respond to emergencies as necessary and assume command until relieved by another supervisor assuming such command;

    5.  Promptly obey orders of superiors and ensure subordinates do the same;

    6.  Submit a written, factual report when an employee risks their life in the performance of duty or for any other act that would tend to bring credit to the employee or the Office;

    7.  Ensure that subordinates promptly and accurately complete all required reports on proper forms;

    8.  Ensure that proper maintenance and care is given to Office property;

    9.  Inform an employee's immediate supervisor, as well as their own supervisor, of any neglect of duty, incompetence, insubordination, or misconduct by an employee not under their supervision as specified in Office Policy CP-2, *Code of Conduct*; and

10.      Investigate reports of unlawful, improper, or immoral conduct of subordinates, as specified in Office Policy GH-2, *Internal Investigations*.

B.      Supervisors shall maintain a written record of the performance of each of their employees in Blue Team Supervisor Notes. The record shall reflect the employee's positive traits and accomplishments and any observed shortcomings.

1.      Supervisor notes shall be of sufficient quality and frequency to facilitate the preparation of an accurate and detailed performance review, but at a minimum an entry shall be completed every month. Supervisors shall complete two supervisor notes per month on sworn employees at a minimum.

2.      Supervisors who have employees that are on an extended leave of absence shall complete a supervisor note to document the beginning date and end date of the absence.

3.      If supervisors had discussions with subordinates regarding discriminatory policing or any Office Policy, this should be documented in Blue Team Supervisor or Briefing Notes. The supervisor shall ensure that they select the proper note in the allegation tab when documenting the discussion.

4.      Supervisors and commanders shall conduct two reviews per month of each sworn, and one per month of each non-sworn subordinates' EIS information for the purpose of identifying and responding to any conduct patterns or concerns including, but not limited to racial profiling, improper immigration enforcement, investigatory stop violations, detentions unsupported by reasonable suspicion or otherwise in violation of Office Policy. This review shall be documented within the Blue Team Supervisor Notes.

5.      Supervisors and commanders shall review EIS records within 14 business days, including disciplinary history, of all employees upon transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes.

6.      Supervisors and commanders shall be responsible for handling potential deficiencies of their employees noted in non-audit inspection reports by the Bureau of Internal Oversight Audits and Inspections Unit (AIU).

     a.      The BIO will initiate a BIO Action Form entry and include as attachments, the *BIO Action Form* and the non-audit inspection report, through Blue Team to the affected commander.

     b.      The commander shall assign the task of completing the *BIO Action Form* to the identified employee's immediate supervisor.

     c.      Prior to determining any corrective action taken, supervisors should review the employee's EIS Dashboard. When repeat deficiencies occur, appropriate action should be taken to remedy the situation.

     d.      The supervisor shall address what action was taken to remedy the deficiency of the employee. The *BIO Action Form* shall include both the immediate supervisor and the employee's signatures affirming the action taken.

     e.      The completed *BIO Action Form* shall be completed, as specified in Office Policy GH-4, *Bureau of Internal Oversight Audits and Inspections* by the affected division within 30 calendar days of the assigned date in Blue Team, and then routed

back through the chain of command to the BIO Action Forms review group, utilizing the Blue Team application.

C.     Supervisors shall document employee information into the EIS and use the EIS to monitor subordinates' conduct as specified in Office Policy GH-5, *Early Identification System*. Supervisors shall attempt to identify and address performance or conduct issues before they reach a threshold alert within the EIS.

D.     Supervisors shall conduct inspections by way of personal observations, review of reports and records, and conversations with employees. These inspections shall be recorded in Blue Team, as specified in Office Policy GH-5, *Early Identification System*, as Line-Level Inspections and include the specifics regarding when the inspection was done, what was inspected, who did the inspection, and the findings of the inspection. Areas of inspection may include, but are not limited to, the following:

   1.   Appearance and grooming, in accordance with Office Policies GC-19, *Dress and Appearance* and GC-20, *Uniform Specifications*;

   2.   Vehicle condition;

   3.   Employee compliance with written and oral instructions;

   4.   Facility or work area cleanliness and condition;

   5.   Condition of assigned equipment, such as weapons, radios, first aid kits, and fire suppression equipment; and

   6.   Other.

E.     Supervisors shall document all tardies and early departures of their employees into Blue Team, as specified in Office Policy GC-1, *Leaves and Absences,* and GH-5, *Early Identification System*. Unscheduled absences will be captured in the ADP System. No Blue Team entry will be required by the supervisor.

   1.   Supervisors shall forward any FMLA documentation from an employee related to an attendance event to the Leave Management Section (LMS), as specified in GC-1, *Leaves and Absences.*

   2.   Supervisors who have identified a possible attendance issue with an employee shall contact the LMS for guidance prior to initiating early intervention, disciplinary action, or addressing attendance issues in an employee's performance appraisal.

   3.   If an employee exceeds the allowable Unscheduled Absence alert threshold, the EIU will send an alert to the employee's supervisor for further action, as specified in Office Policy GH-5, *Early Identification System*.

   4.   Supervisors shall respond to an EIS alert generated regarding absences, as specified in Office Policy GH-5, *Early Identification System*.

   5.   No employee shall be subject to retaliation or discrimination as a result of using leave protected by the FMLA, state law, or federal law or for filing any complaint relating to their use of leave protected by state or federal law.

➢       F.       **Supervisor Initiated Intervention:** Supervisors shall initiate approved interventions, as specified in GH-5, *Early Identification System*, to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation. Supervisors may also initiate this action when an employee's conduct has minimal negative impact on the overall operations of the Office. Supervisors shall refer to Office Policy GH-2, *Internal Investigations,* for further guidance on supervisor initiated interventions.

8.       **Multiple Division Cooperation:** When an operation requires employees from different commands to function as a single unit, the on-scene ranking supervisor of the division with overall responsibility for the outcome of the operation or incident response shall be the commander.

         A.       The senior sworn supervisor shall assume command in an initial response except in a jail facility. Command may later be transferred to a specialty unit supervisor or a higher ranking supervisor, for example the transfer of a secure crime scene from patrol to detective personnel.

         B.       When an incident occurs in a jail facility that requires the response or presence of sworn personnel, such as a riot or a criminal investigation, command of the jail facility shall remain with the jail supervisor, or designee.

                  1.       Command of the specific operation or incident response shall be assumed by the appropriate sworn supervisor.
                  2.       The sworn supervisor in charge of the operation, incident response, or investigation shall work jointly with detention supervisors to assign or deploy sworn and detention personnel as needed.

         C.       In all cases, the on-scene ranking supervisor with overall responsibility for the outcome of the operation or incident response shall be held accountable for the use of any delegated authority.

9.       **TheHUB Training:** Upon publication of a new or revised Office Policy, or a mandatory training course, supervisors shall ensure assigned employees log into TheHUB, review the relevant policy and acknowledge an understanding of that policy, or complete the mandatory training course requirement.

         A.       All Critical Policy and those Office Policies identified by the Chief Deputy or Chief of Staff may require further review and shall require employees to correctly answer questions regarding the revised or new Office Policy.

         B.       TheHUB may be accessed at https://maricopa.csod.com/client/maricopa/default.aspx.

         C.       Within 50 days of the Office policy being distributed, all relevant employees shall complete TheHUB requirement.

10.      **Compliance Reviews:** All commanders, or their designees, shall complete monthly compliance reviews of mandatory training, to include CORT and classroom training, and required Office Policy acknowledgments, through TheHUB, for all employees under their command. To review completion compliance, commanders are provided purview access through the TheHUB Dashboard for assessing each of their assigned employee's compliance progress. Commanders shall access the Reports menu dropdown to conduct these reviews. In the event an employee has not completed mandatory training or required Office Policy acknowledgments as specified, the commander shall take appropriate action.

11.      **Shift Briefings:** Shift briefings shall be conducted as necessary or as determined by the division commander. Blue Team Briefing Notes shall be utilized to memorialize shift briefings so the events and information can be referenced if necessary.

A.     The commanding employee of each division shall be responsible for ensuring that the information provided during shift briefings is accurate and effectively conveyed to all employees. The first line supervisor is normally responsible for conducting shift briefings.

    1.     Supervisors shall ensure that information is made available to all employees under their command.

    2.     Subordinate employees may suggest or request training updates or topics to be covered during briefings.

B.     Shift briefings may include, but are not limited to, the following:

    1.     Review of current, new, or revised Office policies;

    2.     New court decisions;

    3.     Updates on law enforcement and corrections methods and techniques;

    4.     Review of current laws;

    5.     Current issues which affect the community, such as major investigations, stolen vehicles, and wanted persons;

    6.     Training bulletins;

    7.     New procedures; and

    8.     Reinforcement to subordinates that biased-based policing and profiling is unacceptable.

C.     The Training Division may be requested to provide personnel and instructors with expertise in specialized areas to provide training updates during shift briefings. Other divisions of the Office may also be called upon for assistance within their areas of expertise, such as bombs, arson, and narcotics.

12.     **Supervisory Alert Notification and Intervention:** An alert for supervisory review shall be generated by the EIS when an employee meets, or exceeds, an established threshold

A.     There are five categories of alerts generated by the EIS:

    1.     Allegation Alert: An alert is generated when the frequency of an allegation reaches the set threshold.

    2.     Incident Type Alert: An alert is generated when the frequency of an incident type reaches the set threshold.

    3.     Monitored Status Alert: An alert is generated when a tracked behavior is entered while an employee is in monitored status. Monitored status is used to track employees on administrative leave or probation.

    4.     Overall Alert: An alert is generated when the overall frequency of multiple incidents types reaches the set threshold.

    5.     Supervisory Alert: An alert is generated when the frequency of the tracked actions of the

employees supervised by the same person reach the set threshold.

B.      Supervisors may also initiate the EIS alert process on subordinate personnel prior to the employee meeting or exceeding an established threshold to address employee performance and/or conduct.

   1.   To initiate the process, the supervisor shall utilize the Incident Type of Discretionary Alert in Blue Team.

   2.   The entry shall include a written justification for the alert and be submitted through the supervisor's chain of command to the EIU.

   3.   If approved by the chain of command, the EIS will generate an alert and the alert process will commence.

   4.   If not approved by the chain of command, the reason for the non-approval will be documented within the entry by the non-approving entity, and it will be forwarded to the EIU with a carbon copy sent in Blue Team to the initiating supervisor.

   5.   Non-approved Discretionary Alerts will be stored within the EIS Supervisor Notes of the employee.

C.      Established thresholds are viewable within EIS by accessing the EI Dashboard.

   1.   Thresholds are calculated within the EIS on a specified rolling time period.

   2.   While specified thresholds are established to assist supervisors with identifying patterns of conduct, thresholds do not substitute for continual proactive supervision.

   3.   Supervisors shall not wait for an alert to be received prior to taking corrective action for observed patterns, practices, or activities in violation of Office Policy.

   4.   When supervisors receive EIS alerts on employees, they shall complete the alert process, as specified in Office Policy GH-5, *Early Identification System*.

13.   **Sworn Supervisor Responsibilities:** In addition to other matters addressed in this Office Policy, sworn supervisors shall provide the effective supervision necessary to ensure that deputies are following Office policies or procedures, federal, state, or local criminal or applicable civil laws, administrative rules and regulations.

➢     A.      Clearly Identified Supervisor: All deputies, shall be assigned to a single, consistent, and clearly identified supervisor. Patrol supervisors shall be assigned to supervise no more than a total of eight deputies, reserve deputies, and posse members, but in no event should a supervisor be responsible for more than a total of ten deputies, reserve deputies and posse members.

   1.   The following considerations shall apply:

      a.   A Field Training Officer (FTO) and an Officer in Training (OIT) riding in the same patrol vehicle shall count as one deputy toward the ratio and documented on the shift roster.

      b.   An OIT driving solo in a patrol vehicle, on their limited solo phase, shall count as one deputy toward the ratio and documented on the shift roster.

      c.      Two patrol deputies riding in the same patrol vehicle shall count as two deputies toward the ratio and documented on the shift roster.

      d.      Civilian observers, academy recruit ride alongs and employee ride alongs shall not count toward the ratio and shall be noted on the shift roster.

2.     First-line patrol supervisors shall ensure that a Daily Shift Roster is completed for each shift in order to reflect the subordinates that are working under that supervisor for each day worked. The Daily Shift Roster shall be completed by the end of shift and include, but need not be limited to, the following:

      a.      The date, listed as DD/MM/YY;

      b.      The shift times;

      c.      The supervisor's name and serial number;

      d.      All employees supervised to include their serial numbers and letter designator:

           (1)     "S" signifies deputy sheriff;

           (2)     "A" and "B" signifies either a detention officer or civilian employee;

           (3)     "R" signifies reserve deputy;

           (4)     "V" signifies a former compensated deputy who retires and is approved for reserve deputy status;

           (5)     "P" signifies posse member;

      e.      The assigned vehicle number;

      f.      The employee's call sign; and

      g.      The names of any public observers, deputy in training, posse member, reserve deputy, or any other pertinent information.

3.     Only a patrol bureau chief can modify the format of the Daily Shift Roster. It shall be retained digitally in an area accessible to all patrol supervisors.

➢     4.     If at any time a patrol supervisor supervises more than a total of eight deputies, reserve deputies and posse members, and no more than a total of ten deputies, reserve deputies, and posse members, the supervisor shall write a memorandum documenting the situation and why the preferred 8:1 ratio could not be met. The memorandum documenting the situation shall be forwarded through the chain of command. Upon review completion, a copy of the memorandum with command responses shall be forwarded to CID for distribution, and to the BIO for notification for any potential inspections that may be related. The patrol supervisor shall also document this occurrence on the Daily Shift Roster. The Office shall then take action to remedy the situation. The consideration identified in Section 13.A.1 shall also apply when completing the Daily Shift Roster.

     5.     Patrol supervisors shall be available throughout the shift to provide adequate on-scene field supervision to deputies under their direct command and, as needed, to provide supervisory assistance to other units.

     6.     Patrol supervisors shall be assigned to and shall work the same days and hours as the deputies under their direct command, absent exceptional circumstances.

B.     Policing Activities: First-line supervisors shall ensure deputies are policing actively and effectively, are provided with instruction necessary to correct mistakes, and are held accountable for misconduct. Effective supervision requires supervisors to:

     1.     Respond to the scene of certain arrests; including but not limited to:

         a.     Immigration related arrests;

         b.     Assault on or injury to an employee;

         c.     Allegation of assault or injury to a member of the public by an employee;

         d.     Any arrest that involves use of force requiring documentation in a *Use of Force Report*;

         e.     Felony pursuits;

         f.     All critical incidents, as specified in Office Policy GJ-2, *Critical Incident Investigations* including, but not limited to:

             (1)     Any incident that involves the use of force by an employee resulting in death or serious physical injury;

             (2)     The intentional or unintentional discharge of a firearm by an employee in the performance of their lawful duties; or

             (3)     The death of a prisoner or inmate, by any means, while in the custody of the Office;

     2.     Review each *Vehicle Stop Contact Form* (VSCF) and *Non-Traffic Contact Form* (NTCF);

         a.     Supervisors shall review all VSCF and NTCFs made by each deputy under their supervision within TraCS. Absent exceptional circumstances, supervisors shall review all VSCF and NTCFs involving a detention/Terry stop within 72 hours of receiving such documentation.

         b.     If the VSCF or NTCF did not include a detention, the supervisor shall review the form within seven calendar days. When the supervisor completes their review, and approves the form, the supervisor is indicating their agreement that the VSCF or NTCF contains all of the necessary elements of the legal basis for the action.

             (1)     Supervisors shall review all VSCF and NTCF for accuracy, brevity, completeness, boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the VSCF or NTCF is not authentic or

correct. Supervisors shall address concerns with the VSCF or NTCF author through non-disciplinary or disciplinary action as appropriate.

(2) Supervisors shall document on an IR Memorialization Blue Team entry any investigatory stops/ detentions, or searches that appear unsupported by reasonable suspicion or are otherwise in violation of Office Policy; or investigatory stops/detentions, or searches that indicate the need for corrective action or review of Office policy or training.

(3) Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops/detentions or searches, which may include non-disciplinary correction action or referring the incident for administrative or criminal investigation.

(4) The information for the IR Memorialization entry shall be documented through Blue Team by selecting the proper reason that the NTCF is memorialized in the allegations tab, as specified in Office Policy GH-5, *Early Identification System*. The IR Memorialization form shall be sent to the EIU through the chain of command, using Blue Team.

3. Review and confirm the accuracy and completeness of each IR;

4. Respond to each complaint of misconduct;

5. Ensure deputies are working actively to engage the community and increase public trust and safety;

6. Provide counseling, redirection, and support to deputies as needed; and

7. Hold deputies accountable for performing each of their duties.

C. Immigration-Related Investigation or Immigration-Related Crime: Deputies are required to notify and check with a supervisor before any questioning as to alienage or immigration status is initiated to ensure that the circumstances justify such an action under Office policy, and receive approval to proceed with questioning and/or an arrest following an immigration-related inquiry, as specified in Office Policy EB-1, *Traffic Enforcement, Violator Contacts, and Citation Issuance*.

1. The supervisor shall approve or disapprove the deputy's investigation or arrest recommendation based on the available information and conformance with Office policy.

2. The supervisor shall take appropriate action to address any deficiencies in the deputy's investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the deputy, and/or referring the incident for administrative investigation.

D. Review of Stops, Investigative Detentions, and Arrests Documentation: Employees shall submit documentation of all stops, investigatory detentions, and arrests. Supervisors shall review all documentation submitted, as specified in Office Policies GF-5, *Incident Report Guidelines* and GC-4, *Employee Performance Appraisals*.

1. Supervisors shall use Blue Team Supervisor Notes in the EIS to track each subordinate's violations or deficiencies in stops, investigatory detentions and arrests, and the corrective actions taken, in order to identify deputies needing repeated corrective action. The quality

and completeness of the supervisory review shall be taken into account in the supervisor's own performance evaluations. Supervisors shall:

a.     Notify the PSB when a violation of Office policy has occurred;

b.     Ensure that each violation or deficiency is noted in the deputy's performance evaluations; and

c.     Take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough and accurate reviews of deputies' stops, investigatory detentions, and arrests.

➤      2.     Supervisors shall unequivocally and consistently reinforce to subordinates that discriminatory policing is unacceptable. This ongoing reinforcement shall be conveyed, as specified in Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling,* and shall be documented through TheHUB or in Blue Team as a Supervisor Note or Briefing Note. The supervisor shall ensure that the proper note in the allegation tab in Blue Team is selected when documenting the reinforcement with staff.

3.     When a subordinate's report writing reveals deficiencies of a serious nature, the supervisor signing off on the report shall document an *IR Memorialization* entry in Blue Team. The *IR Memorialization* entry shall be documented through Blue Team by selecting the proper reason that the IR is memorialized in the allegations tab. The *IR Memorialization* entry shall be sent to the EIU through the chain of command, using Blue Team.

Supervisors shall document an *IR Memorialization* entry if an employee's report contains conclusory or boilerplate language, contains inconsistent information, lacks support for the action, has other indicia that the information in the report or form is not authentic or correct, contains no probable cause for arrest, contains no reasonable suspicion, is missing elements of the crime, or is bias-based profiling.

a.     Supervisors shall document an *IR Memorialization* entry if an employee's report contains conclusory or boilerplate language. These deficiencies are related, because the use of conclusory language can lead to boilerplate language. For example, an employee may write "I noticed the subject was drunk." This language is conclusory, because it is not supported by fact, and when repeated across reports, the language is also boilerplate.

(1)    Based on the unique facts of the incident, the report could have avoided conclusory language by stating descriptive, explanatory language such as: "I noticed the subject had a strong odor of an alcoholic beverage emitting from the subjects person, the subject's eyes were bloodshot and watery, the subject staggered as they walked toward me and the subject's speech was slurred as they spoke. It appeared the subject was under the influence of alcohol."

(2)    Although this new language is not conclusory, it can become boilerplate through repeated use in reports. This problem often arises through use of a template. Supervisors should, therefore, look for repeated language even if it is not conclusory.

      b.    Supervisors shall document an *IR Memorialization* entry if any investigatory stop or detention appears unsupported by reasonable suspicion or is otherwise in violation of Office Policy, or if any stop or detention indicates a need for corrective action or review of Office policy or training. Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, which may include non-disciplinary corrective action, as specified in Office Policy GH-5, *Early Identification System* or when referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations*. If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

      c.    Supervisors shall document an *IR Memorialization* entry if any arrests appear unsupported by probable cause, are otherwise in violation of Office policy, or indicate a need for corrective action or review of Office policy, strategy, tactics, or training. Supervisors shall take appropriate action to address violations or deficiencies in making arrests, which may include notification to prosecuting authorities, non-disciplinary corrective action, as specified in Office Policy GH-5, *Early Identification System* or when referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations*. If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

E.    Review of Data Collection and Traffic Stops:

    1.    As specified in Office Policy EB-2, *Traffic Stop Data Collection,* supervisors shall conduct monthly reviews and have monthly discussions with the deputies under their command regarding each traffic stop and collected data generated during the review period. The monthly review shall be documented in Blue Team as specified in Office Policy GH-5, *Early Identification System*.

      a.    Supervisors shall utilize the TraCS database and the information from the Supervisor Responsibilities Effective Law Enforcement (SRELE) training, and the EIS training each supervisor is provided to review traffic stop and collected data, to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of immigration-related laws. Supervisors shall take appropriate action to address all violations or deficiencies, which may include non-disciplinary corrective action, as specified in Office GH-5, *Early Identification System,* or may require referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations*. If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures.*

      b.    Supervisors shall acknowledge the interactions through the use of the "Discussed with Deputy" indicator function within the TraCS Form Manager for each individual stop and associated forms discussed with their deputy.

      c.    This process shall be completed for each individual stop and collected data reviewed. Supervisors are prohibited from selecting multiple traffic stops and applying the "Discussed with Deputy" indicator function at one time. The reviews will then be input into Blue Team from TraCS.

2.    If reviews of the traffic stop data indicate that a deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, supervisors shall take reasonable steps to investigate and monitor the situation. Interventions shall be documented in the EIS, as specified in Office Policy GH-5, *Early Identification System* or when referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations*. If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures.*

3.    If there is a systemic problem of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, the Office shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the supervisor or command staff. All actions taken shall be documented in writing.

F.    EIS Data Review: Supervisors shall utilize the EIS for data analysis, pattern identification, intervention, and documentation. Additional required usage includes, but is not limited to:

1.    Comparative data analysis, including peer group analysis, to identify patterns of activity by individual deputies or groups of deputies, including consideration of the nature of the deputy's assignment, and not solely on the number or percentages of the incidents in any category of information recorded in the EIS.

2.    Identification of warning signs or other indicia of possible misconduct. Supervisors who identify warning signs or other indicia shall, unless exigent circumstances exist, immediately notify their chain of command, or in no circumstances more than 72 hours, to determine how to properly address the concern.

   (a)    Supervisors may also initiate the EIS alert process on subordinate personnel prior to the employee meeting or exceeding an established threshold to address employee performance and/or conduct.

      (1)    To initiate the process, the supervisor shall utilize the Incident Type of Discretionary Alert in Blue Team.

      (2)    The entry shall include a written justification for the alert and be submitted through the supervisor's chain of command to the EIU.

      (3)    If approved by the chain of command, the EIS will generate an alert and the alert process will commence.

   (b)    Warning signs or other indicia include but are not limited to:

      (1)    Failure to follow any of the documentation requirements mandated by Office policy;

      (2)    Racial and ethnic disparities in the deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries that cannot be explained by statistical modeling of race neutral factors or characteristics of the deputy's specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a deputy's peers;

(3)     Evidence of extended traffic stops or increased inquires and/or investigations involving driver or passengers belonging to a protected category, as specified in Office Policy CP-3, *Workplace Professionalism: Discrimination and Harassment*;

(4)     A citation rate for traffic stops that is an outlier when compared to data of a deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

(5)     Complaints by members of the public or other employees; and/or

(6)     Other indications of racial or ethnic bias in the exercise of official duties.

3.     Supervisors and commanders shall conduct two reviews per month of each sworn, and one per month of each non-sworn subordinates' EIS information for the purpose of identifying and responding to any conduct patterns or concerns including, but not limited to racial profiling, improper immigration enforcement, investigatory stop violations, detentions unsupported by reasonable suspicion or otherwise in violation of policy. This review shall be documented within the Blue Team Supervisor Notes.

4.     Supervisors and commanders shall initiate, implement, and assess the effectiveness of interventions for deputies, supervisors, and units, based on assessments of the information contained in the EIS.

5.     Supervisors and commanders shall review EIS records within 14 business days, including disciplinary history, of all employees upon transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes.

G.     Supervisors shall review the Patrol Activity Log (PAL) through Praxis for all patrol shifts worked by their assigned subordinates. Supervisors shall check PAL for accuracy and completeness. This review shall ensure subordinates are accurately accounting for their activities during the shift by properly utilizing Out Codes while not assigned to an event. Supervisors should also examine the PAL to confirm correct Disposition Codes are entered when closing events.

1.     This review shall occur no later than seven calendar days after the completion of the shift under review.

2.     At the completion of the review, the reviewing supervisor must select "Approved, No Issues Found" or "Issues Found."

    a.     If the supervisor selects "Issues Found," the supervisor shall add a comment in the provided text box. Supervisors should be aware that any information captured in this box will be visible to all Office personnel. Information of a confidential nature, including possible issues which may result in an administrative investigation, should not be entered in this box.

    b.     If the supervisor needs to document issues regarding a confidential matter, or issues which may result in an administrative investigation, the supervisor shall make the appropriate entry into Blue Team.

3.     Once the initial supervisor review is completed, Praxis will not allow further entry directly into the PAL. Any further comments regarding the PAL shall be entered into Blue Team. The completed record of the review and/or comment for each subordinate is uploaded automatically through the Praxis into the EIS for tracking purposes.

4. When a deputy works a shift outside of their regularly assigned squad or district, or works a special assignment such as a DUI Task Force, special event, or an off-duty job that would require a PAL; it will be the responsibility of the shift supervisor who is managing the deputy on an irregular shift or special assignment to review the deputy's PAL for accuracy and completeness.

   a. The shift Supervisor who is supervising the employee for this specialized detail shall also review any associated daily paperwork generated while working a specialized detail or shift to incorporate all TraCS documents and IR's completed during that shift.

   b. The responsibility for reviewing the Monthly Body Worn Camera Video and the Monthly Discussion of Traffic Data will fall under the responsibility of the regularly assigned supervisor for the deputy.

   c. Since the shift supervisor in these circumstances will not be completing the deputy's Employee Performance Appraisal, the shift supervisor should document deficient performance or performance worthy of commendation in Blue Team, so that the information is available to the deputy's regularly assigned supervisor.

   d. Failure by a shift supervisor to review the PAL of a subordinate deputy, or a deputy they are managing on an irregular shift or special assignment for accuracy and completeness, shall result in a Blue Team entry; and may result in discipline, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

H. Blue Team Supervisor Notes: Supervisors shall document a minimum of two monthly Blue Team Supervisor Notes regarding performance for each deputy under their command. Blue Team shall be used to report the monthly review to Court Implementation Division (CID), as outlined in Office Policy EB-2, *Traffic Stop Data Collection.*

I. Body-Worn Camera Recording Reviews: On a monthly basis, supervisors shall conduct two random reviews of traffic stop video footage for each of their subordinates' body-worn camera recordings. Additionally, supervisors must review a subordinate's body-worn camera recordings in relation to a complaint, an investigation, a pursuit, or critical incident. A review of videos in relation to a complaint, an investigation, a pursuit, or critical incident, shall not be considered as the monthly review of a randomized video. The monthly reviews shall be documented in Blue Team Supervisor Notes. The supervisor shall assess the following:

   1. The deputy's performance and training needs;

   2. Policy compliance;

   3. Consistency between written reports and body-worn camera recordings; and

   4. Whether the camera was functioning properly, and its use was consistent with Office Policy GJ-35, *Body-Worn Cameras*.

   5. The methodology and supervisory checklist for consistently reviewing Body-Worn Camera recordings can be found at the following shared drive location; U:\BIO\Forms.

J. Specialized Units Enforcing Immigration-Related Laws: In the event there is a specialized unit enforcing immigration-related laws, first-line supervisors in such a specialized unit shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying

them in the field and shall directly supervise the in-the-field activities of all members of the unit for at least two weeks every year.

14.   **Sworn Commander Responsibility:** Sworn commanders shall hold all supervisors directly accountable for the quality and effectiveness of the supervision they provide, including the performance evaluations prepared as specified in Office Policy GC-4, *Employee Performance Appraisals*, and whether they identified and responded to employee misconduct, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* GH-5, *Early Identification System,* and GH-2, *Internal Investigations*. Sworn commanders shall document the findings of the following actions in Blue Team.

   A.   Commanders shall review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause, are otherwise in violation of Office policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The commander's review shall be completed within 14 business days of receiving the document reporting the event.

   B.   Commanders shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken.

   C.   Commanders shall take appropriate corrective or disciplinary action against first-line supervisors who fail to conduct adequate and consistent quality reviews of subordinates, as specified in Office Policies GH-5*, Early Identification System* and GC-4*, Employee Performance Appraisals*.

   D.   Commanders shall periodically review the EIS reports and information, and initiate, implement or assess the effectiveness of interventions for individual deputies, supervisors and units based on the review.

   E.   Commanders shall conduct a review of EIS records within 14 business days, including disciplinary history, of all employees upon transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes.

   F.   Commanders, or their designees, shall complete monthly compliance reviews of mandatory training, to include CORT and classroom training, and required Office Policy acknowledgments, through TheHUB, for all employees under their command. To review completion compliance, commanders are provided purview access through the TheHUB Dashboard for assessing each of their assigned employee's compliance progress. Commanders shall access the Reports menu dropdown to conduct these reviews. In the event an employee has not completed mandatory training or required Office Policy acknowledgments as specified, the commander shall take appropriate action.

➢  15.   **Supervisor Employee Performance Appraisal (EPA) Responsibilities:** As specified in Office Policy GC-4, *Employee Performance Appraisals*, immediate supervisors are responsible for evaluating the competence of each assigned employee. Supervisors should be fair, impartial, and accurate in evaluating the performance of their employees. Supervisors who fail to conduct reviews of adequate and consistent quality are subject to appropriate corrective or disciplinary action.

16.   **Office Responsibility:** The Office shall hold all commanders and supervisors directly accountable for the quality and effectiveness of the supervision they provide including the performance evaluations prepared, as specified in Office Policy GC-4, *Employee Performance Appraisals*, and whether they identified and responded to employee misconduct, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* and GH-2, *Internal Investigations*.

17.   **Command Responsibility Regarding Public Access to the Complaint Process:** The Office shall ensure all commanders and supervisors over patrol areas, and areas of public access, adequately provide members of the public with information and forms regarding the complaint filing process.

A.     *Comment and Complaint Forms*: The *Comment and Complaint Forms,* in both English and Spanish, shall be made widely available and maintained at locations around Maricopa County including, but not limited to, the websites of the Maricopa County Sheriff's Office and Maricopa County government. Permanent placards in English and Spanish shall be posted and maintained in locations clearly visible, at all hours, to members of the public at the reception desk at MCSO headquarters and at all District Stations. The placards shall clearly and simply describe the public complaint process and shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and internet sites. The Community Outreach Division shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times, as specified in Office Policy GJ-24, *Community Relations and Youth Programs*.

        1.     *Comment and Complaint Forms* shall not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.

        2.     The Office shall make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or writes in English, or is deaf or hard of hearing, will not be grounds to decline to accept a complaint.

        3.     All Office vehicles shall have a supply of *Comment and Complaint Forms* for distribution to any members of the public that request them. Deputies shall provide information about how to file a complaint, their name and badge number, and the contact information, including telephone number and e-mail address, of the supervisor.

               a.     When notified by an employee, a member of the public, or through a *Comment and Complaint Form*, the supervisor shall immediately document the notification and ensure that PSB has been advised through Blue Team in accordance with Office Policy GH-2, *Internal Investigations.*

               b.     Employees receiving complaints shall ensure the maintenance of confidentiality. Employees shall not divulge the name of any person filing a complaint or provide complaint information to anyone other than the supervisor and/or PSB employees authorized by Office command personnel to properly process and investigate allegations of misconduct.

B.     Placards: The office shall post and maintain in locations clearly visible to members of the public, at all hours, permanent placards clearly and simply describing the civilian complaint process. Locations of the placards shall include the reception desk at the Office Headquarters, Districts, and other public locations. The placards shall include relevant contact information, telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish. The Community Outreach Division shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times.

18.     **Misconduct Investigative Action Responsibilities:** The Office shall ensure all allegations of employee misconduct, whether internally discovered or based on a complaint from a member of the public, are fully, fairly, and efficiently investigated. All investigative findings must be supported by the appropriate standard of proof and documented in writing. All employees who commit misconduct shall be held accountable, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

      A.     The on-duty supervisor or commander shall immediately document in Blue Team the reported act of misconduct. This information shall be automatically routed to the PSB.

B.      All complaints and allegations of misconduct, including third-party and anonymous complaints and allegations, shall be investigated. All employees and members of the public shall be permitted to report allegations of misconduct anonymously.

C.      If at any point during a misconduct investigation an investigating supervisor outside of the PSB has information indicating that the principal may have committed misconduct of a serious or criminal nature, the investigator shall immediately notify the PSB, which shall take over the investigation.

D.      If, after an investigation conducted outside of the PSB, an employee's actions are found to violate policy, the investigating supervisor's division commander shall direct and ensure the appropriate discipline and/or corrective action is administered.

➢      E.      Enforcement Division Commanders of supervisors assigned administrative investigation conducted outside of the PSB, shall conduct reviews of those misconduct investigations, as specified in Office Policy GH-2, *Internal Investigations*.

➢      F.      If, after an investigation conducted by the PSB, an employee's actions are found to violate policy, the PSB Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the PSB Commander shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate bureau chief and division commander for review and action.

G.      If the PSB Commander or the division commander in which the internal affairs investigation was conducted determines that the findings of the investigation report are not supported by the appropriate standard of proof, the commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under their command.

H.      Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of their investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the PSB.

I.      The quality of investigators' internal affairs investigations and supervisor reviews of investigations shall be taken into account in their EPA.

# EXHIBIT C



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | | |
|---|---|---|
| **Subject** **PEACE OFFICER TRAINING ADMINISTRATION** | **Policy Number** **GG-1** | |
| | **Effective Date** **02-26-20** | |
| **Related Information** CP-8, *Preventing Racial and Other Bias-Based Profiling* GB-2, *Command Responsibilities* GC-4, *Employee Performance Appraisals* GC-7, *Transfer of Personnel* GC-17, *Employee Disciplinary Procedures* GD-21, *Business Travel and Travel Expenses* GH-4, *Bureau of Internal Oversight* GH-5, *Early Identification System* GJ-2, *Critical Incident Investigations* GJ-23, *Firearms* GJ-26, *Sheriff's Reserve Deputy Program* GJ-27, *Sheriff's Posse Program* | **Supersedes** GG-1 (08-14-19) | |

## PURPOSE

The purpose of this Office Policy is to establish guidelines for the administration of training for all deputy recruits, deputies-in-training, deputy sheriffs, reserve deputies, posse members, and deputy supervisors.

## POLICY

It is the policy of the Office to ensure that deputy recruits, deputies-in-training, deputy sheriffs, reserve deputies, posse members, and deputy supervisors are trained to perform the job duties of their respective classifications.

## DEFINITIONS

*Advanced Officer Training* **(AOT)***:* For the purpose of this Office Policy, this training provides information to update and refresh the knowledge, skills, and abilities necessary to perform the duties of sworn personnel who have completed the Basic Training Academy and Field Training Program.

*Arizona Peace Officer Standards and Training Board* **(AZPOST)***:* The state agency overseeing the certification of peace officers in Arizona; AZPOST provides formal guidelines for the sworn Basic Training Academy and annual training requirements needed to maintain certification as an Arizona peace officer.

*Basic Training Program:* A program designed to provide information for deputy recruits and deputies-in-training to develop the knowledge, skills, and abilities necessary to perform the duties of a deputy sheriff. This program consists of a Basic Training Academy and a Field Training Program.

*Check Ride:* When the Sworn Field Training Coordinator or the Field Training Supervisor accompanies an officer-in-training (OIT) on a patrol shift and makes independent observations to aid in the determination of whether to extend a field training phase, as well as for how long to extend the phase.

*Compliance Coordinator:* An employee whose responsibilities are to monitor compliance results generated within TheHUB learning system and to report to the Training Commander on the percentage of employees who have

completed training throughout the year.

***Court Order Required Training*** **(CORT)*:*** The section of the Training Division that covers CORT Technical Support, CORT Curriculum Development, CORT Implementation, CORT Administration, and a supervisor to oversee all positions.

***Curriculum Vitae*** **(CV)*:*** A complete list in clear, chronological order of an individual's whole career. It is intended to be a full record of a career history.

***Deputy Recruit:*** A new hire attending the Office's Basic Training Academy or another AZPOST-approved academy.

***Field Training Program:*** On-the-job training provided after successfully completing the Office's Basic Training Academy or another AZPOST-approved academy.

***Field Training Officer*** **(FTO)*:*** A deputy who has received specialized training, has demonstrated a professional demeanor, is able to communicate effectively, has good organizational skills, is self-motivated and decisive, has an above average knowledge of Office Policy, and who has been delegated the responsibility of guiding a deputy-in-training through the Field Training Program. This individual has successfully passed the rigors of a Professional Standards Bureau (PSB) disciplinary review as required by this Office Policy.

***Mandatory Training:*** Mandatory training includes, but is not limited to, all court ordered training and all training specifically designated as mandatory by command staff.

***Misconduct:*** Any violation of Office Policy or procedure; federal, state, or local criminal or civil law; constitutional violations, whether criminal or civil; administrative rules, including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> ***Criminal Misconduct:*** Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> ***Minor Misconduct:*** Conduct that, if sustained, would result in discipline or corrective action less severe that a suspension.

> Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include; squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the Office as an External Complaint or has not already been assigned to the PSB.

> ***Serious Misconduct:*** Conduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

***Officer:*** For the purpose of this Office Policy, an officer is a deputy sheriff who maintains certification as a peace officer through AZPOST.

***Officer-In-Training*** **(OIT)*:*** A deputy sheriff who participates in the Field Training Program after successfully

completing the Office's Basic Training Academy or another AZPOST-approved academy.

*Proficiency Instructor:* A person qualified to teach a specific topic or topics related to proficiency training. Qualifications include, at a minimum: meeting the qualifications for General Instructor; maintaining instructional competency through continued course work and/or Office experience; and successfully completing a proficiency instructor course in a topic area listed in Arizona Administrative Code § R13-4-111(B) (2) (b) that includes a competency assessment to instruct in that area within the Basic Training Academy course or completing an AZPOST-prescribed form that documents advanced training and experience in the topic area including a competency assessment to instruct in that area within the Basic Training course.

*Recruit Training Officer* **(RTO)***:* A deputy who oversees academic testing and grading; monitors and tracks recruit progress throughout all instruction, including defensive tactics, physical conditioning, report writing, and use of computer-based systems; instructs Basic and Advanced Officer Training; mentors recruits; and completes performance appraisals on recruits based on performance in the Office's Basic Training Academy.

*Resume:* A brief, targeted list of the skills and achievements of an individual.

*Serious Offense:* For the purpose of this Office Policy, offenses for which Office personnel have been disciplined or are the subject of an ongoing investigation that would bar that Office personnel from serving as an instructor include, but are not limited to: engaging in discrimination that violates law or policy; failure to follow the requirements of court orders; criminal acts; providing false information in a misconduct investigation; and failing to report observed misconduct of another Office employee or volunteer.

*Shift Briefings:* Informal sessions of short duration to keep employees' knowledge levels high, to keep employees up-to-date on new trends and developments, to keep employees notified of changes in schedule and assignments, and to provide training updates as determined by the Training Division.

*Sworn Field Training Coordinator:* A deputy who coordinates the Office's Field Training Program, the duties include, but are not limited to, being in regular contact with Field Training Officers, compiling statistics related to Field Training Officer activities to ensure quality and quantity of training and providing feedback during the evaluation process to district command staff.

*Test:* A series of questions, problems, or practical tasks to gauge somebody's knowledge, ability, or experience.

*TheHUB:* The learning management system by which employees, reserve deputies and posse members are provided access to online training courses, the ability to register for classroom training courses, and monitor completion of training requirements. This system also allows employees, reserve deputies, and posse members to access all Office Policies and record the acknowledgement required when an Office Policy is updated or revised.

*Training:* Office approved instruction that meets the requirements of this Office Policy and has an approval code, other than Basic Training Academy curriculum, that is issued or provided by the Training Division, or AZPOST which will be tracked in TheHUB. All other instruction that does not meet this definition shall not be considered training for the purpose of this Office Policy. Out of agency training shall be addressed, as specified in this Office Policy.

**PROCEDURES**

1.     **Instructors and Instructor Criteria:**

        A.     The Training Division shall maintain an instructor database containing contact information and instructor qualifications, including a Curriculum Vitae (CV) or, in the case of outside instructors, a resume shall be provided, to facilitate the staffing of training provided by the Office. Instructors are

required to update their CVs, resumes, or other documentation of qualifications at least annually. If an instructor fails to update their qualifications, the Training Division may determine that the instructor lacks the necessary instructional competency to continue as an instructor. The instructor may be deemed ineligible due to the criteria or at the direction of the Chief Deputy, the Chief of Staff, or the Training Commander.

B.     The Training Division shall conduct Misconduct and Disciplinary Reviews on instructors and Sworn FTOs.

    1.     Annual Misconduct and Disciplinary Reviews shall be conducted on all active Office instructors assigned to the Training Division as full-time Training Division staff. No additional Misconduct and Disciplinary Review is required for these personnel throughout the year, unless the Training Commander determines an additional review is warranted.

    2.     Instructors delivering CORT Training shall have a Misconduct and Discipline Review within 30 days from the anticipated first offering of the specific course of instruction. These reviews remain valid until the last offering of the specific course of instruction or annually if the delivery of the training exceeds a 12 month period.

    3.     Instructor Misconduct and Disciplinary Reviews: These annual reviews shall meet the following requirements:

        a.     If an instructor or employee proposed as an instructor has a disciplinary history of three or more sustained allegations of misconduct, or one sustained violation of a Category 6 or Category 7 Offense from the Office's disciplinary matrices that resulted in discipline, the employee shall be presumptively ineligible to be an Office instructor.

            (1)     Discipline involving a sustained Office Policy violation of a Category 1-3 offense shall be considered for three years.

            (2)     Discipline involving a sustained Office Policy violation of a Category 4-7 offense shall be considered for five years.

            (3)     There shall also be an overall ten years lookback review conducted for patterns of behaviors and misconduct.

        b.     For sustained violations resulting in discipline, the employee or their commander or designee, may submit to the Training Commander a waiver of the presumptive ineligibility. The Training Commander shall provide written justification outlining their approval or denial of the application of waiver. This written justification shall be included in the instructor's folder maintained at the Training Division.

        c.     If there is a pending administrative investigation for a serious offense, the instructor will not be considered until that investigation has concluded. The Training Commander may submit written justification for a waiver of the presumptive ineligibility to the PSB. The PSB Commander or designee shall indicate their concurrence or disagreement with the justification. The commander's written justification and the PSB's determination shall be included in the instructor's folder maintained at the Training Division.

    4.     The Law Enforcement Rule 15 Disclosure (Brady List) standing shall be considered in all

instructor selection decisions.

5.    The selection of the instructor may be denied due to the criteria or at the direction of the Training Commander, division commander, the Chief Deputy, or the Chief of Staff.

C.    Instructors must provide documentation to the Office for forwarding to AZPOST that demonstrates the expertise and ability to enhance peace officer training in a special field or possessing a community college or university teaching certificate.

D.    The Instructor Classifications and Qualification Standards are adopted from the requirements of AZPOST listed in the Arizona Administrative Code § R13-4-114. The Training Division shall conduct an annual review of all instructors' qualifications.

1.    General Instructor: A person qualified to teach topics not requiring a proficiency instructor. Qualifications include, at a minimum:

a.    Two years' experience as a certified peace officer;

b.    Maintaining instructional competency through continued course work and/orOffice experience; and

c.    Successfully completing an Office or AZPOST-sponsored general instructor training course, or community college or university teaching certificate.

2.    Proficiency Instructor: A person qualified to teach a specific topic or topics related to proficiency training. Qualifications include, at a minimum:

a.    Meeting the qualifications for General Instructor;

b.    Maintaining instructional competency through continued course work and/orOffice experience; and

c.    Successfully completing a proficiency instructor course in a topic area listed in Arizona Administrative Code § R13-4-111(B) (2) (b) that includes a competency assessment to instruct in that area within the Basic Training Academy course or completing an AZPOST-prescribed form that documents advanced training and experience in the topic area including a competency assessment to instruct in that area within the Basic Training Academy course.

3.    Specialist Instructor: A person other than an Arizona peace officer qualified to teach a topicin which the instructor has special expertise but who does not qualify for general instructor status. Qualifications include, at a minimum:

a.    Obtaining an approval from the Training Commander;

b.    Maintaining instructional competency through continued course work and/or experience; and

c.    Possessing a professional license or certification other than a peace officer certification that relates to the topics to be taught.

4.    Train-the-Trainer courses should be utilized when practical for courses that are to be taught by

multiple instructors to establish expectations and to ensure curricular consistency. All CORT Training courses that are to be taught by multiple Office instructors shall require the instructors participate in a Train-the-Trainer course.

2.    **Test Criteria:**

A.    The Training Division shall assess whether training participants adequately understand the contentor can proficiently perform the skills learned in training. Along with other proposed training materials, instructors shall submit to the Training Division a proposed test and any associated testing criteria, such as a rubric.

   1.    Tests regarding knowledge shall measure understanding through a written examination. When possible, written examinations shall be taken in person. Instructors providing classroom training shall use written and/or competency (proficiency) tests with the use of one remediation. Training participants attending classroom-based instruction shall demonstrate mastery through written assessment by the use of the Scantron System, or through TheHUB, by correctly answering 75% of assessment questions.

   2.    Instructors providing basic and/or advanced officer training, shall use proficiency tests to measure whether the training participants achieved mastery of the learning objectives. Proficiency tests may be developed by the Proficiency Instructor or adopted from AZPOST training requirements and approved by the Training Division.

      a.    Tests regarding skills shall measure proficiency through practical or scenario-based activities.

      b.    Competency tests are graded on a pass/fail basis.

      c.    Training requiring testing in regard to competency (proficiency) may also require testing through TheHUB or Scantron Systems or a combination of these and practical testing.

   3.    When an Office training test is given through TheHUB as part of a stand-alone (online only) computer delivered course and there is no prior attended live training, participants shall demonstrate mastery of the subject matter by correctly answering 75% of assessment questions.

B.    All tests following mandatory training shall be administered immediately after training absent extraordinary circumstances as determined by the Training Division, and participants shall have two opportunities to pass the test. If a training participant fails to satisfy the testing criteria, or as determined by the Training Commander, the participant shall be required to retake the class and retest.

C.    The Training Division shall maintain the results of all testing, whether written or proficiency, for at least two years or for a longer period at the discretion of the Training Commander. These results shall be used with the Training Cycle to evaluate the effectiveness of Office training.

3.    **Law Enforcement Training:**

A.    The Basic Training Program for a deputy recruit shall consist of instruction through the Office's Basic Training Academy or another AZPOST-approved academy. The Basic Training Program may also consist of Pre-Academy Training or Post-Academy Training.

1. Pre-Academy Training is optional training provided by the Training Division and offered to deputy recruits based upon the needs of the individual recruit and the timing of new hire processing. The training may include, but is not limited to, academy orientation, physical conditioning, and an introduction to Office Policy and procedures.

2. Deputy recruits shall attend and successfully complete the course of study in the Basic Training Academy to achieve the requisite number of training hours mandated by AZPOST for all certified peace officers. This training may be provided through the Office's Basic Training Academy or by another AZPOST-approved academy.

   a. The Office's Basic Training Academy shall be administered by sworn personnel, including the Basic Training Academy Commander, Class Sergeant, RTOs, or various certified instructors throughout the Office. All Basic Training Academy instructors must be certified as an AZPOST General Instructor and have a minimum of two years of experience in the field or related to the field that they are teaching. For specialty classes such as firearms, driving track, and defensive tactics, the instructor must have the additional, appropriate, required certifications in order to teach.

   b. The Basic Training Program is based upon the standards and curriculum mandated by AZPOST, and an analysis of the most frequent duties performed by sheriff's deputies, as determined by the Training Division staff.

   c. All recruits must meet the requirements set forth by AZPOST and the Office's Basic Training Academy or another AZPOST-approved academy. The deputy recruits' mastery of requirements will be assessed throughout the Basic Training Academy.

   d. Deputy recruits shall abide by the rules and regulations of the Basic Training Academy, including adherence to the chain of command. The Training Commander shall be advised, as soon as possible, of any serious incidents involving a deputy recruit.

   e. Failure of a deputy recruit to meet Basic Training Academy standards is grounds for dismissal from the Basic Training Academy and the Office.

   f. Successful completion of an AZPOST-approved Academy is required prior to performing any law enforcement duties in which a deputy recruit carries a firearm or makes an arrest. The Basic Training Academy's field ride-along and the traffic control exercises, in which the deputy recruit is uniformed, armed, and under the supervision of a deputy, are the only exceptions to this requirement.

B. The Training Division shall require deputies to complete the Post-Academy Training if the deputy was AZPOST certified at the time of hire without attending the Office's Basic Training Academy. The Post-Academy Training shall include all mandatory and essential training required of new hires.

C. Following graduation from the Basic Training Academy and the MCSO Post-Academy, a sheriff's deputy shall enter the Field Training Program as an OIT. Each OIT shall be assigned to a Sworn Field Training Officer (FTO) who shall conduct field training and evaluate the OIT's performance.

   1. Field Training Program Personnel

      a. The Field Training Program shall be administered by the Sworn Field Training Coordinator. The Sworn Field Training Coordinator shall oversee the development,

review, and annual revision of the standards and practices of the Field Training Program.

b. Advance Officer Training Supervisor shall assist the Sworn Field Training Coordinator and work with district command staff to ensure that each OIT is fully prepared to work as a deputy sheriff.

c. Each patrol district shall have a designated supervisor, as determined by the district commander, to act as a liaison between the district and the Sworn Field Training Coordinator. The supervisor may rotate at the district commander's discretion.

d. Sworn FTOs are directly assigned to supervise an OIT.

(1) The FTO shall demonstrate professional and ethical behavior, reinforce the policies and procedures of the Office, and generally assist the OIT as they transition from a Basic Training Academy to the field.

(2) The FTO shall be assessed on these criteria by their supervisor. All deficiencies shall be documented in Blue Team and the FTO's annual Employee Performance Appraisal (EPA).

2. Sworn FTO requirements shall include the following:

a. A written recommendation from the deputy's immediate supervisor, forwarded through the chain of command to the Sworn Field Training Coordinator.

b. A minimum of two years of peace officer experience with the Office, or two years of peace officer experience from another agency.

c. A "Meets Minimum Performance Standards" rating on the last two consecutive EPAs.

d. Have current cardiopulmonary resuscitation (CPR) certification.

e. Successful completion of the 40-hour AZPOST-accredited General Instructor School.

f. Successful completion of the 24-hour FTO Academy.

3. Sworn FTO Misconduct and Disciplinary Reviews: There shall be Misconduct and Disciplinary Review conducted on an FTO 30 days prior to any OIT being assigned. Should an FTO be assigned successive OITs an additional review is not required when the assignment is 90 days or less from release of the previous OIT.

a. If a Sworn FTO or a deputy proposed as an FTO has a disciplinary history of three or more sustained allegations of misconduct, or one sustained violation of a Category 6 or Category 7 Offense from the Office's disciplinary matrices that resulted in discipline, the deputy shall be presumptively ineligible to be an FTO.

(1) Discipline involving a sustained Office Policy violation of a Category 1-3 offense shall be considered for three years.

(2) Discipline involving a sustained Office Policy violation of a

Category 4-7 offense shall be considered for five years.

(3) There shall also be an overall ten years lookback review conducted for patterns of behaviors and misconduct.

b. For sustained violations resulting in discipline, the employee or proposed FTO, or their commander or designee, may submit to the Training Commander a waiver of the presumptive ineligibility. The Training Commander shall provide written justification outlining their approval or denial of the application of waiver. This written justification shall be included in the FTO's folder maintained at the Training Division.

c. If there is a pending administrative investigation for a serious offense, the employee will be presumptively ineligible to be utilized as an FTO until that investigation has concluded. The Training Commander may submit written justification for a waiver of presumptive ineligibility to the PSB. The PSB Commander or designee shall indicate their concurrence or disagreement with the justification. The commander's written justification and the PSB's determination shall be included in the FTO's folder maintained at the Training Division.

4. The Law Enforcement Rule 15 Disclosure (Brady List) standing shall be considered in all FTO selection decisions.

5. Requirements to Remain an Active Sworn FTO: The following requirements will be reviewed annually by the Training Commander, or designee, in order to remain an active FTO.

a. Maintain a "Meets Minimum Performance Standards" rating on EPAs;

b. Attend the mandatory, annual FTO training;

c. Maintain a current CPR certification status.

d. A Misconduct and Disciplinary Review shall be conducted on an FTO 30 days prior to any OIT being assigned. Should an FTO be assigned successive OITs an additional review is not required when the assignment is 90 days or less from release of the previous OIT.

e. If there is a pending administrative investigation for a serious offense, an FTO shall be presumptively ineligible to be assigned an OIT until that investigation has concluded. The Training Commander may submit to the PSB Commander or designee written justification for a waiver of presumptive ineligibility for assigning an OIT to the FTO. The PSB Commander or designee shall indicate their concurrence or disagreement with the justification. The commander's written justification and the PSB's determination shall be included in the FTO's folder maintained at the Training Division.

f. The FTO may be deemed ineligible for the FTO program due to these criteria or at the discretion of the Training Commander, division commander, the Chief Deputy, or the Chief of Staff.

6. Field Training Program:

a. The standard version of the Field Training Program shall last 15 weeks. The Training Division may offer a 10-week accelerated Field Training Program based upon the skills, knowledge, and experience of the individual officer-in-training.

b. Absent extraordinary circumstances, FTOs shall submit Weekly Observation Reports regarding their assigned OIT within one week of the OIT's completed prior week. The observation reports shall be submitted to an immediate supervisor and the Sworn Field Training Coordinator.

c. When notified of missing FTO paperwork, it is the responsibility of the designated district supervisor liaison, as determined by the district commander, to resolve paperwork missing by the district's FTO.

d. The Field Training Program may be extended one time for remediation if an OIT has not demonstrated proficiency based upon the performance criteria in the Field Training Program checklist.

   (1) The decision to extend the Field Training Program for an OIT shall be made based upon:

       (a) The recommendation of the assigned FTO, the Advance Officer Training Program Supervisor, or the district commander;

       (b) A review of the Weekly Observation Reports; and

       (c) Other information from the FTO.

   (2) All requests for extension must be forwarded through the chain of command to the Sworn Field Training Coordinator for review.

   (3) The review of the OIT may include a check ride conducted by Training Division personnel, at the recommendation of the Training Commander.

   (4) At the discretion of the district commander and the Sworn Field Training Coordinator, the OIT may be assigned to a different FTO and squad.

   (5) An OIT may receive an extension of a phase for one to three weeks based upon the observed and documented deficiencies for that phase. Under extreme circumstances, a full remediation of a phase may be granted by the Training Commander, based upon the advice of the Field Training Program Sergeant and the recommendation of the FTO.

e. A district commander, following the review of documentation provided from the Sworn FTO and the Sworn Field Training Coordinator, may recommend the dismissal of an OIT from the Field Training Program and the Office for failure to meet required standards during the Field Training Program. The district commander shall forward the documentation to the Training Division for audit as to format, completeness, and required documentation, prior to the recommendations going through the chain of command to the Sheriff, or designee. The recommendation for dismissal shall then be forwarded to the Administrative Services Division for administrative action. The recommendation for dismissal paperwork shall include:

       (1)      All Weekly Observation Reports and other field training reports from the FTO or deputies;

       (2)      The check ride documentation from the Sworn Field Training Coordinator or Field Training Program Supervisor;

       (3)      Dismissal documentation from the Field Training Program by the Sworn Field Training Coordinator; and

       (4)      A memorandum with the date and time of a meeting between the district commander and the FTO or deputies, Sworn Field Training Coordinator, and Field Training Program Supervisor, during which the performance of the OIT was discussed. All present at the meeting will be listed on the memorandum and shall sign with name and serial number. The memorandum shall be forwarded, with the termination paperwork, to the Administrative Services Division.

D.     Advanced Officer Training

    1.     All deputies are required to attend Advanced Officer Training according to any applicable deadline. Failure to complete mandatory training as directed can result in disciplinary action, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

       a.      All deputy sheriffs, reserve deputies, and posse members shall receive 12 hours of comprehensive and interdisciplinary training on bias-free policing and 6 hours of training on the Fourth Amendment, including detentions, arrests, and the enforcement of immigration-related laws, within 90 days of the start of their service.

       b.      All deputy sheriffs, reserve deputies, and posse members shall annually receive, at a minimum, 6 hours of comprehensive and interdisciplinary training on bias-free policing and, at a minimum, 4 hours of training on the Fourth Amendment including detentions, arrests, and the enforcement of immigration-related laws.

       c.      Failure by reserve deputies and posse members to complete mandatory training may result in disciplinary action, as specified in Office Policies GJ-26, *Sheriff's Reserve Deputy Program* and GJ-27, *Sheriff's Posse Program*.

    2.     Deputies shall participate in mandatory training to satisfy the AZPOST continuing and/or proficiency training credit-hour requirement. Mandatory training also includes firearms training and remedial training ordered by a deputy's chain of command. All other mandatory training shall be designated by the Training Commander or command staff.

    3.     Deputies may participate in optional, Office-sponsored training to advance their knowledge in specific subject areas of interest.

    4.     Block Training.

E.     Supervisory Training:

    1.     All sworn supervisory personnel shall receive, at a minimum, six hours of comprehensive and interdisciplinary training on supervision strategies and supervisory responsibilities. This training shall occur at the first available class prior to assuming supervisory responsibilities as

a result of a promotion. This training shall address, at a minimum, the topics identified in relevant court orders.

2.    All sworn supervisory personnel shall annually receive, at a minimum, four hours of supervisor-specific training, consisting of the topics identified in relevant court orders.

3.    All sworn supervisory personnel shall receive training and updates as required on conducting Administrative Investigations, utilizing the PSB Checklist and standardized forms, and Internal Affairs Training.

4.    All sworn supervisors shall attend 40 hours of comprehensive training on conducting employee misconduct investigations and eight hours annually thereafter.

5.    All sworn supervisors shall receive training on their obligations when called to a scene by a subordinate to accept a complaint from a member of the public about that subordinate's conduct. This training shall also cover the supervisor's obligations when they are phoned or e-mailed directly by a member of the public filing a complaint on one of their subordinates.

F.    EIS Blue Team Training:

1.    All sworn Office personnel shall receive training regarding EIS Blue Team as appropriate to facilitate a proper understanding and use of the system.

   a.    All supervisors, whether as part of the Supervisory Training or as a stand-alone training, shall receive training on EIS Blue Team to ensure that each supervisor has a complete and current understanding of the employees under the supervisor's command.

   b.    All commanders and supervisors shall receive training in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns.

2.    As needed, all relevant sworn Office personnel shall receive training regarding significant changes to EIS.

G.    Court Compliance and Court-Order Training to be completed by Appropriate Sworn Personnel:

1.    Biased-Free Policing: Training that reinforces the procedures to ensure deputies are fair and equitable in deciding whether to make citizen contacts and take law enforcement actions. Race, ethnic background, gender, sexual orientation, religion, economic status, age, cultural group, or national origin shall not be a motivating factor in any law enforcement action including the selection of people for consensual contacts. Racial and bias-based profiling is strictly prohibited. Training related to Bias-Free Policing shall be completed, as specified in Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling*.

2.    4th Amendment: Training that reinforces the guidelines regarding search and seizure. The Fourth Amendment to the U.S. Constitution places limits on the power of law enforcement to make arrests, search people and their property, and seize objects and contraband (such as illegal drugs or weapons). These limits are the bedrock of search and seizure law.

3.    The Early Intervention System (EIS): Training that provides procedures for an Early Identification System which is designed to identify the Office's operating procedures that

may need reevaluation and to assist supervisors with consistently evaluating employees, identifying those whose performance warrants further review and, when appropriate, intervention. The Office uses data from the Early Identification System to support effective supervision, evaluation, and management of employees in order to promote lawful, ethical, and professional police practices and to evaluate Office operating procedures.

4.      Body-Worn Cameras: Training that provides a standardized system for creating, impounding, retaining, redacting and restricting audio and/or video recordings made with body-worn cameras during investigative or law enforcement activities and contact with members of the public.

5.      TraCS: Training that provides deputies with guidelines for using the Traffic and Criminal Software (TraCS). This is an electronic forms management program that the Office utilizes for, but does not limit its use to, electronic Traffic Citations, Traffic Crash Reports, and *MCSO Vehicle Stop Contact Forms*.

6.      Supervisory: Training to ensure supervisors, at all levels, provide proper direction, coordination, and control of subordinates. Supervisors shall direct their efforts toward the intelligent and efficient performance of the functions of the Office and shall require their subordinates to do the same.

H.      Misconduct-Related Training:

1.      All supervisors responsible for conducting employee misconduct investigations and employees assigned to the PSB shall attend 40 hours of comprehensive training on conducting employee misconduct investigations and eight hours annually thereafter.

2.      All employees shall attend training on identifying and reporting misconduct; the consequences for failing to report misconduct; and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.

3.      All supervisors shall receive training on their obligations when called to a scene by a subordinate to accept a complaint from a member of the public about that subordinate's conduct. This training shall cover the supervisor's obligations when they are phoned or e-mailed directly by a member of the public filing a complaint on one of their subordinates.

I.      Firearms Training: All deputies must attend and successfully complete an annual firearms qualification training course, an annual judgmental shooting course, and any other training deemed mandatory by the Office, as specified in Office Policy GJ-23, *Firearms*.

1.      Range staff from the Training Division shall schedule range use and training events for Office personnel and other federal, state and local governmental agencies.

2.      The use of an authorized firing range shall be strictly limited to the personnel responsible for conducting the training event and those scheduled to participate in the event.

J.      Specialized Assignment Training: Each division commander, or designee, shall be responsible for recommending to the Training Division specific training programs necessary to satisfy specialized assignment training needs for their division, when the necessary training programs or needs cannot otherwise be accomplished by the division or through outside training. The Training Division shall assist the division with the development of a lesson plan for the specialized training, as specified in this Office Policy. The training should be provided to all personnel newly assigned to a specialized

assignment, as specified in Office Policy GC-7, *Transfer of Personnel*.

1. A division seeking to provide its own specialized assignment training must send a copy of the lesson plans to the Training Division. The lesson plan shall be reviewed annually by the Training Division, with the assistance of the specialized division. Any updates to the lesson plan shall be done following the procedures in this Office Policy.

2. The Training Division shall be the repository for all Office developed training programs.

3. Specialized Assignment Training should normally be initiated within 30 days of assignment, and be completed in any event, no later than 90 days of assignment, and shall, at a minimum, address the following:

    a. Relevant Office and unit policies, procedures, protocols, rules, and regulations;

    b. Development of the skills, knowledge, and abilities particular to the specialization;

    c. Performance standards associated with the assignment; and

    d. Each division's supervised on-the-job training program must contain documentation of performance standards and associated tasks to be completed by new personnel and a deadline by which new personnel must successfully demonstrate the ability to perform each task.

    e. The start and completion of the specialized training program by new personnel shall be documented by the supervisor in Blue Team. The division shall maintain the training program documentation for all new personnel, with a copy provided for placement in the employee's training file.

4. Division commanders shall be responsible for the administration and management of the specialized training of their employees. Division commanders and supervisors may access training materials held by the Training Division, as described elsewhere in this Office Policy.

5. Certain assignments, as determined by a bureau chief, may require formalized training beyond what is available within the Office. In these instances, that training shall be provided within one year of the assignment.

6. Personnel who receive specialized training and are transferred to another assignment may be required to provide service to the Office using their specialized training as long as their certification and expertise is maintained.

K. Detective Status Training Courses: All employees working in a detective assignment shall be required to attain detective status. Newly assigned detectives who have not yet attained detective status shall complete the required training within one year of their detective assignment. Detective status training is offered annually through the Training Division. Detective status can be completed prior to working in a detective assignment.

1. The curriculum shall be approved by the Detectives and Investigations Bureau Chief.

2. To obtain detective status, all employees working in a detective assignment must take 88 hours of course work pursuant to the curriculum established by the Training Division. Classes

included in the curriculum include, but are not limited to:

   a.    Instruction and Overview of Criminal Investigations, 24 hours;

   b.    Search Warrants or Search and Seizure, 16 hours;

   c.    Interview and Interrogation, 24 hours; and

   d.    24 hours of elective or specialty classes.

3.    Approved classes shall be of a nature that will enhance the employee's skill level in the area of their specialized assignment or current investigative techniques.

4.    Training for the approved classes may be through an outside provider or the Training Division.

5.    Deputies seeking detective status must track their progress through the required courses. Upon completion of required courses, whether through an outside provider or through an Office-sponsored course, the deputy shall submit a memorandum and the *MCSO Detective Course Completion* form to the Sworn Advanced Training Section of the Training Division.

L.    Annual Detective Status Continued Training:

1.    After receiving detective status, a detective working in a detective assignment shall be required to complete annual detective continued training. The detective unit supervisor shall select training courses for their detectives and ensure the detectives are in compliance with annual detective continued training. One of the following class topics should be completed each year to improve efficiency:

   a.    Interview and Interrogation;

   b.    Crime Scene Processing;

   c.    Social Media Investigation Techniques;

   d.    Search Warrant Methodology;

   e.    Financial Crimes/Fraud Investigations;

   f.    Report Writing; or

   g.    Missing Persons.

2.    Additional course topics may be completed if approved by the Detectives and Investigations Bureau Chief.

3.    The detective unit supervisors over specialized units, such as Lake Patrol, the Special Investigations Division, and the Major Crimes Division, shall ensure the annual detectives continued training courses pertain to their unit's specific focus.

4.    Upon completion of any annual detective continued training courses, whether through an outside provider or through an Office-sponsored course, the detective shall submit a copy of their course completion documentation to the Sworn Advanced Training Section of the

Training Division.

M.   CPR and First Aid Training: All deputies holding the rank of sergeant or below shall be required to complete CPR and first aid training every two years.

N.   Remedial Training: Supervisors are responsible for identifying those employees who do not meet established performance standards and initiate appropriate measures to correct deficient performance. Supervisors should work with the Training Division to identify established training courses to correct deficient performance. When practical, a qualified FTO will deliver the remedial training in coordination with the Training Division. Requests for remedial training shall be completed through Blue Team and tracked by the Training Division.

1.   If a supervisor notices that an employee is deficient in their performance; the supervisor shall document this performance deficiency utilizing the EIS Blue Team Supervisor Notes and the employee's annual EPA, as specified in Office Policy GC-4, *Employee Performance Appraisals*. Upon the supervisor determining what remedial training action needs to be completed by the employee, a Blue Team Incident type 'Remedial Training Request' shall be created. Additional notification shall be made to the Training Division through electronic or memorandum format. A copy of that notification shall be placed into the employee division file and sent to the Training Division for placement into their training file. Follow-up by the Training Division shall be made to ensure that the training need has been addressed and remediated.

2.   If deficient performance has been identified, the employee's routinely assigned duties may be temporarily modified, as determined by the division commander, or designee, to facilitate the successful completion of remedial training. However, the employee shall not be reassigned outside the normal work location unless circumstances clearly indicate that public and employee safety or efficient operations require such reassignment.

a.   The supervisor shall review the deficiency with the employee to determine if remedial training is appropriate and a Blue Team Supervisory Note shall be made to document the conversation and outcome.

b.   If successful remediation of deficient performance cannot be achieved using the resources available to the employee's immediate command, a memorandum shall be submitted to the Training Division, through the employee's chain of command, requesting remedial instruction. One copy of the memorandum shall be placed into the employee's division file and one copy shall be sent to the Training Division for placement the employee's training file. A Blue Team Supervisory Note shall be made to document the action.

3.   Training staff shall determine the appropriate training to be undertaken to address the extent of the deficiency as well as the method of delivery of the training. The recommended course of action, when appropriate, may be returned to the employee's chain of command to correct the problem or Training Division personnel shall schedule specialized training for the employee to correct the deficiency.

4.   Successful remediation must be completed within 60 days unless operational circumstances dictate otherwise. The remediation period shall not extend beyond 90 days absent extraordinary circumstances from the date the Training Division was first notified of the need for remedial training.

        a.      The Training Commander shall report the results of the remedial instruction to the employee's bureau chief through Blue Team if the training was delivered by the Training Division.

        b.      If the remedial training was delivered by an FTO, the FTO shall report the results of the remedial instruction through Blue Team to the bureau chief. The employee's supervisor shall make a Blue Team Supervisor Note of the resolution. This note shall be captured in the employee's annual EPA, as specified in Office Policy GC-4, *Employee Performance Appraisals*.

        c.      In those instances where successful remediation is not achieved within the specified time frames, the Training Division shall be responsible for notifying the employee's bureau chief. The bureau chief shall initiate any appropriate administrative or disciplinary action.

    5.      Attendance is mandatory for all remedial training which is initiated for the affected employee. An employee failing to attend as scheduled shall be referred to the Early Intervention Unit (EIU) for entry into Blue Team and notification to the appropriate supervisor for administrative or disciplinary action, and to evaluate their continued fitness for duty.

O.      Deputies are encouraged to seek out-of-agency training opportunities. Once a deputy has completed an out-of-agency training class and wants to have that class recorded in TheHUB, he must provide the Training Division with: a memorandum containing the pertinent details of the training, including the subject, date, sponsoring agency or organization, and length of training; copies of any resource materials obtained through the training; and a copy of any certificate issued to the participant.

4.    **Training Cycle**: The Training Cycle consists of six steps and shall be applied to all MCSO-generated training. The purpose of the Training Cycle is to ensure consistency and standardization of the development, facilitation, implementation, analysis, and revision of MCSO-generated training, which includes in-service and online classes. Use of the Training Cycle incorporates the most current developments in federal and state law, Office Policy, and shall consider feedback from all stakeholders. The cycle ensures the regular update of training material.

A.      Step 1: Training Diagnosis and Needs Review: The Training Division evaluates the policies, procedures, and practices of the Office for the purpose of developing or revising training through the Training Diagnosis and Needs Review.

    1.      The recommendations of Training Diagnosis and Needs Review shall be conducted by a Training Division supervisor.

    2.      The Training Diagnosis and Needs Review will include, but need not be limited to, an evaluation based on a quarterly review of:

        a.      Recommendations from the Training Division Commander or designee, or other Office command;

        b.      Recommendations from the FTO Program;

        c.      Recommendations for remedial training requested by a supervisor;

➢        d.      Any material submitted to the Training Division by other divisions of the Office

concerning but not limited to:

(1) Body-worn camera recordings, as specified in Office Policy GJ-35, *Body-Worn Cameras*, which shall be reviewed solely to complete training diagnosis, training development, training revision, or to be utilized in future training;

(2) Published audits and studies conducted by the Bureau of Internal Oversight, as specified in Office Policy GH-4, *Bureau of Internal Oversight Audits and Inspections*;

(3) Reports from the EIU documenting Early Identification System (EIS) alerts regarding training issues;

(4) Reports from the PSB documenting training issues identified through closed administrative or criminal investigations;

(5) Sustained complaints lodged by members of the public or personnel with the Office that have identified any training gaps in field practices;

(6) Reports related to critical incidents, as specified in Office Policy GJ-2, *Critical Incident Investigations*;

(7) Test results from training programs;

(8) Civil litigation involving the Office, potentially identifying field-based practices that may be problematic; and

(9) Any external influences on the Office, such as revised laws, world events, etc.

B. Step 2: Training Development:

1. Training curriculum shall be developed to address the results of the Training Diagnosis and Needs Review based upon law enforcement best practices, legal developments, the standards and curriculum required by AZPOST, and the requirements of relevant court orders or judgments. The Training Division shall not develop or revise any copyrighted/proprietary material from an outside vendor that the Office utilizes for training (e.g., Taser, American Heart Association, etc.). Only MCSO-generated courses are subject to follow the Training Cycle.

2. To develop each course, the Training Division and/or the course instructor shall:

a. Articulate specific performance or learning objectives to be accomplished through the training;

b. Identify Office personnel for whom the training will be offered;

c. Identify qualified instructors;

d. Identify a reasonable timeline regarding the length of training for each topic and the overall organization of the course;

e. Draft a test, if applicable, that will measure whether the participant meets the articulated performance objectives for a specific course. The test may include, but is

not limited to, a written test and/or a practical application;

f.      Identify the type of remediation to be utilized; and

g.      Draft a lesson plan following the Training Division mandated format. Any course considered to be "training" shall have a lesson plan. The content of the lesson plan may be based upon the research and experience of staff or course instructors. The training shall include at least 60% live training, such as classroom-based live instruction, which includes an interactive component but no more than 40% on-line, or web-based, training. Optional course material to be developed may include, but not be limited to, the following:

(1)      Slide presentations (e.g., Microsoft PowerPoint);

(2)      Visual aids, such as posters, photos, etc.;

(3)      Student handouts; and/or

(4)      Instructor guides.

3.      The Training Division may incorporate adult learning models, including classroom or web-based instruction, role-playing scenarios, interactive exercises, and/or traditional lecture to assist in comprehensive, quality training.

4.      The Training Division shall be responsible for maintaining a Master Calendar for all training courses.

C.      Step 3: Training Delivery:

1.      All courses that are to be taught by multiple instructors shall require the instructors participate in a Train-the-Trainer course in order to establish expectations and to ensure curricular consistency.

2.      Training shall be delivered by qualified instructors who meet the criteria specified in this Office Policy.

3.      In addition to the qualifications specified in this Office Policy, instructors presenting training on legal matters shall hold a law degree from an accredited law school and be admitted to a Bar of any state or the District of Columbia.

4.      Training delivery may be electronically recorded for future reference.

5.      The Training Commander, or designee, shall ensure that the training delivery conforms to the lesson plans or instructional guidelines and any associated timelines. This shall be accomplished through lesson plan review, participant evaluations, participant test result analysis, and personal observation.

6.      Training Division supervisors' shall ensure proper documentation of any training delivery in which they are responsible for (e.g., Basic Academy Class Sergeant oversees Basic Academy classes). Documentation of training delivery shall include:

a.      Attendance rosters with participant signatures indicating attendance;

      b.      Student test results (if testing is applicable);

      c.      Instructor critiques; and

      d.      Course evaluations.

D.      Step 4: Initial Training Tests and Evaluation:

    1.      Participant tests shall be conducted as specified in this Office Policy. The Training Division may use the results of these tests to suggest remediation or extended training. Note that not all classes will require testing.

    2.      The Training Division shall evaluate instructors, training delivery, course content, curriculum, and course timelines through different forms including, but not limited to, student tests, instructor critiques, and course evaluations.

E.      Step 5: Revision of Training:

    1.      Following training delivery, the Training Division shall use the results of different forms including, but not limited to, student tests, instructor critiques, and course evaluations, that are filled out by participants to evaluate training development and delivery. The Training Division shall analyze the most frequently missed questions on written tests to determine knowledge deficiencies. The Training Division may also solicit written or oral feedback from participants and observers; if solicited, this feedback shall be documented on the *Training Cycle Checklist* or on an Office memorandum, and saved for future development or revision of training.

      a.      Written tests analysis shall be conducted within 72 hours of course completion and may be done so by the instructor or an approved electronic method.

      b.      At the discretion of the Training Commander, or designee, deficiencies may be addressed through, but not limited to instructor updates, instructor removal, or lesson plan updates.

    2.      Based on these test results, evaluations, and optional feedback, the Training Division or course instructors shall be required to revise training materials, including performance objectives, curriculum, timelines, lesson plans, and assessments, as needed, but no less than annually. The Training Division and course instructors shall document any review and revision of training materials on the *Training Cycle Checklist*.

F.      Step 6: Documentation of Process:

    1.      All steps in the Training Cycle shall generate records to ensure the Training Division is able to document its processes in records to review, development, delivery, assessment, and evaluation of training provided. The Training Division shall use the *Training Cycle Checklist* to ensure compliance with this step. A Training Division supervisor is responsible for completing this step in the Training Cycle ensuring that all steps are complete for this training. Note that not all steps will be completed immediately; the process of completing the entire Training Cycle for one course may take several months, but no more than one year.

    2.      The Training Division shall keep a central repository of all training materials, including standards, curriculum, lesson plans, research, and instructor lists. Where possible, this central

repository shall be electronic.

3.      The Training Division shall also maintain a central repository of participant information such as attendance rosters, assessments, and evaluations. Where possible, this central repository shall be electronic.

5.      **TheHUB:** The Training Division shall work in coordination with Maricopa County to maintain TheHUB learning management system on behalf of the Office. All recruits, deputies-in-training, deputies, reserve deputies, and posse members shall have a unique user profile to access TheHUB for training course work, tests taking, and for accessing Office Policy, and completing Policy revision and update acknowledgments.

A.      Training Through TheHUB:

1.      TheHUB shall be used to deliver online training courses, conduct electronic written tests, distribute training materials for live courses, and track successful participant completion of mandatory and elective courses. This electronic format allows personnel to complete required courses from locations outside of the training building, such as at the employee's designated work assignment.

2.      Web based deliveries shall conform to the AZ POST Policy statement regarding the issuance of AZ POST Continuing Education Credits for vendors (05/09/2016).

3.      Depending upon the subject matter of the course work, courses delivered through TheHUB may qualify for AZPOST credit hours.

4.      All sworn related online training courses offered by the Training Division through TheHUB shall be approved by the Sworn AOT Supervisor. The AOT Supervisor, or designee, shall designate employees required to complete the online training course and assign a deadline for the completion of each course.

5.      Electronic written assessments delivered through TheHUB shall follow the test requirements discussed within this Office Policy.

6.      TheHUB records successful participant completion of mandatory and elective training courses. TheHUB Dashboard provides each individual training compliance reports.

7.      Division commanders, or their designees, shall ensure TheHUB training compliance within their division by utilizing the TheHUB Dashboard purview. Division commanders, or their designees, shall review the reports, as specified in Office Policy GB-2, *Command Responsibility*.

B.      Office Policies Through TheHUB:

1.      TheHUB will allow all recruits, deputies-in-training, deputies, reserve deputies, and posse members access to Office Policies, and to record the acknowledgment required when an Office Policy is new, updated, or revised. TheHUB will also include *The Briefing Board* for time sensitive changes to Office Policy.

2.      Office Policy revision, update, or newly created policies will be received by the Training Division from the Policy Development Section directly, or through the chain of command, for dissemination, through TheHUB.

3. Unlike credits earned through TheHUB training courses, the credits assigned in TheHUB for policy matters will not count toward AZPOST credit hours but are instead used for acknowledgment of an employee's understanding of the policy and tracking purposes.

4. The CORT Supervisor, or designee, shall approve the release of all policies through TheHUB. The CORT Supervisor, or designee, shall then designate employees required to receive and acknowledge understanding of the policy and assign a deadline for the review of each policy.

5. Where necessary, tests used to check understanding of policy changes will be developed by the CORT Supervisor with assistance from relevant Office personnel. These tests shall comply with the requirements found in the Training Cycle, Step 4: Training Assessment and Evaluation.

6. TheHUB records acknowledgments of Office Policies. TheHUB Dashboard provides each individual compliance reports. Division commanders, or their designees, shall review the reports, as specified in Office Policy GB-2, *Command Responsibilities*.

7. Division commanders, or their designees, shall ensure compliance with review timelines within their division by utilizing the TheHUB Dashboard purview.

6. **Master Training Calendar:** The Training Division shall maintain a Master Training Calendar, containing the dates, times, and locations of Office-offered training. The Training Division shall regularly update the Master Training Calendar to reflect the addition or cancellation of Office-offered training.

A. The Training Division shall use the Master Training Calendar to ensure all OITs, deputies, reserve deputies, and posse members meet their annual training requirements related to these courses.

B. The Master Training Calendar shall include, at a minimum, information related to: Bias-Free Policing Training; Detentions, Arrests, and Immigration-Related Law Enforcement Training; Court Order-Related Supervisory Training; EIS Training; PSB Investigative and Checklist Training; TraCS Training, and Body-Worn Camera Training.

C. The Master Training Calendar may include information related to other law enforcement training at the discretion of the Training Commander.

7. **Training Division Database:**

A. The Training Division shall maintain a central repository of the following categories of documents:

1. The results of the Training Diagnosis and Needs Review that uses the Training Cycle Checklist to compile data on courses;

2. Training materials, including, but not limited to, performance objectives, curriculum research, sample lesson plans or instructional guides, scenarios or other learning activities, tests, instructor critiques, and course evaluations;

3. Participant information, including attendance rosters, participant test results, and Course Assessment forms, associated with specific courses;

4. Documentation associated with the Training Revision, including the feedback from course participants and observers; and

           5.       Training Cycle Checklists.

    B.       All training materials shall be available to instructors for the purpose of developing training. These materials may also be available to supervisors for coaching purposes.

8.     **EIU Report:** On a quarterly and annual basis, within 30 days of the end of the period, the EIU will document and review all EIS Alerts generated from the IA Pro database. Based upon that review, the EIU Commander will send a report to the Sworn Advanced Officer Training Commander recommending specific formal training topics for individuals or groups to improve employee performance and address systemic issues. The EIU Commander and staff will be available to assist and consult with the Sworn Advanced Officer Training Commander in identifying EIS performance patterns or trends requiring attention. The Sworn Advanced Officer Training Commander, or designee, will review the report and any associated documents for the purpose of drafting a memorandum to the Training Division Commander. The memorandum will recommend the training action, including an Office Policy refresher or training course work through TheHUB, instructor led training course work, and/or initiation of the Training Cycle, to address the systemic issue; the memorandum also will identify the individuals or divisions that will attend the training.

# EXHIBIT D



# *The Briefing Board*

### Number 17-14
### March 16, 2017

## IMMEDIATE POLICY CHANGE
## CP-1, USE OF FORCE

Detention personnel and those employees associated with detention related functions are **required** to read the below policy to ensure they are familiar with the changes that have been made. Employees are **required** to log into E-Policy, at http://epolicy.mcso.org, to review and acknowledge an understanding of the policy by **March 31, 2017**.

Employees are reminded that *The Briefing Board* has the same force and effect of policy. Division commanders shall ensure that employees have access to a copy of this *Briefing Board* announcement. Policy changes should be discussed during shift briefings, as specified in *Office Policy GB-2, Command Responsibility.*

## CP-1, USE OF FORCE

**Effective immediately**, Office Policy CP-1, *Use of Force* is revised as follows (Changes indicated in ~~strikethrough~~ and **UPPER-CASE BOLD UNDERLINED** text):

2.     **Considerations in Use of Force:** The reasonableness of a particular use of force or control will be determined by the circumstances known to the employee at the time of the incident.

    C.     Detention Planned Use of Force: Employees shall consult with Correctional Health Services (CHS) mental health staff prior to any detention planned use of force incident within a detention facility.

        1.     **THIS CONSULTATION SHALL INCLUDE ALL INMATES REGARDLESS OF THEIR CLASSIFICATION STATUS, AND THOSE INMATES THAT HAVE BEEN DESIGNATED BY CHS MENTAL HEALTH STAFF AS SERIOUSLY MENTALLY ILL (SMI) OR MENTAL HEALTH CHRONIC CARE (MHCC).**

        2.     **IF, FOLLOWING THE CONSULTATION, MENTAL HEALTH STAFF OR CHS STAFF IS PRESENT, PRIOR TO THE PLANNED USE OF FORCE, THEY MAY BE PERMITTED TO SPEAK TO THE INMATE IN AN EFFORT TO DEESCALATE THE SITUATION, IF IT IS SAFE TO DO SO.**

        3.     **THE CONSULTATION AND RESPONSE BY MENTAL HEALTH STAFF OR CHS STAFF SHALL BE DOCUMENTED IN THE OPERATION JOURNAL (OJ).**



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | | |
|---|---|---|
| **Subject** | | **Policy Number** |
| | | **CP-1** |
| **USE OF FORCE** | | **Effective Date** |
| | | **02-06-16** |
| **Related Information** **CRITICAL POLICY** | **Supersedes** CP-1 (12-09-11) | |

**PURPOSE**

The purpose of this Policy is to provide employees with guidelines on the authorized use of force or control that objectively reasonable employees would apply in the performance of their lawful duties.

➢ Although this Policy refers to "employees" throughout, this Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

**POLICY**

It is the policy of the Office to ensure that trained employees are authorized to use reasonable force or control in the performance of their duties.

**DEFINITIONS**

***Blue Team:*** The Early Identification System (EIS) application that allows employees and supervisor to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IA Pro Early Identification case management system.

➢ ***Detention Planned Use of Force:*** An incident involving an inmate who is not posing an immediate threat to officers, staff, or other inmates, where force must be used to protect the inmate involved or to allow Correctional Health Services (CHS) staff to administer involuntary psychotropic medications.

***Early Identification System (EIS):*** A system of electronic databases that capture and store threshold events to help support and improve employee performance through early intervention and/or to identify Office operating procedures that need evaluation. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, the EIS Dashboard, IA Pro, and EI Pro are applications of EIS.

***Employee:*** A person currently employed by the Office in a classified, unclassified, full-time, part-time, contract or probationary status.

***Restraint Devices:*** Equipment used to control and restrict the physical movement of a prisoner or inmate.

***Volunteer:*** A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

**PROCEDURES**

1.  **Completion of Approved Training:** All employees must successfully complete approved training before employing any of the authorized weapons, equipment, or techniques approved by the Office. Guidelines for the use and application of weapons, equipment, and techniques are taught during training and should be followed. All required certifications and re-certifications will be obtained, as specified in the Training Calendar.

2.  **Considerations in Use of Force:** The reasonableness of a particular use of force or control will be determined by the circumstances known to the employee at the time of the incident.

    A.  Enforcement Considerations: The decision to use force should balance the need to apprehend or control the subject against the intrusion or impact of the capture. Factors to be considered include, but are not limited to, the following:

        1.  The immediate threat to the employee or others.

        2.  A subject who is resisting arrest or attempting to evade arrest by flight.

        3.  A situation that is tense, uncertain, or rapidly evolving.

        4.  The severity of the crime.

    ➢   B.  Detention Considerations: The decision to use force should balance the need to preserve internal order and discipline within the jail and the need to maintain institutional security. Employees shall only use the amount of force that is reasonable and necessary to address the situation. Factors to be considered include, but are not limited to, the following:

        1.  The threat as reasonably perceived by the employee.

        2.  The extent of the threat to the safety of staff and inmates, as reasonably believed by the employee based on the known facts.

        3.  The relationship between the need and the amount of force used.

        4.  When the force is applied, the amount of injury that it may cause the inmate and other involved parties.

    ➢   C.  Detention Planned Use of Force: Employees shall consult with Correctional Health Services (CHS) mental health staff prior to any detention planned use of force incident within a detention facility.

3.  **Decision to Use Force or Control:** The employee's decision to use force or control will be based on the totality of circumstances known to the employee at the time of the incident, his training, and the subject's actions. Considerations include the following:

    A.  The elements of force present.

        1.  Ability: The subject's physical or mental power to carry out an act.

        2.  Opportunity: The subject's chance to carry out an act.

        3.  Jeopardy: The danger to the employee, others, or to property, if the subject acts.
        4.  Preclusion: The consideration of reasonable means of force or tactical redeployment.

B.     The type of resistance used by the subject.

C.     The response options reasonably and readily available to the employee at the time.

4.   **Type of Resistance:** The following types of resistance may influence an employee's response.

A.     Psychological Intimidation: Non-verbal cues indicating a subject's attitude, appearance, and physical readiness.

B.     Verbal Non-Compliance: Verbal responses indicating unwillingness or threats.

C.     Passive Resistance: Physical actions that do not prevent an employee's attempt of control, such as a protester going limp and having to be carried away or an inmate not following verbal commands.

D.     Active Resistance: Physical actions which attempt to prevent an employee's control, but never attempt to harm the employee, such as a subject tightening up or attempting to pull away.

E.     Active Aggression: Physical actions of assault, such as a subject displaying threatening behavior, assaulting or attempting to assault another person, or destroying or attempting to destroy property.

F.     Aggravated Active Aggression: Physical actions which result in a deadly-force encounter.

5.   **Response and Control Options:** Actions an employee may use in an attempt to control a subject.

A.     Employee's Presence: Identification of the employee's authority.

B.     Verbal Direction: Commands of direction or arrest.

C.     Empty-Hand Control and Restraint Devices:

1.     Soft, Empty-Hand Control: Techniques that have minimal chance of causing injury such as, escort position, handcuffing, and leg cuffs.

2.     Hard, Empty-Hand Control: Techniques that have a probability of causing injury such as, closed fist strikes, palm-heel strikes, kicks, and knee strikes.

D.     Intermediate Weapons and Control: Force that has a probability of causing injury, but is unlikely to result in death, when properly used.

1.     Soft, Intermediate Weapons and Control: The use of intermediate weapons where vulnerable areas of the body are not the target of force delivery techniques. This includes techniques such as impact weapons, joint locks, wristlocks, and come-a-longs.

2.     Hard, Intermediate Weapons: The use of intermediate weapons where vulnerable areas of the body are the target of force delivery techniques when it is reasonable to do so based on the totality of the circumstances. This includes techniques such as impact weapon strikes.

E.      Deadly Force: Force that is likely to cause death or serious physical injury. Deadly force should only be exercised when other reasonable, safe alternatives are not present, not practical, or have been exhausted.

1.      An employee may use deadly force to protect himself or others from an immediate threat of death or serious bodily harm.

2.      An employee may use deadly force to prevent the escape of a subject whom the employee has probable cause to believe has committed an offense involving the infliction or threat of serious physical injury or death, and is likely to endanger human life or cause serious injury to another, unless apprehended without delay. When safe and feasible, a verbal warning should be given.

3.      Employees should not discharge a firearm at, or from, a moving vehicle, except as an extreme measure of self-defense or defense of another, when all other means are ineffective or impractical.

6.      **Authorized Weapons, Equipment, and Techniques:** Guidelines for the use and application of weapons, equipment, and techniques are taught during training and should be followed. The vulnerable areas of the body to avoid, durations of use, and frequency of use authorized are specified in training. Authorized weapons, equipment, and techniques include, but are not limited to, the following:

➢      A.      Baton: The use of a baton is limited to sworn personnel, Qualified Armed Posse (QAP), and firearms qualified detention personnel.

B.      Canine: Will be used, as specified in Policy GJ-25, *Canine Unit Operations*.

C.      Carotid Control Technique: Will only be used by sworn officers trained in its use.

D.      Conducted Electrical Weapon (CEW): Use of the CEW is authorized, as specified in Policy GJ-30, *TASER$^®$ Conducted Electrical Weapon (CEW)*.

1.      CEWs are considered intermediate weapons.

2.      Examples of CEWs include Advanced TASER$^®$ X2™ and TASER$^®$ X26™.

E.      Firearms: Use of firearms is authorized in this Policy and Policy GJ-23, *Firearms*. Only sworn personnel will use a firearm to destroy an animal. An attempt shall be made to locate and contact the animal's owner by searching for brandings or ID tags. If the animal's owner cannot be determined and there is no reasonable likelihood the animal can be humanely rescued, the deputy may use his firearm to destroy the animal.

F.      Oleoresin Capsicum (OC): Only Office approved OC spray is authorized for use. All employees should be aware of and take precautions for multi-agency participation in which a variety of OC sprays and equipment might be used, since some types of OC spray may be flammable.

G.      PepperBall$^®$ Launcher: Use of the PepperBall$^®$ launcher is authorized, as specified in Policy GJ-31, *PepperBall$^®$ Launcher*. PepperBall$^®$ launchers are considered intermediate weapons.

H.      Restraints: Employees are authorized to restrain combative subjects by binding the hands to the ankles in front of the body. Binding the hands to the ankles behind the back is strictly prohibited.

I.     Vehicle: Employees should not deliberately use an Office vehicle in an attempt to collide with another vehicle or force any vehicle off the roadway unless, given the totality of the circumstances, it is a reasonable use of force. Only those employees trained in the Pursuit Immobilization Technique (PIT) are authorized to use it, as specified in Policy CP-4, *Emergency and Pursuit Driving.*

7.     **Use of Other Reasonable Weapons, Equipment, or Techniques:** An employee is authorized to use other reasonable weapons, equipment, or techniques available to him if authorized weapons, equipment, and techniques are unsafe, unavailable, or ineffective given the totality of the circumstances.

8.     **Medical Treatment:** Employees should determine whether an individual has sustained any injury as a result of the use of force or control. Appropriate medical treatment should be obtained when necessary. Medically protected documents shall not be forwarded outside their originating bureau.

➢ 9.     **Documenting Use of Force:**

A.     Supervisors shall ensure that all incidents above and beyond Soft, Empty-Hand Control are documented using the *Use of Force Report* form.

B.     An *Incident Report* (IR) shall also be completed when there is an incident that requires a *Use of Force Report* form.

C.     A memorandum to the immediate supervisor shall be completed following the use of deadly force in which no injury occurred.

D.     Routing the *Use of Force Report* forms:

    1.     Sworn:

        a.     The *Use of Force Report* shall be completed in the EIS Blue Team application. All supporting documentation, including but not limited to, the IR, Taser download, evidence impound forms, pictures, and any video of the incident, shall be uploaded in the EIS Blue Team application. If the video is too large to download into the EIS Blue Team application, it shall be impounded as evidence, and referenced in the IR. Once the *Use of Force Report* has been completed in the EIS Blue Team application, it will be forwarded through the chain of command to the division commander.

        b.     Once approved by the division commander, the *Use of Force Report* shall be forwarded to the Chief of Operations, or his designee, who will then evaluate the incident.

        c.     After review and approval by the Chief of Operations, of his designee, *the Use of Force Report* shall be forwarded to the Early Intervention Unit. A copy of the *Use of Force Report* will be saved by the Chief of Operations, or his designee, for records retention.

    2.     Detention:

        a.     The *Use of Force Report* shall be completed in the EIS Blue Team application. All supporting documentation, including but not limited to, the IR, Taser download, evidence impound forms, pictures, and any video of the incident, shall

                be uploaded in the Blue Team application. If the video is too large to download into the Blue Team application, it shall be impounded as evidence, and referenced in the IR. Once the *Use of Force Report* has been completed in the EIS Blue Team application, it will be forwarded through the chain of command to the division commander.

        b.      Once approved by the division commander, the *Use of Force Report* shall be forwarded to the Detention Use of Force Committee Facilitator and the Detention Use of Force Committee. The Use of Force Review Committee will then evaluate the incident.

        c.      After review and approval by the Detention Use of Force Review Committee, the *Use of Force Report* shall be forwarded by the Detention Use of Force Committee Facilitator and to the Early Intervention Unit. A copy of the *Use of Force Report* will be saved by the Custody Bureau Hearing Unit for records retention.

10.    **Critical Incident Stress Management (CISM) Team:** The CISM team may be utilized following a critical incident, as specified in Policy GC-22, *Critical Incident Stress Management Program.*

11.    **Use of Force Review Committee:** The Use of Force Review Committee is comprised of designated personnel who evaluate use of force incidents to ensure that proper action has been taken and to identify any policy or training deficiencies. The Committee does not hold hearings or impose discipline. Policy, procedure, or training deficiencies identified by the Use of Force Committee shall be forwarded to the appropriate division or bureau for review and follow-up.

        A.      Enforcement Action: A copy of the Use of Force Review Committee findings will be forwarded to the Operations Bureau Commander who will determine if a minor or major infraction occurred. If a major infraction occurred, the information will be forwarded to the Sheriff, or his designee, to determine the appropriate course of action.

        B.      Custody Action: A copy of the Use of Force Review Committee findings will be sent to their respective bureau commander who will determine if a minor or major infraction occurred. If a major infraction occurred, the information will be forwarded to the Sheriff, or his designee, to determine the appropriate course of action.

12.    **Training Programs:** The Training Division shall be responsible for developing, implementing, and monitoring programs designed to provide training in the use of force and control, defensive tactics, and weapons. Specialty units will be responsible for their specialized training and should forward their training documents to the Training Division for tracking purposes. All employees shall successfully complete the training requirements appropriate to their classification prior to:

        A.      Assignment to law enforcement or detention duties.

        B.      Authorization to carry or use any weapon, ammunition, or use of force tool in the line of duty.

# EXHIBIT E



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | | |
|---|---|---|
| **Subject** **HIRING AND PROMOTIONAL PROCEDURES** | **Policy Number** **GC-12** | |
| | **Effective Date** **07-23-20** | |
| **Related Information** Arizona Administrative Code Employee Merit System Rules Law Enforcement Officers' Merit System Rules GB-2, *Command Responsibility* GC-11, *Employee Probationary Periods* GC-17, *Employee Disciplinary Procedures* GF-3, *Criminal History Record Information and Public Records* GG-1*, Peace Officer Training Administration* GG-2*, Detention / Civilian Training Administration* GH-3, *Polygraph Procedures and Documents* GH-5, *Early Identification System* GJ-28, *Prison Rape Elimination Act* (PREA) | **Supersedes** GC-12 (06-14-19) | |

## PURPOSE

The purpose of this Office Policy is to establish a uniform process for hiring and promotional procedures, and to explain the responsibilities of each component involved in the process.

## POLICY

It is the policy of the Office to administer an efficient, effective, and fair process resulting in the appointment and promotion of those individuals who best demonstrate the skills, knowledge, and abilities necessary for a successful career with the Office. Responsibility for the phases of hiring and promotion is divided between the Office and the Maricopa County Human Resources Department. The hiring and promotional procedures used by the Office shall be in accordance with state and federal law, Maricopa County Law Enforcement Officers' Merit System Rules (LEOMSRs), and Maricopa County Employee Merit System Rules (EMSRs).

## DEFINITIONS

*Applicant:* A person who has filed an application with Maricopa County Human Resources for employment.

*Appointing Authority:* The Sheriff of Maricopa County or the designated representatives authorized to act in this capacity.

*Appointment:* Assignment of an employee into an unclassified position.

*Business Necessity:* Relating to an essential function of the job. Each evaluation or other selection criterion which might exclude an individual with a disability must relate to an essential function of the job, or it is not consistent with business necessity.

*Candidate:* An applicant approved for participation in an examination or an assessment process.

*Eligible:* A person who has qualified for and attained a passing score on an examination for a specific position. The eligible person must meet the established prerequisites of the position to be filled, such as the minimum, acceptable levels of education, experience, and skill; and must be able to perform the essential functions of the job, with or without

reasonable accommodations.

***Eligible List, Civilian and Detention Only:*** An official list of those eligible for a particular position, which shall be used by the appointing authority, for selection for appointments to positions.

***Essential Functions:*** Those fundamental operations or duties which are considered indispensable to the successful completion of a job task. Functions are considered "essential" when employees are required to perform them <u>and</u> when their elimination would fundamentally alter the job. A function which is rarely performed may nevertheless be essential.

***Examination:*** The evaluation process used by the Maricopa County Human Resources Director to measure the qualifications and determine the relative excellence of candidates. Examinations include, but are not limited to, oral exams, written exams, demonstration or performance exams, and training and experience evaluations conducted by Maricopa County Human Resources.

***Initial Probation, Detention Only:*** The initial probationary period for an entry level employee shall be 12 months and may be extended by the Sheriff, or designee for up to six additional months. An initial probationary employee is considered at-will and may be separated at any time during the initial probationary period without the right of appeal, unless written notice of the action taken by the Sheriff, or designee is not given to the employee prior to the expiration of the established probationary period. In any case of suspension, dismissal, or demotion during an employee's initial probationary period, the Sheriff, or designee, may investigate the circumstances and causes for the action taken if non-compliance with Office Policy, or federal or state laws is alleged. The employee must be given written notice of the action taken by the Sheriff, or designee, prior to the expiration of the established probationary period or the employee will be considered to have successfully completed the probationary period.

***Job Announcement:*** An official public notice that a recruitment is being conducted.

***Job-Related Standard:*** A legitimate measure or qualification relevant to an essential function of the job.

***Medical Examination:*** Procedures or tests that may seek information regarding an individual's physical or psychological health, or that seek information about the existence, nature, or severity of an individual's physical or mental impairment. Medical examinations do not include tests for physical agility; however, positions which require medical examinations for employment include drug screening tests.

***Misconduct:*** Any violation of Office Policy or procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules, including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> ***Criminal Misconduct:*** Conduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> ***Minor Misconduct:*** Conduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

> Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include; squad briefing, meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the

Office as an External Complaint, or has not already been assigned to the PSB.

*Serious Misconduct:* Conduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

*Principal:* An employee identified as the primary focus of an administrative investigation and against whom a complaint of misconduct has been made. An administrative investigation may have multiple principals.

*Probationary Appointment, Sworn Only:* The appointment to a regular position through certification in accordance with the Law Enforcement Officers' Merit System Rules. The probationary period for an entry level employee shall be one year and may be extended by the Sheriff, or designee for up to six additional months. An employee may be separated at any time during the initial probationary period of the probationary appointment without the right of appeal. In any case of suspension, dismissal, or demotion during an employee's initial probationary period the Sheriff, or designee, may investigate the circumstances and causes for the action taken. The employee must be given written notice of the action taken by the Sheriff, or designee, prior to the expiration of the established probationary period or the employee will be considered to have successfully completed the probationary period.

*Promotional Probation, Detention Only:* The promotional probationary period for a detention officer shall be 12 months unless extended by the Sheriff for not more than six months. A promotional probationary employee, who fails to satisfactorily complete the promotional probationary period may be, without right of appeal, reverted to a position of the class previously occupied or to another suitable position.

*Promotional Probation, Sworn Only:* The promotional probationary period for a sworn employee shall be six months unless extended by the Sheriff for not more than six months. A promotional probationary employee, who fails to satisfactorily complete the promotional probationary period may be, without right of appeal, reverted to a position of the class previously occupied or to another suitable position. A promotional probationary employee, who is suspended or dismissed, has the right of appeal.

*Register, Sworn Only:* An official list of eligible individuals for a particular position, placed in order of excellence according to results of an examination, which shall be used by the appointing authority for selection for appointments to positions in the Office.

*Serious Offense:* For the purpose of this Office Policy, offenses for which Office personnel have been disciplined or are the subject of an ongoing investigation that would bar Office personnel from a promotion or hire to a new position include, but are not limited to: engaging in discrimination that violates law or policy; failure to follow the requirements of court orders; criminal acts; providing false information in a misconduct investigation; and failing to report observed misconduct of another Office employee or volunteer.

*Unclassified Employee, Civilian Only:* An at-will employee not covered by the Maricopa County Employee Merit System Rules.

**PROCEDURES**

1.      **Responsibilities:**

        A.      The Maricopa County Human Resources Director (MCHRD), or designee, is responsible for recruiting and examining applicants for employment and candidates for promotion and developing a register or eligible list. Upon receipt of a written request from the Human Resource Services Division, the MCHRD shall recruit, test, and then certify a list of eligible candidates.

        B.      The Human Resource Services Division and the Pre-Employment Services Division Commanders shall be responsible for administering the role of the Office in the promotional and hiring processes respectively. Both division commanders are responsible for acting as the liaison between the Office

and the following entities:

1.       The Maricopa County Human Resources;

2.       The Maricopa County Employees Merit System Commission; and

3.       The Maricopa County Law Enforcement Officers' Merit System Commission.

C.       Responsibilities of both the Human Resource Services Division and Pre-Employment Services Division include, but are not limited to, the following:

1.       Adhering to promotional procedures, as specified in the applicable LEOMSRs or EMSRs;

2.       Preparing an announcement for an in-house publication, such as an MCSO Administrative Broadcast, that explains the required steps for promotion or hiring;

3.       Advising County Human Resources of the selection of individuals for promotion or hire from the register or eligible list pursuant to the applicable LEOMSRs or EMSRs and Arizona Revised Statutes (ARS);

4.       Reviewing and evaluating the hiring or promotional processes as needed; and

5.       Initiating the employees or applicants promotional and hiring eligibility review.

2.       **Announcements:** Open competitive announcements shall be by public notice. Internal and promotional announcements may be issued separately for specific positions or on a combined basis with open, competitive announcements. Open, internal, and promotional announcements will be posted on the Maricopa County employment website; all reasonable efforts will be made to communicate with employees concerning promotional opportunities.

3.       **Efforts to Attract Applicants:** Every reasonable effort shall be made to attract qualified persons to compete in the selection process for open positions. The Sheriff or designee may appoint someone directly, who has a unique skill set, for high-level or otherwise critical unclassified positions. Accordingly, the Office may not announce for an unclassified position recruitment.

4.       **Reasonable Accommodations:** Qualified individuals with disabilities shall be provided with reasonable accommodations so that they can participate in the recruitment and selection process.

5.       **Candidate Examinations:** Examinations shall be conducted for all candidates. Qualifying standards for the examinations shall be job-related and consistent with business necessity.

A.       Promotional examinations shall be conducted either on a qualifying or competitive basis.

B.       Sworn personnel are eligible to participate in promotional examinations if they have received a "Meets Minimum Standards" on their last two annual Employee Performance Appraisals (EPAs), as specified in the LEOMSRS 9.04-B.4.

6.       **Hiring and Promotional Procedures:** Hiring and promotional procedures shall conform to the rules specified by the Maricopa County Human Resources Department, the applicable LEOMSRs or EMSRs, and Office Policies.

A.       When making hiring and promotional decisions, the Office shall consider an individual's disciplinary

history. This consideration shall be documented in the paperwork generated during the hiring and promotional process. The Applicant Processing Tracking Sheet shall be used for documenting the hiring review and the Promotional Eligibility/Review form shall be used for documenting the promotions review. The applicable form will be placed in the Personnel File.

1.  If an employee or applicant has a disciplinary history of three or more sustained allegations of misconduct, or one sustained violation of a Category 6 or Category 7 Offense from the Office's disciplinary matrices that resulted in discipline, the employee or applicant shall be deemed ineligible for hiring or promotion.

    a.  Discipline involving a sustained Office Policy violation of a Category 1-3 offense shall be considered for three years.

    b.  Discipline involving a sustained Office Policy violation of a Category 4-7 offense shall be considered for five years.

    c.  There shall also be an overall ten years lookback review conducted for patterns of behaviors and misconduct.

    d.  The Law Enforcement Rule 15 Disclosure (Brady List) standing shall be considered in all promotional decisions; however, may not be a singular reason for denying a promotion.

    e.  Any exceptions shall require a written justification by the appointing authority for hiring or promoting the employee or applicant. The written justification shall be placed in the employee's personnel file and handled according to additional provisions contained within the Court Implementation Division (CID) Operations Manual.

2.  If an employee is the principal of an ongoing administrative investigation of a serious offense, the employee shall be deemed presumptively ineligible for promotion or hire to a new position until the investigation has reached its conclusion.

    a.  Any exceptions shall require a written justification by the appointing authority for promotion or hiring the employee into a new position.

    b.  The written justification shall be placed in the employee's personnel file and handled according to additional provisions contained within the CID Operations Manual.

B.  The Office shall take into consideration any violations of sexual misconduct or alleged violations of sexual misconduct involving inmates and prisoners when making hiring and promotional decisions, as specified in Office Policy GJ-28, *Prison Rape Elimination Act* (PREA).

1.  The Office shall not hire or promote anyone that may have contact with inmates or prisoners, and shall not enlist the services of any contractor that may have contact with inmates or prisoners under the following conditions:

    a.  Has engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution; or

    b.  Has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent, or was unable to consent or refuse.

2.     The Office shall take into consideration any incidents of sexual harassment in determining whether to hire or promote anyone, or to enlist the services of any contractor, who may have contact with inmates.

3.     At a minimum, every five years, the Records & AFIS Division shall conduct criminal records checks on all current employees for investigations of allegations of sexual abuse. Criminal History Record Information (CHRI) shall not be made available to anyone not authorized, except as specified in Office Policy GF-3, *Criminal History Record Information and Public Records.*

7.   **Creation of Eligible List** (Civilian and Detention Only)**:** At the conclusion of an assessment process, the MCHRD shall prepare a list of eligible candidates or merge the names of new eligible candidates with those on an existing eligible list. The MCHRD shall determine the order in which candidates are placed on an eligible list. Typically, the names of eligible candidates shall be in alphabetical order, or by the order of their final numeric assessment score, if applicable.

8.   **Placement on Register** (Sworn Only)**:** After examinations are completed, the Maricopa County Law Enforcement Officers' Merit System Commission shall prepare a register, or merge the names of the new eligible candidates with those on an existing register. The names of eligible candidates shall be placed continuously on registers in the order of their final composite scores in the examination.

9.   **Certification:** The Human Resource Services Division shall request a register or eligible list of anyone eligible in order to fill positions.  The Pre-Employment Services Division and the Human Resource Services Division shall maintain contact with those individuals throughout the employment process.

10.  **Background Investigations:** The Pre-Employment Services Division shall conduct background investigations on anyone eligible for hire. Background investigations shall not include any inquiry into a medical or psychological condition. If any medical or psychological information is voluntary disclosed by the individual during the background investigation it shall not be considered when determining whether or not to make a conditional offer of employment. The background investigation includes, but is not limited to, the following:

A.     Verification of the individual's identifying credentials, such as driver's license, birth certificate, passport, or social security card;

B.     Verification of the individual's compliance with Arizona Peace Officer Standards and Training Board (AZPOST) or other applicable employment standards;

C.     A review of the individual's criminal history record;

D.     A review of the individual's employment history;

E.     A review of any former Office employee's disciplinary history with the Office;

F.     A review of any disciplinary history related to the individual's employment at another law enforcement agency;

G.     Verification of the individual's references. Prior employers or others shall not be asked any questions that cannot be directly asked of the individual applicant;

H.     Obtaining copies of the individual's educational credentials, such as transcripts, diplomas, and degrees, if applicable to the position. High school or college transcripts may be procured at the pre-offer stage; and

I.     Conducting Federal Bureau of Investigations (FBI) checks and national credit checks, as applicable for the position;

11.    **Polygraph Services:** The Polygraph Services Section shall conduct polygraph examinations of individuals applying to be hired, and maintain a record of the results, as specified in Office Policy GH-3, *Polygraph Procedures and Documents.* Polygraph examinations shall be conducted only after a conditional offer of employment has been made. The results of a polygraph examination may be used as a determinant of employment eligibility.

12.    **Physical Agility Evaluations and Oral Interviews:** The Pre-Employment Services Division and the Training Division shall be responsible for administering physical agility evaluations and coordinating oral interviews, when necessary. Physical agility evaluations may be given at any point in the application or employment process, as long as they are job-related, and consistent with business necessity.

A.     Physical agility evaluations given <u>prior</u> to a conditional offer of employment shall meet the following criteria:

1.     All eligible individuals shall be provided with a detailed, written description of the evaluation;

2.     Physiological or biological responses shall not be measured; and

3.     Impairment related inquiries or medical examinations to establish an individual's fitness to take an agility evaluation are prohibited. Furthermore, those eligible shall not be screened for medical conditions, such as heart disease, prior to the evaluation.

B.     Select individuals who meet the eligibility requirements for deputy trainee, may be invited for a structured oral interview conducted by a minimum of two ranking, sworn officers.

13.    **Civilian Positions:** Once an eligible list has been referred to the Office, the Pre-Employment Services Division will notify the division requesting to fill or promote civilian positions and schedule a time for the eligible individuals to be interviewed by a supervisor from the division. Current Office civilian employee applicants who are in a classified position and accept a new position during a job announcement or promotional recruitment, will become unclassified employees.

A.     It is the interviewer's responsibility to be aware of state and federal law and Maricopa County Merit Rules as they relate to the interviewing process.

B.     The interviewer is responsible for determining the candidate's potential for a job, based on their skill, experience, education, and any other requirements of the position that they seek, and whether they can perform the essential functions of the position with or without reasonable accommodation. The following topic outline is suggested for employment interviews for open competitive positions:

1.     Introduction: Greeting, explaining the structure of the interview, opening question.

2.     Work Experience: Previous jobs or tasks done during other employment, military assignments, and volunteer work.

3.     Education: High school, college, special training.

4.     Summary of Strengths and Shortcomings: Strengths or assets, shortcomings or areas for development.

5.     Position Information: Description of the essential functions of the position. The job description

should be focused on the tasks, not the methods for performing the tasks. The possibility of alternative ways to perform the tasks should be left open. Only the "essential functions" of the job should be included, while noting other tasks, not considered essential, that an individual may be asked to perform on occasion. Only those job qualifications, such as educational level or job skills, which relate directly to the performance of the essential job function, should be specified. After the essential tasks to be performed on the job have been discussed, the individual shall be asked:

    a.    "Can you perform the essential tasks described with or without a reasonable accommodation?"

    b.    No other discussion which may identify a disability or medical condition is permitted.

    c.    If a disability or medical condition is voluntarily disclosed by the candidate during the interview process, it shall not be considered when determining whether or not to advance the candidate to the next phase of the selection process. Only job-related criteria may be utilized to make any hiring decisions. If a candidate indicates that a reasonable accommodation is needed to perform any of the essential tasks, the interviewer(s) should make note of the request and advise the Pre-Employment Services Division of the request made by the candidate, after the conclusion of the interview.

6.    Office Information: Information about current Office benefits, salary, history, and operation. Interviewers should refrain from discussing pay rates other than to indicate that the salary offered will be within the posted salary range and based upon prior experience, internal equity, and budgetary consideration.

7.    Candidate's Questions: The candidate should be allowed to ask questions.

8.    Parting: No commitments will be made at this time. The supervisor is required to document the findings of the interview on forms provided by the Pre-Employment Services Division.

14.    **Requesting Medical Information:** Some positions require a post-offer medical examination and/or psychological evaluation, which is coordinated by the Pre-Employment Services Division.

    A.    The medical examination shall be conducted by qualified and licensed vendors under contract to the Maricopa County Office of Procurement Services, certifying the individual's ability to perform the essential functions of the position, as outlined in the job description. The examination may also include a drug screening.

    B.    All psychological evaluations and assessments shall be conducted by qualified licensed vendors under contract with the Maricopa County Officer of Procurement Services.

    1.    Emotional stability and psychological fitness evaluations shall be conducted on all candidates for deputy sheriff trainee and detention officer recruit. Psychological fitness evaluations may be required for civilian positions, including, but not limited to, Emergency Dispatcher.

    2.    The Pre-Employment Services Division shall maintain a record of the results of emotional stability and psychological fitness evaluations.

    C.    After reviewing the results of the medical examination and, when appropriate, the psychological evaluation, the Human Resources Bureau Chief, or designee, will determine whether the eligible individual, is suitable for hire.

15.    **Interviews Out of Sequence:** Under special circumstances, as determined by either the Human Resource Services Division Commander or the Pre-Employment Services Division Commander, evaluations and interviews conducted by either division may be accomplished out of sequence in order to expedite the employment process. However, polygraph examinations and, psychological and medical evaluations may only be accomplished following a conditional offer of employment, as specified in this Office Policy.

16.    **Selection:** The Office's selection must be from among the candidates listed on the register or eligible list.

17.    **Notification:** Candidates who are unsuccessful may be informed of the specific evaluation, interview, or investigation which they failed. Notification shall be made verbally or by mail, or in any other manner prescribed by the HR Bureau Chief and/or Maricopa County Merit System Rules, if applicable.

18.    **Access to Records:** Access to a candidate's processing materials shall be limited to the Sheriff, or designee, and employees of the Human Resource Services Division, Pre-Employment Services Division and, the Administrative Services Division. All processing materials shall be retained in a secure location when not being processed or reviewed. Record retention schedules shall be in compliance with the Arizona State Department of Library, Archives, and Public Records policies. Records that are no longer required to be retained by law, court order, or other authoritative mandates shall be disposed of by Pre-Employment Services Division personnel.

19.    **Probationary Periods:** All employees occupying a classified position shall serve an initial probationary period. Unclassified employees do not serve a probationary period as they are at-will employees and are not covered by the Maricopa County Employee Merit System Rules, as specified in Office Policy GC-11, *Employee Probationary Periods*.

20.    **Rehire Discipline History:** When a former employee, not subject to the provisions of Arizona Administrative Code R13-4-109 (Denial, Revocation, Suspension, or Cancellation of Peace Officer Certified Status), or has not previously received a sustained allegation of a Category 6 or Category 7 offense, is rehired, whether in a full time or reserve deputy status, their past discipline history shall be considered during the hiring process, and during the course of their current employment as follows:

    A.    If a former employee is rehired, the employees past discipline history shall continue to be considered for any future promotions throughout the course of employment, as specified in this Office Policy.

    B.    If a former employee is rehired, the employees past discipline history shall continue to be considered for any future discipline during the time frame of the most current sustained offense, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

    C.    If a former employee is rehired, the employees past discipline history shall continue to be considered for any future transfers during the time frame of the most current sustained offense, as specified in this Office Policy.

    D.    If a former employee is rehired, the employees past discipline history shall be considered in future assignments as a Training Division Instructor or Field Training Officer during the time frames of the most current sustained offense, as specified in Office Policy, GG-1, *Peace Officer Training Administration* and GG-2, *Detention / Civilian Training Administration*.

1  ADEL ALLISTER
   MARICOPACOUNTY ATTORNEY
2

3  By:    SHERLE R. FLAGGMAN (019079)
          MAXINE S. MAK (031158)
4         Deputy County Attorneys
          flaggmas@mcao.maricopa.gov
5         makm@mcao.maricopa.gov

6
   CIVIL SERVICES DIVISION
7  225 West Madison Street
   Phoenix, Arizona 85003
8  Telephone (602) 506-8541
   Facsimile (602) 506-4317
9  ca-civilmailbox@mcao.maricopa.gov
   MCAO Firm No. 00032000
10

11 *Attorneys for Defendants Maricopa County*
   *& Maricopa County Sheriff's Office*
12

13         **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

14              **IN AND FOR THE COUNTY OF MARICOPA**

15

16 | Kayla Melton, surviving wife of Pedro Colazo-Villa, and on behalf of Pedro Agustin Colazon, Isaac Colazo, Alisco Ofelia Jalisciense Colazo-Villa and Vincent Aylan Colazo, surviving children of Pedro Colazo-Villa, | No. CV2020-005416 |

17

18 **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiffs,

20 v.

(Honorable Christopher Coury)

21
   Maricopa County, a political subdivision of the
22 State of Arizona; John and Jane Does 1
   through 10; Black and White Companies I
23 through X;

24
                    Defendants.
25

26

27     Defendants submit their Reply in support of their Motion to Dismiss.

28

1.     **Plaintiff has failed to state a claim against the Maricopa County Sheriff's Office because it is a non-jural entity which cannot be sued.**  At 5:6 of her Response, Plaintiff correctly points out that Defense Counsel contacted Plaintiff's Counsel to advise that "Sheriff Paul Penzone is the proper Defendant."  That is accurate. Notwithstanding that communique to counsel, and notwithstanding the applicable case law, "Plaintiffs amended their Complaint to add the Maricopa County Sheriff's Office (MCSO) as a defendant in response to counsel's communications." (Response at 5:11) Plaintiff erred in naming MCSO. As pointed out in Defendants' Motion, MCSO may not be sued because it is a non-jural entity. *Braillard v. Maricopa County*, 224 Ariz. 481, 232 P.3d 1263 (Ariz. Ct. App. 2010). MCSO is not interchangeable with Sheriff Penzone, and Plaintiff's counsel failure to appreciate the distinction does not alter the fact that MCSO cannot be sued because it is non-jural. Accordingly, Plaintiff's FAC fails to state a claim against MCSO and MCSO must be dismissed from this action.

2.     **Plaintiff has failed to state a claim against Maricopa County for the actions of the Sheriff's deputies.** Under a theory of *respondeat superior,* an employer may be liable for the negligence of its employee when, 'with respect to the physical conduct of the employee and the performance of his service, he is subject to the employer's control or right of control.'" *Myers v. City of Tempe,* 212 Ariz. 128, ¶ 16 (2006). *See also,* Restatement (Third) of Agency §7.07(1) (2006). The authority of a county is limited to those powers expressly, or by necessary implication, given by the state constitution or statutes. *Home Builders Ass'n of Cent. Ariz. v. City of Maricopa,* 215 Ariz. 146, ¶ 5 (App. 2007). When examining whether the employee's  actions are within the "scope of employment" in the tort context, courts look at the employer's control or right to control the employee's activity at the time of the tortious conduct and if the employee was acting in furtherance of the employer's business. *Engler v. Gulf Interstate*

*Engr., Inc.*, 227 Ariz. 486, 491 (2011); *Fridena v. Maricopa County*, 18 Ariz. App. 527, 530 (1972).

In *Fridena*, the Court of Appeals held that Maricopa County could not be held liable under *respondeat superior* for the tortious conduct of sheriffs or their deputies because it did not have a right of control over the service of the writ of restitution. While no Arizona precedent suggests anything to the contrary, similar results have been reached in cases decided by both the Arizona Court of Appeals and the United States District Court for the District of Arizona. *See e.g., Dimmig v. Pima Cty.,* No. 2 CA-CV 2009-0060, 2009 WL 3465744, at *1 (Ariz. Ct. App. Oct. 27, 2009) ("[F]ollowing the analysis in *Fridena*, Pima County cannot be liable under the doctrine of respondeat superior for actions in furtherance of the Sheriff's exercise of his statutory powers to preserve the peace and make arrests."); *Kloberdanz v. Arpaio,* No. 2:13-CV-02182-JWS, 2014 WL 309078, at *4 (D. Ariz. Jan. 28, 2014) ("Here, the actions of the deputies were committed in furtherance of the sheriff's exercise of his statutory duties to preserve the peace and make arrests. Thus, . . . based on *Fridena*, the County cannot be liable for their actions under the doctrine of *respondeat superior*."); *Hernandez v. Maricopa County,* 138 Ariz. 143, 146, 673 P.2d 341, 344 (App. 1983) ("The duties of Justice of the Peace Phares who is an elected official are imposed by the Arizona Constitution and by statutes. … Maricopa County has no power to control the implementation and execution of those duties. There is, therefore, no master-servant or principal-agent relationship between these separate branches of government. Consequently, the doctrine of *respondeat superior* cannot be invoked to impute liability to Maricopa County for the acts of Justice of the Peace Phares and his staff.") (internal citations omitted); *Hounshell v. White*, 220 Ariz. 1, 3-4, ¶¶ 10-15 (App. 2008) (holding that the County is not the employer of the Sheriff's deputies and has no authority to hire, fire or discipline such employees).

Plaintiffs' position seeking to hold the County liable for the actions of Sheriff's deputies is contrary to the law and was specifically rejected by the holding in *Fridena*, which remains controlling law in the state of Arizona. The Sheriff, a publicly elected official, controls his office, is responsible for the acts or omissions of his deputies taken in the course and scope of their employment, and is the proper party defendant when a plaintiff seeks vicarious liability under state law for actions or omissions of Sheriff's deputies. Because all actions and omissions alleged in the Complaint are those of the Sheriff or his deputies, Maricopa County is not a proper defendant in this case. Therefore, Maricopa County must be dismissed from this action.

**3.** **Plaintiff's First Amended Complaint fails to state a claim for relief under A.R.S. §§ 13-409 and 13-410.** Plaintiff errs at 7:1 of her Response when she asserts that that Defendants have failed to provide authority establishing that A.R.S. §§ 13-409 and 13-410 do not give rise to a cause of action. *Ryan v. Napier*, 245 Ariz. 54, 62, ¶ 34 (2018) makes clear that these statutes establish defenses to intentional tort claims. Plaintiff not only fails to cite any authority for her claim that these justification statutes give rise to a cause of action, but she also fails to explain what the Arizona Supreme Court could otherwise have meant in *Ryan* when it held that "Section 13-409 provides a justification defense for law enforcement officers who use physical force." *Ryan*, 245 Ariz. at 62. Instead of citing any authority to support her position, Plaintiff continues to argue at 7:3 that she has properly pled a claim and that Defendants cannot argue to the contrary. Plaintiff's position is not supported by the law; her allegations based on A.R.S. §§ 13-409 and 13-410 fail to state a claim, and they must be dismissed.

**4.** **Plaintiff's First Amended Complaint fails to state a claim for the negligent use of force.** Rather than cherry picking language from *Napier* to support her negligence allegation, Plaintiff would have been better served reading the entire case

because it makes clear that no negligence cause of action exists for the deputies' intentional decision to shoot. *Napier* at 61. Case law establishes that battery is the only common law tort claim applicable to an intentional shooting case, but Plaintiff has failed to allege a claim for battery.

*Napier* and its progeny establish that negligent use of intentionally inflicted force is not a cognizable claim; therefore, Plaintiff's negligence allegations fail to state a claim and must be dismissed.

**5.  Plaintiff's First Amended Complaint fails to state a claim for negligence *per se*.**  Plaintiff's Response misses the mark in arguing about negligence *per se;* rather than acknowledging her pleading error, she skirts the issue by regurgitating the standard for such a claim even though it has no applicability here. Plaintiff's error is plain; the justification statutes upon which she relies are not public safety statutes and no independent (negligence) or derivative (negligence *per se*) cause of action arises from them.  Plaintiff has failed to state a claim for negligence *per se* and Count III of her First Amended Complaint must be dismissed.

**6.  Plaintiff's First Amended Complaint fails to state a claim for wrongful death.**  Plaintiff fails to cite case law that supports her argument that she has stated a wrongful death claim under the facts alleged; instead, she again tries to support her position by digging in her heels and making an argument tantamount to "because I said so." Based upon *Napier*, Plaintiff's allegation of wrongful death fails to state a claim for relief and must be dismissed.

**7.  Conclusion.**  Plaintiff's First Amended Complaint fails to state a claim for relief because: (1) MCSO is a non-jural entity and cannot be sued; (2) Maricopa County cannot be vicariously liable for the actions of MCSO deputies; (3) no cause of action arises from the Arizona justification/defense statutes; (4) Arizona does not recognize a tort

of negligent use of excessive or unreasonable force; (5) Plaintiff has failed to state a claim for negligence *per se;* (6) a wrongful death allegation fails to state a claim for relief in the context of alleged excessive or unreasonable force.

Based upon the foregoing, Plaintiff's First Amended Complaint must be dismissed.

**RESPECTFULLY SUBMITTED** this 13th day of November 2020.

ALLISTER ADEL
MARICOPACOUNTY ATTORNEY

BY: /s/ *Sherle R. Flaggman*
SHERLE R. FLAGGMAN
MAXINE S. MAK
Deputy County Attorneys
*Attorneys for Defendants Maricopa*
*County & Maricopa County Sheriff's*
*Office*

CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the TurboCourt System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Honorable Christopher Coury
Maricopa County Superior Court
East Court Building-914
101 W. Jefferson Street
Phoenix, AZ 85003

David Degnan, Esq.
Mark W. Horne, Esq.
DEGNAN LAW GROUP
4105 N. 20th St., Ste. 220
Phoenix, AZ 85016
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiff*

/s/ *R. Scott*

S:\CIVIL\CIV\Matters\CJ\2019\Melton v. Penzone CJ2019 0134\Pleadings\Reply to MTD.docx

1  ADEL ALLISTER
   MARICOPACOUNTY ATTORNEY
2

3  By:    SHERLE R. FLAGGMAN (019079)
          MAXINE S. MAK (031158)
4         Deputy County Attorneys
          flaggmas@mcao.maricopa.gov
5         makm@mcao.maricopa.gov

6
   CIVIL SERVICES DIVISION
7  225 West Madison Street
   Phoenix, Arizona 85003
8  Telephone (602) 506-8541
   Facsimile (602) 506-4317
9  ca-civilmailbox@mcao.maricopa.gov
   MCAO Firm No. 00032000
10

11 *Attorneys for Defendant Maricopa County*

12

13       **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

14          **IN AND FOR THE COUNTY OF MARICOPA**

15
   Kayla Melton, surviving wife of Pedro Colazo-     No. CV2020-005416
16 Villa, and on behalf of Pedro Agustin Colazon,
   Isaac Colazo, Alisco Ofelia Jalisciense Colazo-   **DEFENDANT'S RESPONSE TO**
17 Villa and Vincent Aylan Colazo, surviving         **PLAINTIFFS' MOTION FOR**
   children of Pedro Colazo-Villa,                   **LEAVE TO FILE SECOND**
18                                                   **AMENDED COMPLAINT**

19                   Plaintiffs,
                                                     (Honorable Christopher Coury)
20 v.

21 Maricopa County, a political subdivision of the
   State of Arizona; John and Jane Does 1
22 through 10; Black and White Companies I
   through X;
23

24                   Defendants.

25
          Defendant responds in opposition to Plaintiffs' Motion for Leave to File Second
26
   Amended Complaint. While Defendant agrees that leave to amend should be freely
27
   granted, leave to amend should not be granted when doing so would be, as is the case
28

                                       1

here, futile. *See Tumacacori Mission Land Dev. Ltd. V. Union Pac. R. Co.,* 231 Ariz. 517, 520 ¶12 (App. 2013); *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 597, 826 P.2d 1217, 1223 (App. 1991) (upholding denial of a request for leave to amend because the new claim would not survive summary judgment).

Here, Plaintiff provides a proposed Second Amended Complaint which continues to include Counts 1, 2, 3 and 4 of her First Amended Complaint; these counts are the subject of a pending Motion to Dismiss, but rather than correcting the deficiencies in her First Amended Complaint, Plaintiff repackages them into her proposed Second Amended Complaint which is designed only to add new federal law claims. Defendant incorporates by reference its Motion to Dismiss the First Amended Complaint and Reply to same regarding the allegations Plaintiff has regurgitated and repackaged Counts 1-4 of her proposed Second Amended Complaint. It would be futile to allow Plaintiff to file a Second Amended Complaint only to have Defendant file another Motion to Dismiss the same defective allegations. Until Plaintiff cures the defects in her First Amended Complaint, the Court should deny leave for Plaintiff to file another amended pleading that contains the same fatal errors.

Plaintiff's proposed Second Amended Complaint contains new allegations that fail to state a claim for relief. The new allegations would also be subject to a Motion to Dismiss, thus again rendering moot the proposed Second Amended Complaint. In the revised Count Four, for example, Plaintiff includes a hodgepodge of theories alleged to be based upon the United States Constitution (¶52 and ¶57 allege Fourth Amendment theories; (¶53 and ¶57 allege Fourteenth Amendment theories; ¶54 and ¶56 allege Eighth Amendment theories; ¶55 alleges substantive due process theories). Plaintiff's Fourteenth Amendment substantive due process claims fail to state a claim for relief because the specific provisions of the Fourth Amendment apply to her claims. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or

other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"). The alleged Fourteenth Amendment allegations are futile, fail to state a claim, and would be subject to dismissal were Plaintiff's motion to be granted.

Plaintiff has added a claim for joint and several liability in ¶58 of her proposed Second Amended Complaint; joint and several liability has been abandoned for claims arising under 42 U.S.C. §1983; *see Monell v. Dep't of Soc. Services of City of New York, 436 U.S. 658, 692, (1978)* ("Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent.") and has also been abandoned in Arizona; *see* A.R.S. § 12-2506.

In ¶59 of her proposed Second Amended Complaint, Plaintiff refers to County customs and policies, but she fails to properly allege a claim under *Monell* for policies and customs that cause a constitutional violation. General allegations are insufficient to state a *Monell* policy claim. *See Herd v. Cty. of San Bernardino*, 311 F. Supp. 3d 1157, 1167 (C.D. Cal. 2018) ("[a]llegations of *Monell* liability will be sufficient for purposes of Rule 12(b)(6) where they: (1) identify the challenged policy/custom; (2) explain how the policy/custom is deficient; (3) explain how the policy/custom caused the plaintiff harm; and (4) reflect how the policy/custom amounted to deliberate indifference, i.e. show how the deficiency involved was obvious and the constitutional injury was likely to occur.") Municipal liability may attach where evidence of "widespread practice . . . is so permanent is well settled as to constitute a 'custom or usage' with the force of law," *Gillette v. Delmore*, 979 F.2d 1342, 1348-49 (9th Cir. 1992) (internal quotations omitted). But Plaintiff fails to include such allegations or the requisite level of specificity in her proposed Second Amended Complaint. Moreover, a *Monell* claim may not be based on "a single constitutional deprivation, a random act, or an isolated event." *Castro v. County of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015). Rather than pointing out a widespread

pattern of conduct, Plaintiff has failed to allege anything more than an isolated event allegedly resulting in her husband's death. Because the allegations of the proposed Second Amended Complaint are insufficient to state a claim under *Monell*, permitting the proposed amendment will be futile and should be denied.

Notwithstanding the mismatched assortment of allegations, Plaintiff persists in incorrectly alleging a tort-based wrongful death claim in Count Four of her proposed Second Amended Complaint. For the reasons set forth in Defendant's Motion to Dismiss, the tort-based claim is not cognizable under the facts of this case. The proposed amendment will be subject to dismissal and should therefore be denied as futile.

Count Five of Plaintiff's Proposed Second Amended Complaint is deficient in several particulars. First, it again improperly alleges joint and several liability in ¶74 "They are therefore liable for the injuries and damages resulting from the unreasonable force of each other officer." As set forth above, State and Federal law have abandoned joint and several liability. The allegation renders the proposed amendment moribund and it should be denied as futile. Moreover, at ¶78 of her proposed Second Amended Complaint, Plaintiff refers to municipal customs and policies, which, without specific allegations required under *Monell* and its progeny as set forth above, are not sufficient to state a claim for relief. Among other deficiencies, Plaintiff has not alleged a widespread practice that can be considered a policy or custom. Liability under *Monell* "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), cert. denied, 520 U.S. 1117, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997). In addition, although Plaintiff alleges that excessive force violated decedent's rights under the Fourth and Fourteenth Amendments to the Constitution, a claim that law enforcement officers used excessive or deadly force is examined only under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 389, 395 (1989) The proposed

amendment is thus improper and deficient in many ways and will be subject to a motion to dismiss. The amendment is futile and Plaintiff's motion for leave to amend should be denied.

Plaintiff fails to state a claim for relief in Count Six of her proposed Second Amended Complaint; permitting the amendment would be futile and should be denied. In Count Six, Plaintiff alleges an Eighth Amendment violation based upon an alleged failure to provide medical care to the decedent (*see* ¶¶ 85, 86); however, such a claim does not arise under the Eighth Amendment. Rather, the Supreme Court has held the Due Process Clause of the Fourteenth Amendment requires the provision of medical care to "persons ... who have been injured while being apprehended by the police." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983)); *Simmons v. Navajo County, Az.*, 609 F.3d 1011, 1017 (9th Cir. 2010). And, the Fourth Amendment applies to claims of failure to provide medical care from arrest up until the time the arrestee is in custody, while the Fourteenth Amendment governs treatment of pre-trial detainees during the period of confinement after an arrestee is in custody. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019); *Tatum*, 441 F.3d at 1098-99; *Torres v. City of Madera*, 524 F.3d 1053, 1056 (9th Cir. 2008) (quoting *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985)). And to state a claim for denial of medical care under § 1983, a plaintiff must show: (1) "a serious medical need by demonstrating that the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) that "the defendant's response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). Plaintiff's proposed Second Amended Complaint errs in its Eighth Amendment allegations and fails to plead with specificity the elements of a claim for the denial of medical care. The proposed amendment is deficient

in these requirements and permitting it to be filed would be futile.[1]

Count Seven of Plaintiff's proposed Second Amended Complaint is likewise deficient. It improperly and without the requisite level of specificity alleges a *Monell* policy claim (¶106), and it also improperly alleges joint and several liability (¶102). Because the proposed amendment would be subject to a motion to dismiss, granting leave to amend would be futile. Plaintiff's motion should be denied.

Plaintiff's proposed Second Amended Complaint is defective and will be subject to dismissal if leave to file it is granted. While leave to amend should be granted, it need not be permitted if doing so would be futile. Plaintiff's motion should be denied.

**RESPECTFULLY SUBMITTED** this 13th day of November 2020.

ALLISTER ADEL
MARICOPACOUNTY ATTORNEY

BY: /s/ Sherle R. Flaggman
SHERLE R. FLAGGMAN
MAXINE S. MAK
Deputy County Attorneys
*Attorneys for Defendant Maricopa County*

CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the TurboCourt System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Honorable Christopher Coury
Maricopa County Superior Court
East Court Building-914
101 W. Jefferson Street
Phoenix, AZ 85003

---

[1] Count Six is also defective for the same reasons the previous allegations are defective with claims of joint and several liability and improperly alleged *Monell* claims based upon municipal policies, procedures, or customs.

David Degnan, Esq.
Mark W. Horne, Esq.
DEGNAN LAW GROUP
4105 N. 20th St., Ste. 220
Phoenix, AZ 85016
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

/s/ R. Scott

S:\CIVIL\CIV\Matters\CJ\2019\Melton v. Penzone CJ2019 0134\Pleadings\Response to Motion for Lv to File SAC.docx

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-005416                                          11/19/2020


                                               CLERK OF THE COURT
HONORABLE CHRISTOPHER COURY              L. Stogsdill
                                                       Deputy


KAYLA MELTON                             MARK W HORNE

v.

MARICOPA COUNTY, et al.                  SHERLE R FLAGGMAN




MINUTE ENTRY


        The Court wishes to disclose counsel that Steve Chucri, is a member of the Board of
Maricopa County Supervisors, and is his cousin.

        Accordingly, if any counsel has an issue with this disclosure and would prefer that the
Court recuse from this matter,

        **IT IS ORDERED** that counsel shall file a notice with the Court no later than **November
30, 2020.**

**DEGNAN LAW GROUP**
David Degnan (AZ SBN 027422)
Mark W. Horne (AZ SBN 029449)
4105 N. 20th Street, Suite 220
Phoenix, Arizona 85016
(602) 266-0531
d.degnan@degnanlawaz.com
m.horne@degnanlawaz.com
*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| KAYLA MELTON, surviving wife of PEDRO COLAZO-VILLA, and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, ALISCO OFELIA JALISCIENSE COLAZO-VILLA and VINCENT AYLAN COLAZO, surviving children of PEDRO COLAZO-VILLA, <br><br> Plaintiffs, <br><br> vs. <br><br> MARICOPA COUNTY, a political subdivision of the State of Arizona; MARICOPA COUNTY SHERIFF'S OFFICE; JOHN and JANE DOES 1 through 10; BLACK and WHITE COMPANIES I through X; <br><br> Defendants. | No. CV2020-005416 <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** <br><br> (*Assigned to the Honorable Christopher Coury*) |

Plaintiffs KAYLA MELTON, as surviving wife and on behalf of PEDRO AGUSTIN COLAZO, ISAAC COLAZO, VINCENT AYLAN COLAZO and ALISCO OFELIA JALISCIENSE COLAZO-VILLA, as surviving children of PEDRO COLAZO-VILLA (collectively "Plaintiffs" or "Claimants"), by and through undersigned counsel, submit the following as their Reply In Support of Motion for Leave to File Second Amended Complaint

1

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

(the "SAC").

As a preliminary matter, Defendants do not allege that Plaintiffs are engaging in undue delay, bad faith, or dilatory motive. Defendants also do not claim that they would be unduly prejudiced by the amendment. Instead, Defendants only claim that the proposed amendment would be futile.

**<u>Granting Plaintiffs leave to amend would not be futile.</u>**

In their Response to Plaintiffs' Motion for Leave to File Second Amended Complaint (the "Response"), Defendants argue that granting leave would be futile [Response at 1-2.] Defendants cite two cases to support their argument that leave should not be granted when doing so would be futile, both of which are easily distinguishable. First, the *Tumacacori* case involved a motion to amend filed *after* summary judgment had already been granted and affirmed. *Tumacacori Mission Land Dev. Ltd. v. Union Pac. R. Co.*, 231 Ariz. 517, 520 ¶ 12 (Ct. App. 2013). In that case, the Court held that amending the complaint would be futile because the claims were precluded by res judicata. *Id*. Here, the amended claims included in the SAC are not subject to res judicata, and thus amending the complaint would not be futile. In the *Walls* case, the Court determined that a new claim for gross negligence would be futile because the trial court had already decided the issue of gross negligence in its granting of summary judgment. *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 597, 826 P.2d 1217, 1223 (Ct. App. 1991). Here, the court has not decided on any motions for summary judgment, and has not yet decided on Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. Without such a ruling, Defendants cannot say that amending the complaint would be futile in light of *Walls*.

Defendants argue that "Plaintiff's Fourteenth Amendment substantive due process claims fail to state a claim for relief because the specific provisions of the Fourth Amendment apply to her claims."  But this is a meaningless distinction because the Fourth Amendment,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**made applicable to the states through the Fourteenth Amendment** in *Wolf v. Colorado*, 338 U.S. 25 (1949), states in part that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.  Defendants also misleading cite *Graham v. Connor*, 490 U.S. 386, 395 (1989) for the alleged proposition that any claim that involves the use of deadly force are not analyzed under substantive due process rights."  However, Graham was in case in which the arrestee, who was not killed, brought his own direct claims for the use of deadly force.

To the contrary, the Ninth Circuit in *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) considered the question of whether the "children also plead that the defendants violated their personal 'rights not to be deprived of the life of their father and not to be deprived of his love, comfort, and support," and concluded "that based on this allegation the children state a claim for violation of their substantive due process rights."  Both the parents and children of a decedent are deprived of their substantive due process rights where they are deprived of their child/father by the government.  *Id.* Thus, the Second Amended Complaint sufficiently states a claim under 1983 for violation of substantive and procedural due process rights under both the Fourth and Fourteenth Amendments.

In regards to *Monell,* Defendants argue that "[r]ather than pointing out a widespread pattern of conduct, Plaintiff has failed to allege anything more than an isolated event allegedly resulting in her husband's death."  However, Plaintiffs specifically allege at Paragraphs 59, 78, 92 and 106 of the SAC that "Defendants were acting pursuant to a municipal/county custom, policy, decision, ordinance, regulation, or practice in their

DEGNANLAW GROUP
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

interactions with Decedent." Defendants have failed to cite any cases on the Rule 12 standard because they directly contradict Defendants' argument. "In *Leatherman v. Tarrant County*, 507 U.S. 163, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993), the Supreme Court unanimously rejected a heightened pleading requirement for federal court § 1983 municipal liability claims*." Id.* "The decision excuses plaintiffs from pleading specific evidentiary facts that they might not be able to obtain prior to discovery due to exclusive municipality control." *Id.* Thus, this Court "must apply pleading standards in a realistic, common-sense fashion that recognizes that at the pleading stage (i.e. prior to discovery occurring) a plaintiff frequently lacks the actual details concerning supervisors' interactions with employees accused of committing constitutional violations." *Id.* at 1227. Plaintiffs are "not required to know such details of the internal operations of the [Maricopa County Sheriff's Office] or police departments prior to discovery." Thus, Plaintiff's have stated a valid *Monell* claim and are not required to state with factual specificity the history of such policy/custom/practice before they are entitled to discovery on the matter.

For example, in *McGrath*, this Court denied a motion to dismiss supervisory claims under 1983 against multiple state defendants where the complaint alleged that such defendants "failed to take sufficient action in terms of training, hiring, retaining and supervision to prevent Defendant Scott from using excessive force against plaintiff." The plaintiff also alleged that the supervisor defendants "were deliberately indifferent, reckless, knew about and acquiesced, gave tacit authorization and/or ratified or condoned the violations …." *Id. "*Taken as a whole, these allegations sufficiently satisfy[ied] Fed. R. Civ. P. 8's notice pleading standard and state a claim for supervisory liability under § 1983 against

each of the State Defendants." *Id. citing Jones v. Williams*, 297 F.3d 930, 927 n. 4 (9th Cir. 2002). In *Lozeman*, the United States Supreme Court found that the plaintiff had alleged a Monell claim where he alleged an "'official municipal policy'" of intimidation." *Lozman*, 138 S. Ct. 1945, 1947-48, 201 L.Ed.2d 342, 345-46 (2018). If that "boilerplate and conclusory allegation" regarding official policy was sufficient then the SAC in this case certainly is.

Defendants argue that "Plaintiff persists in incorrectly alleging a tort-based wrongful death claim in Count Four of her proposed Second Amended Complaint. For the reasons set forth in Defendant's Motion to Dismiss, the tort-based claim is not cognizable under the facts of this case." "Based upon *Napier*, Plaintiff's allegation of wrongful death fails to state a claim for relief and must be dismissed." Motion to Dismiss at 7: 2-3. However, *Napier* is entirely premised on Arizona's statute A.R.S. § 12-820.05(B), which makes the State immune for intentional acts of its agents. *E.g. Ryan v. Napier*, 245 Ariz. 54, 61, 425 P.3d 230, 237 (2018) ("First, a public entity, like the Pima County Sheriff's Office, is immune from liability for damages caused by an employee's felony act unless the entity knew of the employee's propensity to commit such acts. See A.R.S. § 12-820.05(B)."). According to Napier, therefore, "the applicability of [state] legislatively mandated immunity, insurance, and evidentiary presumption provisions should not depend on clever pleading." *Id.* **However, the state immunity provisions in A.R.S. § 12-820.05(B) et al. do not apply to federal 1983 claims**, as mandated by basic principles that federal law supersedes state law. *E.g. Haywood v. Drown*, 556 U.S. 729, 771, 129 S. Ct. 2108, 2135, 173 L.Ed.2d 920, 951 (2009) ("**States may not add immunity defenses to § 1983**.") (*citing Haywood v. Drown*,

556 U.S. 729, 736-37, 129 S. Ct. 2108, 2115, 173 L.Ed.2d 920, 929 (2009) (explaining that "a Florida school board could [not] assert a state-law immunity defense in a § 1983 action brought in state court.").

Thus, neither A.R.S. § 12-820.05(B) nor the principles set forth in Napier apply to Plaintiffs' 1983 claims, and Plaintiffs have thus stated claims for wrongful death. *E.g. Rose v. Los Angeles*, 814 F. Supp. 878, 881 (C.D. Cal. 1993) (*citing See Kelson v City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985) ("Numerous courts, including the Ninth Circuit have allowed parents to assert § 1983 constitutional claims based upon the wrongful deaths of their children, typically by law enforcement officers."). "These decisions reason that parents have a due process right to raise their children and that this right is extinguished by the wrongful death of a child." *Id.*

## CONCLUSION

Plaintiffs respectfully request that the Court grant leave to amend their Amended Complaint, and allow the Plaintiffs ten (10) days from entry of the order granting this Motion to file and serve the Second Amended Complaint. The Defendants arguments as set forth in their Response are more appropriate for consideration on a Motion for Summary Judgment, after Plaintiffs have had the opportunity to perform discovery.

**RESPECTFULLY SUBMITTED** this 30th day of November, 2020.

**DEGNAN LAW GROUP**

/s/ *Mark W. Horne*
David Degnan, Esq.
Mark W. Horne, Esq.
*Attorneys for Plaintiffs*

ORIGINAL of the foregoing e-filed
this 30th day of November, 2020, with copy
emailed to:

Sherle R. Flaggman, DCA
Maxine S. Mak, DCA
**Maricopa County Attorney's Office**
*Civil Services Division*
225 W. Madison Street
Phoenix, AZ 85003
flaggmas@mcao.maricopa.gov
makm@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
*Attorneys for Defendants*


/s/ *Kellen Quinn*_____

**DEGNAN LAW GROUP**
4105 N. 20TH STREET, SUITE 220
PHOENIX, ARIZONA 85016

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-005416                                    12/02/2020


                                          CLERK OF THE COURT
HONORABLE CHRISTOPHER COURY                  J. Holguin/C. Mai
                                                  Deputy



KAYLA MELTON                          MARK W HORNE

v.

MARICOPA COUNTY, et al.               SHERLE R FLAGGMAN



                                      JUDGE COURY



                        MINUTE ENTRY


       The Court has reviewed and considered the following:

       A. *Defendants' Motion to Dismiss First Amended Complaint*, filed September 28, 2020;

       B. *Plaintiffs' Response to Defendants' Motion to Dismiss First Amended Complaint*, filed
          October 30, 2020; and

       C. *Defendants' Reply in Support of Motion to Dismiss Plaintiff's First Amended
          Complaint*, filed November 13, 2020.

       Oral argument was not requested and the Court does not believe it would be helpful.

       When reviewing a motion to dismiss for failure to state a claim, allegations in the complaint
that are well-pled are taken as admitted. *Aldabbagh v. Arizona Department of Liquor Licenses &
Control*, 162 Ariz. 415, 417 (App. 1989). In addition to well-pled facts, the Court is entitled to
consider all reasonable interpretations of such facts. *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz.
417, 420 (2008).

CV 2020-005416                                             12/02/2020

**THE COURT FINDS** as follows:

1. The Maricopa County Sheriff's Office (MCSO) is a non-jural entity and cannot be sued. *Braillard v. Maricopa County*, 224 Ariz. 481 (App. 2010).

2. Maricopa County cannot be vicariously liable for the actions of MCSO deputies. *Fridena v. Maricopa* County, 18 Ariz. App. 527, 531 (1972); *Hernandez v. Maricopa County*, 138 Ariz. 143, 146 (App. 1983). As an elected official pursuant to A.R.S. § 11-401, the Maricopa County Sheriff is the proper party defendant when a plaintiff seeks vicarious liability under Arizona law for the actions or omissions of MCSO deputies.

3. A.R.S. § 13-410 does not create a cause of action, nor is this a public safety statute. It is a justification defense. This statute does not support a stand-alone claim, nor does it support an independent negligence or a negligence *per se* claim. Counts I, II and III fail to state claims for relief.

4. Because Plaintiff is seeking leave to amend the claim for wrongful death in a second amended complaint, the Court believes the Motion to Dismiss as to Count IV is moot. It is prudential to consider the allegations of the wrongful death claim as it is re-pled in the Second Amended Complaint. Consequently, without considering the arguments of Defendants as to Count IV at all, the Motion to Dismiss as to Count IV will be denied without prejudice as moot.

Good cause appearing,

**IT IS ORDERED** granting in part *Defendants' Motion to Dismiss First Amended Complaint*, filed September 28, 2020. Counts I, II, and III are dismissed for failing to state a claim upon which relief can be granted.

**IT IS FURTHER ORDERED** denying in part, without prejudice, as moot *Defendants' Motion to Dismiss First Amended Complaint*, filed September 28, 2020 with respect to Count IV. Defendant may move to dismiss this claim, as re-pled, in the Second Amended Complaint, if desired (assuming that leave is granted to allow the filing of the Second Amended Complaint).

**NOTE:** Due to the spread of COVID-19, the Arizona Supreme Court Administrative Order 2020-79 requires all individuals entering a court facility to wear a mask or face covering at all times they are in the court facility. With limited exceptions, the court will not provide masks or face coverings. Therefore, any individual attempting to enter the court facility must have an

CV 2020-005416                                    12/02/2020

appropriate mask or face covering to be allowed entry to the court facility.  Any person who
refuses to wear a mask or face covering as directed will be denied entrance to the court facility or
asked to leave.  In addition, all individuals entering a court facility will be subject to a health
screening protocol.  Any person who does not pass the health screening protocol will be denied
entrance to the court facility.

### SUPERIOR COURT OF ARIZONA
### MARICOPA COUNTY

CV 2020-005416                       12/09/2020

                                      CLERK OF THE COURT
HONORABLE CHRISTOPHER COURY         P. McKinley
                                      Deputy

KAYLA MELTON                          MARK W HORNE

v.

MARICOPA COUNTY                 SHERLE R FLAGGMAN

                                       MAXINE S MAK
                                       DAVID W DEGNAN
                                       JUDGE COURY

### ORDER

The Court has reviewed and considered the following:

A. Plaintiffs' *Motion for Leave to File Second Amended Complaint*, filed October 30, 2020, together with all exhibits thereto;

B. *Defendant's Response to Plaintiffs' Motion for Leave to File Second Amended Complaint,* filed November 13, 2020; and

C. *Plaintiffs' Reply in Support of Motion for Leave to File Second Amended Complaint*, filed November 30, 2020.

Oral argument was not requested and this Court does not believe it would be helpful.

Under Arizona law, leave to amend a complaint "shall be freely given when justice requires." Rule 15(a), *Arizona Rules of Civil Procedure*. Unless futile, a motion to amend should

be granted; an amendment is futile when claims proposed to be added fail to state a claim upon which relief can be granted. *Spitz v. Bache & Co., Inc.,* 122 Ariz. 530, 531 (1979).

**THE COURT FINDS** as follows:

1. Plaintiffs seek leave to file a 7-count Second Amended Complaint.

2. The Court has already addressed the deficiencies in identically-pled Counts I, II, and III of the First Amended Complaint. [*See* Minute Entry dated December 4, 2020.] The Court ruled that Counts I, II and III failed to state a claim for relief. Consequently, allowing leave for Plaintiff to file these amended claims in a Second Amended Complaint would be futile.

3. Count IV of the Second Amended Complaint fails to state a claim for multiple reasons:

   a. Because the negligent use of intentionally inflicted force is not a cognizable claim under Arizona law, a wrongful death claim predicated upon the use of such force also is not cognizable under Arizona law. *Ryan v. Napier*, 245 Ariz. 54 (2018).

   b. No claim for joint and several liability exists under state or federal law. A.R.S. § 12-2506; *Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658, 692 (1978).

   c. Paragraphs 53 and 54 of the Second Amended Complaint fail to state claims for relief. Claims that law enforcement officers have used excessive force in the course of an investigatory stop, arrest or other seizure, are analyzed under the Fourth Amendment of the United States Constitution, not the Fourteenth Amendment or Eighth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

   d. To the extent that Plaintiffs' wrongful death claim is predicated on the failure to comply with customs and policies, such a claim must be pled so as to identify and comply with the requirements of *Monell, See Herd v. City of San Bernardino*, 311 F. Supp. 3d 1157, 1167 (C.D. Cal. 2018). Additionally, a *Monell* claim may not be predicated on a single constitutional deprivation, a random act, or an isolated event. *Castro v. County of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015).

4. Count V of the Second Amended Complaint fails to state a claim for relief. To the extent that Count V fails to allege a claim under *Monell* and attempts to assert that the Fourteenth Amendment analysis controls the claim, it does not state a claim. Such a claim can be asserted under the Fourth Amendment, as stated *supra.*, provided that the claim is adequately pled.

5. Count VI of the Second Amended Complaint fails to state a claim for relief. A claim alleging a failure to provide medical care does not arise under the Eighth Amendment. Rather, such a claim arises under the Due Process Clause of the Fourteenth Amendment for the failure to provide care while being apprehended by the police and for treatment of pre-trial detainees. And, such a claim arises under the Fourth Amendment for the failure to provide medical care from arrest until the time the arrestee is in custody. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019). Additionally, to state a § 1983 claim for denial of medical care, Plaintiffs must plead the requisite elements of this claim, as set forth in *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).

6. Count VII fails to state a claim because it does not contain the required specificity as required by *Monell*. To the extent that Count VII alleges joint and several liability, it also fails to state a claim.

7. Allowing this case to proceed with Counts IV, V, VI and VII of the Second Amended Complaint would be futile.

8. The Court cannot say, however, that Plaintiffs absolutely are unable to plead adequate claims. Consequently, the Court believes Plaintiffs should be afforded another opportunity to amend their Complaint.

Good cause appearing,

**IT IS ORDERED** denying Plaintiffs' *Motion for Leave to File Second Amended Complaint*, filed October 30, 2020.

**IT IS FURTHER ORDERED** granting Plaintiffs leave to file a Third Amended Complaint on or before January 8, 2021. Plaintiffs' allegations in the Third Amended Complaint shall correct the pleading deficiencies identified herein and in this Court's Minute Entry dated December 4, 2020.

**LET THE RECORD REFLECT** that the Third Amended Complaint shall not contain claims that do not exist under applicable law. Rather, the Third Amended Complaint may contain

CV 2020-005416                                        12/09/2020

only those claims that are recognized, and shall be properly pled.  Surplus allegations asserting theories that have been rejected shall not be contained in the Third Amended Complaint; an adequate record of the Court's ruling on such theories presently exists for purposes of appeal.

# Attachment 6

Verification of Sherle R. Flaggman

## VERIFICATION OF SHERLE R. FLAGGMAN

STATE OF ARIZONA    )
                     ) ss.
County of Maricopa    )

      I, Sherle R. Flaggman, Deputy County Attorney declare under penalty of perjury that true and complete copies of all pleadings and other documents filed in *Melton v. Maricopa County, et. al.,* Maricopa County Superior Court No. CV2020-005416 have been filed with the Notice of Removal.

DATED this 22nd day of January 2021.

Sherle R. Flaggman
Deputy County Attorney